David **MARTINEZ**, TDCJ No. 999173, Petitioner,

v.

Douglas **DRETKE**, Director, Texas Department of Criminal Justice, Correctional Institutions Division, Respondent.

No. SA–03–CA–665–FB.

United States District Court, W.D. Texas, San Antonio Division.

March 29, 2006.

410

David Martinez, Livingston, TX, pro se.

Anne More Burnham, The Law Offices of Ann Burnham, San Antonio, TX, Nancy Blair Barohn, Attorney at Law, Kansas City, MO, for Petitioner.

Fredericka Sargent, Austin, TX, for Respondent.

### MEMORANDUM OPINION AND ORDER DENYING RELIEF

BIERY, District Judge.

Petitioner David Martinez filed this federal habeas corpus action pursuant to Title 28 U.S.C. Section 2254 challenging his October, 1995, Bexar County capital murder conviction and sentence of death. For the reasons set forth below, petitioner is entitled to neither federal habeas corpus relief nor a Certificate of Appealability from this Court.

### I. Statement of the Case

A. *The Crime and Its Immediate Aftermath*

Late on the evening of July 10, 1994, 11–year–old Belinda Prado lay down to watch

television on the living room couch of the home she shared with her mother Carolina and her 14–year–old brother Eric.[1] Eric fell asleep on a.mattress on the floor in the living room while Carolina slept in her bedroom.[2] Later that night, the petitioner, who had been staying with Carolina, and another man whom Belinda had never seen before came to her home.[3] The other man left after 15–20 minutes and Belinda saw the petitioner go to her mother's bedroom.[4] Early on the morning of July 11, 1994, Belinda awoke to the sound of a baseball bat striking something in the living room.[5] Belinda saw the petitioner, who was dressed only in a pair of boxer shorts, repeatedly strike Eric in the head with a baseball bat.[6] Belinda saw blood flying as petitioner beat Eric with the bat.[7] When Belinda asked petitioner "to behave," petitioner told her to be quiet or he would kill her, too.[8] Fearful for her life, Belinda asked where her mother was and petitioner replied Carolina was in the shower.[9] When Belinda looked in the bathroom, however, she did not see her mother there.[10]

Petitioner forced Belinda into Eric's bedroom at knife-point and tied her to the bed.[11] Petitioner was dressed in a white shirt, a pair of black pants, a leather vest Belinda recognized as belonging to her uncle, and a pair of boots.[12] Before leaving the house, petitioner gave Belinda a handwritten note and directed her to take the note to her grandmother, who lived a short distance down the street.[13] Petitioner's handwritten note, which was admitted into evidence at petitioner's trial, read "I messed up. I'LL Be at the Friends on the EAst side." [14] Still fearful for her life, Belinda waited several minutes after petitioner left the house before she took his note to her grandparents' home.[15] Belinda gave her grandmother petitioner's note and accompanied her grandparents back to her home, where she learned her mother was dead in her bedroom.[16]

Carolina Prado's mother, Rosa Ramirez, testified at petitioner's trial as follows: (1) she first met petitioner in June, 1994, when Carolina introduced petitioner to her and informed her mother she and petition-

1. Statement of Facts from petitioner's trial (henceforth "S.F. Trial"), Volume 17, testimony of Belinda Prado, at pp. 2455–61.

2. S.F. Trial, Volume 17, testimony of Belinda Prado, at pp. 2461–63.

3. *Id.* at pp. 2458–60 & 2463–64.

4. *Id.* at pp. 2464–65.

5. *Id.* at p. 2466.

6. *Id.* at pp. 2468–72.

7. *Id.* at p. 2483.

8. *Id.* at p. 2475.

9. *Id.* at pp. 2476–77.

10. *Id.* at p. 2477.

11. *Id.* at pp. 2477–79.

12. *Id.* at pp. 2477–80.

13. *Id.* at pp. 2481 & 2484–85.

Carolina Prado's mother (and Belinda's grandmother) Rosa Ramirez testified at petitioner's trial she resided at 215 Obregon in San Antonio while her daughter and her daughter's two children Eric and Belinda were all living at 231 Obregon on the date of Carolina and Eric's deaths. S.F. Trial, Volume 17, testimony of Rosa Ramirez, at pp. 2397–99.

14. S.F. Trial, Volume 17, testimony of Belinda Prado, at p. 2481. A photocopy of the petitioner's handwritten note, i.e., State Exhibit No. 3., appears in S.F. Trial, Volume 21. The capitalization in the quoted text above mirrors petitioner's handwritten note.

15. *Id.* at pp. 2484–85.

16. *Id.* at pp. 2484–86.

er were going to live together [17]; (2) she gave petitioner a black tie, one of her other daughters gave petitioner a white shirt, and Carolina helped petitioner find work at a nearby grocery store [18]; (3) Carolina was divorced from Eric and Belinda's father, with whom the two children had stayed for several weeks prior to date of the murders [19]; (4) around 5:10 a.m. on the morning of the murders, petitioner telephoned her and informed her Carolina was tired and did not plan to go to work that day [20]; (5) she had no difficulty understanding anything petitioner told her during their brief telephone conversation, and petitioner did not appear to her to have slurred his speech [21]; (6) around 8:30 a.m. the same morning, Belinda rang her door bell and, when she answered the door, Belinda, who appeared nervous, handed petitioner's note and told her Eric had a lot of blood on his head [22]; (7) as she and Belinda walked down to Carolina's house, Belinda told her Carolina was at work [23]; (8) when they arrived at Carolina's home, Belinda directed her to go inside but Belinda refused to enter the house [24]; (9) she entered the house and walked into the living room, where she found Eric lying dead with a towel covering his head [25]; (10) when she lifted the towel, she observed that Eric's head was "broken," his brains were "all over the place," and there was "lots of blood" [26]; (11) after her husband entered the house and observed Eric, they walked back to their home where her husband called 911 and then called Carolina's place of employment [27]; (12) by the time they returned to Carolina's home, a police officer had sealed the house and would not allow them to enter [28]; (13) the officer told her there was a dead woman in the back bedroom [29]; (14) she observed drops of blood on the curtains and window of Carolina's bedroom [30]; and (15) she never again saw Carolina.[31]

San Antonio Police Officers who arrived at the scene found Eric lying dead from obvious head injuries in the living room and Carolina dead from even more gruesome head injuries in the blood-drenched bedroom.[32] Police officers also found what

---

17. S.F. Trial, Volume 17, testimony of Rosa Ramirez, at pp. 2402–03.

18. *Id.* at pp. 2405 & 2408.

19. *Id.* at pp. 2409–11.

20. *Id.* at pp. 2412–17. As Rosa Ramirez explained during her trial testimony: (1) Carolina worked at Lackland Air Force Base; (2) on work days, Carolina's father usually drove Carolina to a bus stop where Carolina caught the bus to Lackland; and (3) petitioner was aware of these facts. *Id.* at pp. 2416–17.

21. *Id.* at pp. 2416–17.

22. *Id.* at pp. 2418–23.

23. *Id.,* at pp. 2427–28.

24. *Id.* at p. 2429.

25. *Id.* at pp. 2430–31.

26. *Id.* at p. 2432.

27. *Id.* at pp. 2434–35.

28. *Id.* at p. 2435.

29. *Id.* at pp. 2435–36.

30. *Id.* at p. 2436.

31. *Id.*

32. The first officer on the scene testified: (1) he entered the house through the back door and kitchen, went to the living room and found Eric on the living room floor apparently dead from severe head trauma; (2) he backed out of the house, notified EMS, and secured the scene; and (3) he took possession of the petitioner's handwritten note. S.F. Trial, Volume 17, testimony of Edward Lopez, at pp. 2440–48.

Another San Antonio Police Officer testified he observed Eric's head had been beaten se-

appeared to be a bloody baseball bat covered by a towel on a living room chair.[33]

An autopsy established Carolina Prado: (1) sustained a large contusion on her right shoulder and arm, a bruise on the back of her elbow, bruising of the eyelids secondary to a massive skull fracture, and the right side of her head caved in due to blunt trauma; (2) suffered multiple fractures in all areas of the skull, including behind the eye and at the base of the skull; (3) suffered a massive stellate or multi-rayed laceration on the right side of her head with multiple loose fragments of skull; (4) lost approximate one-half of her brain tissue from her cranial cavity due to massive blunt force trauma; and (5) died as a result of multiple, massive skull fractures and severe underlying brain injuries.[34]

An autopsy established Eric Prado: (1) sustained a large contusion in the right parietal occipital area above and behind the right ear accompanied by a large laceration due to bony skull fragments and brain matter protruding from the defect, as well two smaller lacerations just behind the larger one; (2) suffered a hinge fracture laterally across the base of the brain from ear to ear; (3) was likely rendered unconscious immediately and died almost immediately after he was assaulted; (4) received "a tremendous blow" by something heavy; (5) did not show any sign of defensive injuries; and (6) died as a result of cranial cerebral injuries, including severe fractures of the skull and severe underlying brain injuries.[35]

## B. Petitioner's Arrest and Its Aftermath

At approximately 3:30 a.m. on July 13, 1994, San Marcos Police Officers arrested petitioner on a capital murder warrant at the residence of petitioner's grandmother.[36] Upon his arrest, petitioner repeated-

---

verely. *Id.*, testimony of Gary Grona, at pp. 2449–54.

Photographs of the bedroom where Carolina's lifeless body was found graphically depicted her massive head injuries, as well as copious amounts of blood and tissue which had been splattered on all four walls and the ceiling. S.F. Trial, Volume 17, testimony of Ted. A. Prosser, Jr., at pp. 2508–29. Numerous grisly photographs showing Carolina's battered head and bloody-drenched bedroom were admitted into evidence during petitioner's trial as State Exhibit Nos. 28, 32, 33, 35, 38, 40, 42, 47, 49, 50, and 53. Photocopies of those photographs appear in S.F. Trial, Volume 21.

33. S.F. Trial, Volume 17, testimony of Brian Walsh, at pp. 2530–47.

Photocopies of the photographs of the baseball bat in question, both showing it covered by the towel and with what appeared to be blood and hair on it after the towel was removed, were also admitted into evidence as State Exhibit Nos. 30 and 31 and appear in S.F. Trial, Volume 21. *Id.*, testimony of Ted. A. Prosser, Jr., at p. 2525.

34. S.F. Trial, Volume 18, testimony of Robert Charles Bux, at pp. 2688–94 & 2700–01. The

medical examiner also testified: (1) the baseball bat found at the crime scene qualified as a "deadly weapon," and (2) only the application of a "tremendous blow" could have caused Carolina Prado's injuries. *Id.* at pp. 2699–2701.

The autopsy report on Carolina "Carol" Prado was admitted into evidence at petitioner's trial as State Exhibit No. 76 and appears in S.F. Trial, Volume 21.

35. *Id.* at pp. 2694–98 & 2700. The medical examiner also opined that he could not tell how many times each victim had been struck or which victim sustained more force. *Id.* at pp. 2707–08.

The autopsy report on Eric Prado was admitted into evidence at petitioner's trial as State Exhibit No. 75 and appears at S.F. Trial, Volume 21.

36. S.F. Trial, Volume 17, testimony of Jeff Caldwell, at pp. 2565–72; testimony of Jehu Derrickson, at pp. 2583–91. At trial, San Marcos Police Officer Derrickson testified without contradiction petitioner's grandmother owned the residence at 315 W. Martin Luther King Drive in San Marcos where peti-

ly gave police a fictitious name even after they discovered his identification in his back pocket and noted the identifying tattoos on petitioner's arm.[37] Immediately upon his arrest, petitioner received his *Miranda* warnings and gave a nod to indicate he understood same.[38] Following his arrest, while police were examining a baseball bat they found in the bedroom where petitioner had been arrested, petitioner volunteered a comment along the lines of "that's not what you're looking for" or "that's not it."[39]

During the brief drive to the Hays County Law Enforcement Center from the residence where petitioner had been arrested, petitioner: (1) asked if he were going to San Antonio that night and, when the officer driving the vehicle indicated negatively, petitioner volunteered that he had known there were police officers outside watching the house and that he could have done something if he had wished to do so; (2) spontaneously inquired "who ratted on me?" and, when the officer driving the vehicle responded the matter was in the papers, petitioner sat up straight, appeared to be proud, and later volunteered "I killed them just like cockroaches"; and (3) spoke English without difficulty and displayed no slurred speech, smell of alcohol, or other overt sign of intoxication.[40]

### C. *Further Investigation Culminating in Petitioner's Confession*

Much later on the morning of July 13, 1994, a pair of San Antonio Police homicide detectives traveled to San Marcos to interview petitioner but were forced to wait several hours while petitioner went before a local magistrate.[41] While they waited, the two detectives: (1) went to the residence where petitioner had been arrested, (2) obtained consent from petitioner's grandmother and uncle to search the residence, (3) took custody of a backpack petitioner's grandmother indicated belonged to petitioner, (4) took custody of a Dallas Cowboys baseball cap and a pair of tennis shoes, both of which Belinda Prado testified belonged to her brother Eric, and (5) took custody of a shirt and pair of trousers petitioner's uncle indicated belonged to petitioner.[42] Inside the backpack, the detectives found a black leather vest which Belinda Prado testified at trial belonged to one of her uncles.[43]

The San Antonio homicide detectives returned to the Hays County Law Enforcement Center and interviewed petitioner. At approximately 12:30 p.m., after again receiving his *Miranda* warnings, petitioner

---

tioner was arrested. *Id.*, testimony of Jehu Derrickson, at p. 2600.

**37.** *Id.*, testimony of Jeff Caldwell, at pp. 2573–75.

**38.** *Id.*, testimony of Jeff Caldwell, at pp. 2574–76; testimony of Jehu Derrickson, at p. 2592.

**39.** *Id.*, testimony of Jeff Caldwell, at p. 2579.

**40.** *Id.*, testimony of Jeff Caldwell, at pp. 2575–76; testimony of Jehu Derrickson, at pp. 2594–98.

**41.** S.F. Trial, Volume 18, testimony of Alvin C. Brown, II, at pp. 2615–21. Detective Brown traveled to San Marcos with fellow San Antonio Police homicide detective Tony Muro. *Id.*, at p. 2616.

**42.** *Id.*, testimony of Alvin C. Brown, II, at pp. 2618–26.

Belinda Prado identified the tennis shoes and baseball cap in question as those of her late-brother Eric. S.F. Trial, Volume 17, testimony of Belinda Prado, at pp. 2487–88.

**43.** S.F. Trial, Volume 18, testimony of Alvin C. Brown, II, at pp. 2624.

Belinda Prado identified the black leather vest as belonging to one of her uncles. S.F. Trial, Volume 17, testimony of Belinda Prado, at p. 2480.

agreed to be interviewed and signed a waiver of his rights.[44] In his written confession, petitioner stated, in pertinent part as follows:

I want to talk to you about what I remember about the murder of Carol Prado and Eric Prado, 231 Obregon, San Antonio, Texas, on Monday, July the 11th, 1994.

I have been dating Carol for about two months. I had drank a 12–pack of Bud Light beer, a big bottle of Bacardi rum. I got off work at Handy Andy at 1:45 a.m., and I walked to Carole's house. I am living with Carole, and when I got home I started drinking. I got home about 1:50 a.m. When I got there, Carole was awake. Eric was asleep in the living room on a mattress on the floor. Belinda was on the couch also in the living room. Belinda was awake. I had a friend of mine there but I don't want to tell you who he is. I walked my friend down the street at about 3:00 a.m., and I returned a short time later. I went outside and drank more, and then I walked down the street and threw the bottle. I went back in the house at 5:10 a.m. I was freaking and tripping and I hit Carole for no reason. I picked up a baseball bat that I tripped on. It was wooden. I hit Carole in the head with the bat. I must have hit her a lot to make her pass away. When I came in at 5:10 a.m., she

told me to call her mom and tell her mom that she was going to stay home with the kids and would not be going to work.[45]

After acknowledging his statement extended to a second page, petitioner continued his confession as follows:

After I hit Carole, I went back to the living room and put the bat on the side of the couch, and I sat on the couch. Belinda was half awake and half asleep. Belinda wanted to go see her mother, and I told Belinda not to go in the bedroom because Carole was in the shower. I didn't want Belinda to see her mother. I told Belinda to lay down and go to sleep. I thought I saw Eric coming at me, so I grabbed the bat and hit him in the head. I realized he was still laying on the floor. I stood up and hit Eric about four times with the same bat. I looked at Eric and said to myself, What the fuck AM I doing. I then tied Belinda's hands in front of her with a tie. I told her to go to her grandmother's house after I left. I tied her hands loosely. Belinda asked me what she was supposed to tell her grandmother. I then wrote a note that said "I messed up. I'll be on the east side." I gave Belinda the note. I then left and went to a friend's house on the east side of San Antonio. I told him what I had done and I asked my friend to just put a bullet in my head. I can't give you my

**44.** S.F. Trial, Volume 18, testimony of Alvin C. Brown, II, at pp. 2631–35. The petitioner's signed waiver of his rights form was admitted into evidence at petitioner's trial as State Exhibit No. 66 and appears in S.F. Trial, Volume 21.

**45.** S.F. Trial, Volume 18, at pp. 2645–46.

Petitioner's written confession was admitted into evidence at petitioner's trial as State Exhibit No. 65 yet appears under the heading "State Exhibit No. 2" in S.F. Trial, Volume 21.

After admission of petitioner's confession, the prosecutor read same into the record. S.F. Trial, Volume 18, testimony of Alvin C. Brown, II, at pp. 2644–49.

The spelling of Carolina Prado's name as either "Carol" or "Carole" in the text above tracks the spellings of that name as they appear in the petitioner's hand-written confession, as opposed to the spelling employed by the court reporter in the Statement of Facts from petitioner's trial.

friend's name. I don't know why I hit Carole and Eric. Carole had told me when I came home that she had seen me talking to a lady at Handy Andy but we didn't argue. I understand my rights and I am waiving my rights and I am giving this statement because I want to. My statement is true and correct and this happened in San Antonio, Bexar County, Texas.[46]

After making a correction to the draft of his confession, petitioner wrote the following appendix to his confession in his own handwriting:

> I feel for the actions I took, I'm requesting the only just sentence for me is the "Death Penalty." I took a life of someone who I cared about a lot. I feel that I can never bring her back. Please, give me the "Death Penalty"!! I'll never forget Carol. The pain swells within my heart forever. Carol, wherever you are please forgive me. "I Do Love you"!! [47]

## D. *Indictment*

On October 4, 1994, a Bexar County grand jury indicted petitioner on a single count of capital murder charging petitioner with having: (1) murdered Carolina Prado by striking her with a deadly weapon, i.e., a bat, (2) murdered Eric Prado by striking

him with a deadly weapon, i.e., a bat, and (3) committed both murders during the same criminal transaction.[48]

## E. *Pretrial Competency Evaluation*

On October 20, 1994, petitioner's trial counsel filed a motion requesting petitioner be evaluated for competence to stand trial as well as for sanity.[49] In an Order issued October 26, 1994, the trial court granted those requests.[50] On January 9, 1995, Dr. Julia B. Spears filed separate reports concluding petitioner was: (1) not insane at the time of his offense and (2) fully competent to stand trial.[51]

## F. *Hearing on Petitioner's Pretrial Motions to Suppress*

On October 19, 1995, the state trial court held a pretrial *Jackson v. Denno* hearing on petitioner's motions to suppress his confession and various items of physical evidence obtained by police during the course of the investigation into. petitioner's offenses, including a backpack of pornographic magazines allegedly belonging to petitioner which had been discovered by relatives of Carolina Prado in a storage shed located at her residence.[52] In an *ex parte* hearing held before the start of the hearing on petitioner's motions to suppress, petitioner's trial counsel advised the

---

**46.** S.F. Trial, Volume 18, at pp. 2646–48.

The quotation marks which appear in the quoted language above appear in the petitioner's actual confession (State Exhibit 65) but not in the court reporter's transcription of same as it appears in the Statement of Facts from petitioner's trial.

**47.** S.F. Trial, Volume 18, at p. 2648.

The punctuation marks and capitalization which appear in the language quoted in the text above are identical to those appearing in the petitioner's actual handwritten confession.

**48.** Transcript of pleadings, motions, and other documents filed in petitioner's trial court

proceeding (henceforth "Trial Transcript"), at p. 5.

**49.** Trial Transcript, at pp. 18–19.

**50.** Trial Transcript, at pp. 22–22.

**51.** Trial Transcript, at pp. 118–34.

**52.** Carolina Prado's sister testified at the pretrial hearing on petitioner's motions to suppress. During her testimony, she identified a backpack containing pornographic magazines she had found in a storage shed located next to her late-sister's house as belonging to petitioner. S.F. Trial, Volume 16, testimony of Rosemary Ramirez, at pp. 2282–85.

trial court on the record: (1) petitioner had requested said counsel call Mark Martinez and Tomas Guadalupe, two residents of the Rio Grande Valley, to testify at the hearing; but (2) after interviewing those two persons, said counsel was not going to call either to testify at the hearing because to do so might alert the prosecution to the fact those persons could furnish inculpatory testimony.[53]

One of the San Marcos Police officers who assisted in petitioner's arrest testified during the hearing as follows: (1) petitioner was given his *Miranda* warnings at the time of his arrest; (2) during the short drive to the Hays County Law Enforcement Center, petitioner volunteered several inculpatory statements; (3) he observed nothing about petitioner's appearance or demeanor which indicated petitioner was intoxicated at the time of his arrest; and (4) he saw no beer cans or alcoholic beverage containers inside the home where petitioner was arrested.[54]

Another San Marcos Police Officer who participated in petitioner's arrest testified: (1) he gave petitioner his *Miranda* warnings at the time of petitioner's arrest; (2) petitioner nodded responsively and appeared to understand those rights as he read them to petitioner; (3) when other officers discovered a baseball bat in the bedroom where petitioner was arrested, petitioner spontaneously remarked either "that's not what you're looking for" or "that's not it"; (4) he did not observe any alcoholic beverage containers in or around the house where petitioner was arrested; and (5) petitioner gave officers a false name and persistently insisted he was someone else even after officers discovered

petitioner's identification card in petitioner's pocket and pointed out identifying tattoos on petitioner's arm.[55]

One of the San Antonio Homicide Detectives who interviewed petitioner following his arrest testified at the same hearing as follows: (1) while they waited for petitioner to be taken before a magistrate, he and his colleague went to the residence where petitioner had been arrested, secured a consent to search same from petitioner's grandmother, Sophie Castilleja, and found a backpack containing a black vest, tie, digital watch, and white tee shirt; (2) he was aware of no information indicating petitioner had ever possessed any expectation of privacy in the residence in question or any of the contents of same; (3) after petitioner had been taken before a magistrate, he and another detective interviewed petitioner; (4) during their interview, petitioner displayed no indications of intoxication; (5) after his colleague read petitioner his *Miranda* warnings, petitioner executed a card acknowledging he had been read and understood those warnings; (6) petitioner then gave the written statement quoted extensively above; (7) no promises, threats, or others forms of coercion were directed to induce petitioner's confession; and (8) none of the occupants of the residence where petitioner had been arrested informed him or his partner about any consumption of alcoholic beverages by petitioner prior to his arrest.[56]

At the conclusion of the hearing, the state trial court overruled petitioner's motions to suppress various items discovered at both the crime scene and petitioner's grandmother's address in San Marcos,

**53.** S.F. Trial, Volume 16, at pp. 2219–20.

**54.** S.F. Trial, Volume 16, testimony of Jehu Derrickson, at pp. 2224–58.

**55.** S.F. Trial, Volume 16, testimony of Jeff Caldwell, at pp. 2259–80.

**56.** S.F. Trial, Volume 16, testimony of Alvin Brown, at pp. 2289–2340.

specifically finding petitioner had no standing to challenge any seizures made at either location.[57] The trial court also ruled: (1) petitioner's written confession was freely and voluntarily given and therefore, admissible and (2) petitioner's inculpatory, oral, post-arrest statements were also admissible.[58]

### G. Guilt–Innocence Phase of Trial

The guilt-innocence phase of petitioner's trial commenced on October 23, 1995. In addition to the evidence summarized above, including petitioner's written confession and petitioner's inculpatory, oral statements, the prosecution presented testimony from a forensic documents examiner establishing the same person who wrote the final paragraph of petitioner's handwritten confession had also written the note petitioner gave to Belinda Prado on the date of the murders.[59] Petitioner's trial counsel presented no evidence. After deliberating slightly more than an hour, the jury returned its verdict finding petitioner guilty of capital murder as charged in the indictment.[60]

### H. Punishment–Phase of Trial

The punishment-phase of petitioner's trial commenced on October 30, 1995.

#### 1. The Prosecution's Evidence

The prosecution presented a plethora of witnesses who testified regarding petitioner's criminal history, well-demonstrated propensity for violence, and consistent refusals to accept responsibility for his criminal conduct or conform his behavior to societal rules.

##### a. Juvenile Burglaries and Stay in TYC

A police officer from Pharr, Texas, testified regarding his arrest of petitioner on September 19, 1988, while petitioner was in the course of burglarizing a convenience store.[61] A Hidalgo County juvenile probation officer testified petitioner: (1) was charged with six counts of burglary arising from crimes committed June through September, 1988, (2) received a one-year probated sentence on December 13, 1988, (3) was arrested less than a week later for another burglary, (4) once threatened the officer's life, and (5) was committed to the custody of the Texas Youth Commission

57. S.F. Trial, Volume 16, at p. 2354.

58. *Id.* at p. 2355.

59. S.F. Trial, Volume 18, testimony of Marvin Morgan, at pp. 2661–81. More specifically, the expert testified: (1) he examined the note given to Belinda Prado admitted into evidence as State Exhibit No. 3; (2) he also reviewed the concluding paragraph of the petitioner's handwritten confession; (3) there was absolutely no doubt in his mind the same person wrote both the known samples of petitioner's handwriting and the questioned document, i.e., the note given to Belinda Prado; and (4) he based his conclusion not only on his review of the final paragraph of petitioner's written confession but also a set of handwriting exemplars a San Antonio Police Officer had obtained from petitioner. *Id.*
A San Antonio Police Officer testified he obtained handwriting exemplars, identified at trial as State Exhibit No. 71, from the petitioner following petitioner's arrest and transport to Bexar County. S.F. Trial, Volume 18, testimony of Daniel Gonzales, at pp. 2654–80.

60. S.F. Trial, Volume 18, at pp. 2754–59. More specifically, petitioner's jury retired to deliberate at 9:50 a.m. on October 25, 1995 and returned its verdict not later than 11:00 the same date. *Id.*

61. S.F. Trial, Volume 19, testimony of Guadalupe Salinas, at pp. 2775–83.
Officer Salinas also testified the same store had been burglarized five times before the night he caught petitioner in the act of burglarizing same and petitioner's fingerprints matched those from each of the other burglaries. *Id.* at p. 2782.

("TYC") on January 30, 1989.[62] A former TYC case manager, who met weekly with petitioner during petitioner's subsequent stay at a TYC-contract facility, testified petitioner: (1) became enraged, threw his chair, and broke a 50–gallon aquarium in March, 1989, when she denied his request for a furlough to visit his mother, (2) briefly escaped in June, 1989, (3) habitually tried to stare down anyone who would not do what he wanted, (4) was a "manipulator" who frequently tried to "sweet talk" her but would try to intimidate her if he did not get what he wanted, (5) had a problem with authority figures, (6) often talked back to officials at his TYC facility, (7) had trouble controlling his temper and aggressive impulses, (8) was intelligent, as demonstrated by his completion of his GED while under TYC supervision, and (9) was discharged from the TYC in May, 1990.[63]

### b. Adult Conviction for Attempted Sexual Assault

A McAllen shoe store employee testified petitioner: (1) entered her store on the morning of May 30, 1990, (2) waited until a courier left the store, (3) followed her to the back of the store where he grabbed her around the neck and waist and held her tightly against him while she screamed and fought unsuccessfully for her freedom,

(4) said he "wanted to be alone" with her and touched her breast and buttocks, (5) told her to stop yelling and pulled her down to the floor, injuring her back in the process, (6) finally released her only after she begged him not to hurt her and convinced him she was pregnant, (7) left the store only after she promised not to call the police and begged him to leave, and (8) threatened to return if she called the police.[64] The store clerk also testified she saw petitioner walking along a city street on July 9, 1990, and identified him as her assailant when police brought him to her store later that same day.[65] A McAllen police officer testified: (1) he arrested petitioner on July 9, 1990, (2) the store clerk identified petitioner as her assailant during a show-up that same date, and (3) petitioner was subsequently charged with attempted sexual assault.[66]

### c. Probation Revocation

A former Hidalgo County adult probation officer testified: (1) petitioner received a probated 10–year sentence in May, 1991, following his conviction for attempted sexual assault, (2) the conditions of petitioner's probation included making financial contributions, reporting weekly, and participating in a weekly sex offender group program, (3) in early-July, 1991, petitioner stopped reporting weekly, stopped

**62.** S.F. Trial, Volume 19, testimony of Enrique Hinojosa, at pp. 2783–97.

Officer Hinojosa also testified: (1) the burglary charges against petitioner involved crimes committed at six different locations, (2) petitioner was 16 years old at the time of his initial arrest, (3) following petitioner's release on probation and subsequent arrest, he met with petitioner to explain that he intended to recommend petitioner be sent to the Texas Youth Commission ("TYC"), (4) during their meeting petitioner became angry and threatened to kill Officer Hinojosa, and (5) petitioner denied any drug or alcohol abuse during their interview. *Id.*

**63.** S.F. Trial, Volume 19, testimony of Dolores Rodriguez, at pp. 2797–2826.

**64.** S.F. Trial, Volume 19, testimony of Maria Vasquez, at pp. 2827–39.

**65.** *Id.* at pp. 2840–42.

**66.** S.F. Trial, Volume 19, testimony of George Moreno, at pp. 2845–64.

This officer testified, at the time of petitioner's arrest, he discovered a nude photograph of a woman and a pair of women's panties inside one of petitioner's pants pockets. *Id.* at pp. 2855–56.

attending weekly group counseling sessions, and ceased working or making his required financial contributions, (4) after several months of unsuccessful attempts to contact petitioner, he filed a motion to revoke petitioner's probation in December, 1991, (5) when law enforcement officers went to execute the warrant for petitioner's arrest, petitioner fled and was later charged with evading arrest, (6) petitioner never advised his probation officer he suffered from any drug or alcohol problems, and (7) petitioner pleaded "true" to the motion to revoke and was sentenced to serve a 5–year prison term.[67] A McAllen police officer testified: (1) he assisted in the arrest of petitioner on April 1, 1992, on a motion to revoke probation, (2) when officers announced their presence at the front door of petitioner's residence, petitioner fled out the back door, (3) petitioner then led several officers on a chase through several backyards, over fences, and through alleyways, (4) the chase did not terminate until the officer, traveling in a police vehicle, interrupted petitioner's attempted flight some 3 city blocks north and two and a half blocks east of the petitioner's residence, and (5) he arrested petitioner for evading arrest and pursuant to the motion-to-revoke warrant.[68]

### d. Parole Violations and Revocation

A fingerprint expert testified petitioner's fingerprints matched those on a pen packet admitted into evidence.[69] A Texas Department of Criminal Justice parole supervisor testified: (1) petitioner was paroled December 2, 1992, (2) the conditions of petitioner's parole included mandatory participation in psychological sex offender counseling and making three face-to-face reports to his parole officer each month, (3) a parole revocation was issued September 10, 1993, based on petitioner's failure to attend sex offender counseling, (4) following petitioner's arrest for capital murder, petitioner waived both preliminary and final revocation hearings and admitted he was guilty of capital murder, and (5) while the conditions of petitioner's parole included drug and alcohol counseling, petitioner never reported to his parole officer that he had ever been under the influence of either.[70]

### e. Misconduct During Pretrial Detention

Five Bexar County Adult Detention Center ("BCADC") officers testified regarding a series of incidents in which petitioner violated the rules of that facility or otherwise engaged in violent misconduct. More specifically, those officers testified: (1) on November 19, 1994, petitioner cursed and threatened a detention officer while the officer was escorting petitioner to a visit[71]; (2) on April 14, 1995, petitioner shouted and kicked a food tray out of the food slot under his cell door, spilling food across the floor[72]; (3) on May 27, 1995, petitioner disobeyed a verbal order to stop changing the channel on a television and, when an officer wrote petitioner

---

**67.** S.F. Trial, Volume 19, testimony of Jesse Vasquez, at pp. 2864–81.

**68.** S.F. Trial, Volume 19, testimony of Jose J. Trevino, at pp. 2882–91.

**69.** S.F. Trial, Volume 19, testimony of Vernon "Buddy" Ginn, at pp. 2892–94.

 More specifically, this expert testified petitioner's fingerprints, which he took from peti-

tioner personally, matched those on the pen packet marked as State Exhibit No. 55. *Id.*

**70.** S.F. Trial, Volume 19, testimony of Roger Thomas Sturdivant, at pp. 2897–2917.

**71.** S.F. Trial, Volume 19, testimony of Bryan Higby, at pp. 2918–26.

**72.** *Id.*, testimony of Patrick Nocker, at pp. 2926–30.

up for that rule violation, profanely threatened to harm that officer's family[73]; (4) on an unspecified date, petitioner engaged in a verbal altercation with another inmate over the television during which petitioner assumed a fighter's stance and had to be restrained by detention officers before blows were exchanged between the inmates[74]; and (5) on or about August 21, 1995, petitioner attempted to assert "tank boss" status by demanding other inmates pay him with food for the privilege of using the telephone.[75]

### f. Psychological Assessment

A Hidalgo County psychologist who had attempted to treat petitioner in a sex offender program in 1991 testified petitioner: (1) was not a successful participant in the program because he would not often attend group sessions and, even when he did, petitioner refused to divulge any information about himself, (2) showed a lack of progression throughout his life, (3) displayed a defiant refusal to admit he had a problem, which makes petitioner dangerous, (4) displayed an extremely poor ability to empathize with others, especially in situations in which dominance or control is an issue, which also makes petitioner dangerous, (5) showed no sign of having sustained any neurological injury or brain damage, (6) tested well above average on one intelligence test, (7) suffers from an antisocial personality, i.e., petitioner demonstrates a pervasive, non-flexible pattern of behavior characterized by the disregard

for, and violation of, the rights of others, (8) petitioner's antisocial personality manifests itself through his persistent unlawful conduct, deceitfulness, impulsiveness, irritability, aggressiveness, irresponsibility, and lack of remorse for his misconduct, (9) is not mentally ill, (10) displays a powerful sex drive directed toward children, (11) refused to admit he had sexually assaulted the shoe store clerk even after he had pleaded guilty to that offense, and (12) poses an obvious danger to society.[76]

### g. Sexual Assault on Belinda Prado

Belinda Prado returned to the stand near the conclusion of the prosecution's evidence at the punishment-phase of petitioner's capital trial and testified petitioner: (1) touched her on her breasts and vagina for five-to-ten minutes immediately after he had beaten Eric to death, (2) forced her into Eric's bedroom at knifepoint when she told him to stop touching her, (3) tied her hands behind her to the bed with a necktie, and (4) then wrote the note he directed her to take to her grandmother.[77] A physician who examined Belinda for sexual assault on July 27, 1994, testified: (1) Belinda displayed a blunted or flat affect during her physical examination, (2) Belinda reported no sexual history other than petitioner's contact with her, (3) her examination of Belinda's hymen disclosed an abnormality, i.e., a cleft in the eight o'clock position indicative of penetration, but (4) Belinda's hymen injury

---

73. *Id.*, testimony of Collis Boone, at pp. 2930–38.

74. *Id.*, testimony of Guadalupe Garza, at pp. 2939–43.

75. *Id.*, testimony of Nathan Willis, at pp. 2944–52.

76. S.F. Trial, Volume 19, testimony of Gregorio Pina, III, at pp. 2953–85.

Dr. Pina also testified: (1) petitioner's crimes indicate a lot of anger and rage toward women, (2) petitioner persistently attempts to rationalize his criminal conduct, such as through his assertions of intoxication, and (3) the best indicator of future conduct is past behavior. *Id.* at pp. 2967–72.

77. S.F. Trial, Volume 19, testimony of Belinda Prado, at pp. 2985–96.

was older than one-to-two weeks and could have been as old as a year or more.[78]

### h. *Threats Against Both Defense Counsel and Prosecutor*

Finally, a court bailiff testified: (1) on October 10, 1995, petitioner demanded to be placed in handcuffs because, otherwise, he was going to "go off" on his attorney and (2) two days later, petitioner threatened a prosecutor during a heated exchange before the trial judge.[79]

### 2. *The Defense Evidence*

The defense presented four witnesses who knew petitioner when he was growing up, all of whom requested the jury dispense mercy to petitioner.[80] Petitioner then took the stand and: (1) denied he had killed either Carolina Prado or Eric Prado, (2) denied he had sexually molested Belinda Prado, (3) denied he had given the written confession admitted into evidence, claiming he was intoxicated at the time he "gave" his confession and merely wrote what law enforcement officers told him to write after they threatened to bring additional charges against him, (4) claimed he never read the confession he admitted he signed, (5) denied he ever had a drug or alcohol problem, (6) admitted he drank liquor and smoked marijuana on the night of the murders, (7) claimed he did not remember what he had meant when he wrote "I messed up" on the note he gave to Belinda Prado, explaining he only wrote what Belinda told him to write, (8) stated "I can't say I'm sorry for killing them because I did not kill them," (9) admitted the bag containing adult magazines found at the crime scene belonged to him, (10) claimed he was innocent of the attempted sexual assault of the shoe store clerk who had testified at his capital murder trial even though he pleaded guilty to that charge, explaining he entered his plea solely to get a probated sentence, (11) admitted he does not like it when people show him disrespect, (12) admitted he had an altercation in jail with five black inmates while awaiting trial for capital murder, and (13) admitted he gets bored with jobs and has never held a job for longer than nine months.[81]

### 3. *The Verdict*

On October 30, 1995, the jury returned its verdict, finding: (1) beyond a reasonable doubt there was a probability petition-

**78.** S.F. Trial, Volume 19, testimony of Rebecca Huston, at pp. 2997–3008.

**79.** S.F. Trial, Volume 19, testimony of Ruben Martinez Ramos, at pp. 3009–18.

**80.** More specifically, a family friend with whom petitioner had lived briefly testified petitioner had been abandoned by his mother. S.F. Trial, Volume 20, testimony of Rosemary Vargas, at pp. 3023–28.

A cousin of petitioner's mother testified: (1) petitioner's mother had mental problems, (2) petitioner's father died in a fatal shooting in a bar, (3) petitioner was hurt very deeply by his father's untimely death, (4) before his father's death, petitioner's parents argued frequently, (5) petitioner's parents did not treat him with love, and (6) petitioner had always been helpful to her and respectful of her, working part-time and living and helping her after she underwent surgery. S.F. Trial, Volume 20, testimony of Cecilia Flores, at pp. 3029–43.

Petitioner's former aquatic coach during petitioner's stay at a TYC residential facility testified petitioner was very trustworthy and had spoken to children about the dangers of drugs. S.F. Trial, Volume 20, testimony of Roy Lopez, at pp. 3044–50.

The wife of petitioner's aquatic coach testified: (1) she met petitioner in 1988, (2) petitioner stayed in their home one weekend, and (3) petitioner very effectively spoke to her elementary school students about the dangers of drugs. S.F. Trial, Volume 20, testimony of Maria Estella Lopez, at pp. 3050–59.

**81.** S.F. Trial, Volume 20, testimony of David Martinez, at pp. 3060–3128.

er "would commit criminal acts of violence that would constitute a continuing threat to society" and (2) taking into consideration all of the evidence, including the circumstances of the offense, petitioner's character and background, and petitioner's personal moral culpability, there were insufficient mitigating circumstances to warrant a sentence of life imprisonment, rather than a death sentence, be imposed on petitioner.[82]

## I. Direct Appeal

Petitioner appealed his conviction and sentence and asserted more than thirty points of error in his original appellant's brief and a pair of supplemental briefs.[83] In an unpublished opinion issued November 4, 1998, the Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence.[84] On October 4, 1999, the United States Supreme Court denied petitioner's petition for writ of certiorari.[85]

## J. State Habeas Corpus Proceeding

On May 6, 1999, petitioner filed an application for state habeas corpus relief in which he asserted more than fifteen claims for relief, including a multi-faceted assertion of ineffective assistance by his trial counsel.[86]

**82.** Trial Transcript, at pp. 199–200; S.F. Trial, Volume 20, at pp. 3176–78.

**83.** As points of error on direct appeal, petitioner argued: (1) the prosecution engaged in misconduct by provoking petitioner during a pretrial hearing and using the record of that hearing against petitioner at the punishment-phase of trial, (2) the trial court erred in permitting a court bailiff to testify regarding petitioner's confrontation with the prosecutor during the pretrial hearing in question, (3) the trial court erred in permitting cameras in the courtroom over petitioner's protests, (4) the trial court erred in permitting the prosecutor to comment on petitioner's silence during the guilt-innocence phase of trial, (5) the trial court erred in failing to set aside the indictment based on the failure of the mitigation special issue to assign the burden of a proof, (6) the trial court erred in failing to suppress the victim's clothing found in petitioner's backpack at petitioner's grandmother's residence and the pornographic magazines found in a gym bag at the crime scene, (7) the trial court erred in admitting testimony regarding petitioner's adult magazines during the punishment-phase of trial, (8) the trial court erred in admitting petitioner's pen packet at the punishment-phase of trial over petitioner's hearsay objection, (9) the trial court erred in striking four venire members for cause, (10) the trial court erred in refusing to strike five other venire members for cause, (11) the trial court erred in limiting his trial counsel's voir dire examination of six venire members, (12) the trial court erred in questioning, and making comments on the testimony of, a particular venire member during voir dire, (13) the trial court erred in failing to quash the indictment against petitioner on Double Jeopardy grounds after petitioner pleaded "true" to a parole revocation charge arising, in part, out of his capital murder, (14) the trial court erred in failing to expressly rule on petitioner's competence to stand trial after a written motion was filed by petitioner's trial counsel, and (15) the trial court erred in failing to hold a hearing on petitioner's competence to stand trial after petitioner's trial counsel filed a written motion questioning petitioner's competence to stand trial.

**84.** *Martinez v. State*, No. 72, 288 (Tex.Crim. App. Nov. 4, 1998), *cert. denied*, 528 U.S. 825, 120 S.Ct. 74, 145 L.Ed.2d 63 (1999).

**85.** *Martinez v. Texas*, 528 U.S. 825, 120 S.Ct. 74, 145 L.Ed.2d 63 (1999).

**86.** State Habeas Transcript, at pp. 1–165.

As grounds for relief in his state habeas corpus application petitioner argued: (1) his trial counsel rendered ineffective assistance (citing more than fifty instances of allegedly deficient performance by said counsel), (2) his appellate counsel rendered ineffective assistance, (3) his Eighth Amendment rights were violated by the trial court's punishment-phase jury instruction directing the jury to disregard the impact of state parole law when answering the capital sentencing special issues, (4) the Texas capital sentencing scheme violates the Eighth Amendment because (a) its "aggra-

The state trial court held an evidentiary hearing in petitioner's state habeas corpus proceeding on May 9–10, 2000, during which petitioner presented virtually no evidence supporting the vast majority of his numerous assertions of ineffective assistance.[87] Instead, petitioner presented only his own testimony and the testimony of his former lead defense counsel and lead prosecuting attorney.

Petitioner's former trial counsel testified: (1) his initial "trial strategy" was to assert an insanity defense but petitioner would not cooperate with such a strategy at trial, (2) he was unable to get a straight answer from petitioner on the critical question of what exactly happened the night of the murders because petitioner kept changing his version of the critical events, initially refusing to discuss the facts of the case then claiming he was not involved in the murders and, finally, claiming a third party must have committed the offense while petitioner was passed out, (3) the information petitioner did furnish him regarding the circumstances of the offense did not match the petitioner's description of the offense as set forth in petitioner's written confession, (4) while he agreed the prosecutor's references to petitioner's offense as "mass murder" were inflammatory and harmful, his experience with the lead prosecutor had taught him it was wise to give the aggressive prosecutor enough rope to hang himself, (5) this was an explosive, violent offense as evidenced by the extraordinarily bloody crime scene, as depicted in the crime scene photographs, (6) his ability to marshal and present mitigating evidence on petitioner's behalf was hampered by the unwillingness of petitioner's family to testify at trial, (7) his failure to request a punishment-phase jury instruction regarding the mitigating impact of evidence of intoxication-induced temporary insanity was "an oversight," (9) he considered the verbal confrontation between petitioner and prosecutor Luitjen "macho talk" akin to a man with a sharp stick poking at a barking dog and did not foresee the possibility the prosecution would use the exchanges in question as

---

vating factors" are insufficiently defined, (b) no meaningful appellate review of the jury's answers to the capital sentencing special issues is provided, (c) the burden of proof is not allocated on the mitigating evidence or *Penry* special issue, (d) the jury is granted open-ended discretion to impose or withhold the death penalty, (e) the term "mitigating evidence," as defined in the Texas capital sentencing statute, is unconstitutionally narrow, and (f) the capital sentencing jury is not informed of the impact of a single holdout juror, (5) the Texas 10–12 rule violates the principles announced by the Supreme Court in its opinions in *Mills v. Maryland* and *McKoy v. North Carolina,* (6) the trial court erred in admitting evidence of petitioner's unadjudicated extraneous offenses during the punishment-phase of trial, and (8) the Texas death penalty, as currently administered, is unconstitutional.

**87.** For instance, petitioner criticized his trial counsel's failure to present a pair of witnesses whom petitioner contended could have furnished testimony at trial regarding petitioner's allegedly intoxicated condition prior to petitioner's arrest. Yet, petitioner presented neither of these witnesses during petitioner's state habeas corpus proceeding.

Likewise, petitioner faulted his trial counsel for failing to present testimony from a mental health expert who, at the direction of the trial court, examined petitioner prior to trial for competence to stand trial and sanity. Yet, petitioner presented the state habeas court with nothing more to support this claim than the expert's written reports, which had been filed with the trial court prior to petitioner's trial and which contained a significant amount of double-edged evidence. Petitioner did not present the mental health expert's testimony to the state habeas court nor offer any evidence showing the expert in question was available and willing to testify to anything helpful to petitioner had she been called to testify during petitioner's trial.

evidence against petitioner, (10) while at one point petitioner asserted he was elsewhere at the time of the murders, petitioner never furnished his defense team with any names of witnesses who could corroborate petitioner's asserted alibi defense, (11) likewise, petitioner never gave his defense team any information supporting the theory someone else had committed the murders, (12) petitioner was aware of his right to testify at both phases of trial and voluntarily chose to testify during the punishment-phase, (13) the fundamental problems with petitioner's punishment-phase testimony were petitioner's refusal to accept responsibility for his offense or to express remorse for the murders and the fact petitioner's trial testimony ran counter to his written confession, (14) petitioner's punishment-phase testimony significantly hampered counsel's ability to secure a life sentence for petitioner by depriving defense counsel of the ability to argue petitioner had shown remorse and, therefore, was entitled to mercy from the jury, and (15) he was never aware of any evidence showing petitioner did not commit the murders or petitioner was entitled to assert any recognized affirmative defense.[88]

Petitioner's state appellate counsel testified he carefully reviewed the record from petitioner's trial and found numerous instances in which the failure of petitioner's trial counsel to make timely objections had effectively waived potentially viable points of error on direct appeal.[89]

The lead prosecutor at petitioner's trial testified: (1) what frightened him most about petitioner's demeanor during their pretrial confrontation was the lack of emotion petitioner exhibited while threatening to kill the prosecutor, (2) he be-

lieved petitioner was familiar with the criminal justice system and knew his rights throughout the pretrial hearing petitioner had requested by filing a *pro se* motion to dismiss trial counsel, (3) during that hearing, he merely asked rhetorical questions in response to petitioner's arguments directed to the trial court, and (4) he was unaware of any exculpatory or mitigating evidence in petitioner's case.[90]

During the same hearing, petitioner testified: (1) he asked a court bailiff to handcuff him to prevent him from assaulting his own trial counsel, (2) the prosecutor attempted to provoke him through the pretrial and trial proceedings by, among other things, deliberately bumping into petitioner and making rude gestures toward petitioner, (3) he informed his trial counsel he did not wish to pursue an insanity defense, (4) he did not wish his trial counsel to seek a life sentence but, instead, wanted only an acquittal, (5) he felt he could not trust his trial counsel and, therefore, did not cooperate with his defense counsel, (6) he was aware of his right to testify at the pretrial hearing on his motion to suppress but did not do so because his trial counsel advised him against testifying at the hearing, (7) he wanted the trial judge removed because the judge kept referring to him as "mijito," which petitioner considered an insult, (8) he wanted his trial counsel to file motions for a speedy trial and to dismiss his confession as illegally obtained, (9) he was not present at the Prado residence at the time of the murders, (10) he never told anyone he committed the murders, (11) he refused to assist his trial counsel, (12) he wrote the note introduced at trial as State Exhibit No. 3 and gave same to Belinda Prado, (13) he signed the confession admitted into

**88.** S.F. State Habeas Hearing, Volume 1 of 3, testimony of Vincent D. Callahan, at pp. 6–98.

**89.** S.F. State Habeas Hearing, Volume 1 of 3, testimony of John Fahle, at pp. 99–128.

**90.** S.F. State Habeas Hearing, Volume 1 of 3, testimony of Mark Luitjen, at pp. 129–66.

evidence at his trial but did so because he was intoxicated and was not cognizant of the words written thereon, (14) he nodded while a police officer read him his *Miranda* warnings, (15) had his trial counsel not advised him against doing so, he would have testified at the guilt-innocence phase of trial in the same manner as he did at the punishment-phase of his trial, (16) he did not want his family to testify at his trial, and (17) his trial counsel failed to show petitioner all the physical evidence in the case prior to trial.[91]

On January 14, 2003, the state trial court issued an order containing its: (1) findings of fact, (2) conclusions of law, and (3) recommendation that petitioner's state habeas corpus application be denied.[92] On July 2, 2003, the Texas Court of Criminal Appeals issued an unpublished order adopting the trial court's findings and conclusions and denying state habeas relief.[93]

### K. *Proceedings in Federal Court*

Petitioner filed his petition for federal habeas corpus relief in this Court on June 28, 2004, asserting eleven grounds for relief including a multifaceted ineffective assistance claim consisting of more than fifty assertions of deficient performance by his trial counsel.[94] On October 15, 2004, respondent filed his original answer and motion for summary judgment.[95] On October 3, 2005, petitioner filed his reply to respondent's motion for summary judgment.[96]

### II. *AEDPA Standard of Review*

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of peti-

tioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Williams v. Taylor*, 529 U.S. 362, 404–05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if: (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Mitchell v. Esparza*, 540 U.S. 12, 15–16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003)("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set

---

91. S.F. State Habeas Hearing, Volume 2 of 3, testimony of David Martinez, at pp. 4–66.

92. State Habeas Transcript, at pp. 222–61.

93. *Ex parte David Martinez*, No. 54, 794–01 (Tex.Crim.App. July 2, 2003).

94. Docket entry no. 8.

95. Docket entry no. 12.

96. Docket entry no. 15.

of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.' "). A state court's failure to cite governing Supreme Court authority does not, *per se* establish that the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents; 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.' " *Mitchell v. Esparza,* 540 U.S. at 16, 124 S.Ct. at 10.

■■■ Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Wiggins v. Smith,* 539 U.S. 510, 520, 123 S.Ct. 2527, 2534–35, 156 L.Ed.2d 471 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Wiggins v. Smith,* 539 U.S. at 520–21, 123 S.Ct. at 2535. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Wiggins v. Smith,* 539 U.S. at 520, 123 S.Ct. at 2535; *see Price v. Vincent,* 538 U.S. 634, 641, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003)("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner"). Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado,* 541 U.S. 652, 661, 124 S.Ct.

2140, 2147, 158 L.Ed.2d 938 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." '); *Lockyer v. Andrade,* 538 U.S. 63, 71–72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).

■■■ The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. A petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *See Morrow v. Dretke,* 367 F.3d 309, 315 (5th Cir.2004) ("The AEDPA requires that we presume correct the state court's findings of fact unless the petitioner 'rebuts the presumption of correctness by clear and convincing evidence.' "), *cert. denied,* 543 U.S. 951, 125 S.Ct. 375, 160 L.Ed.2d 270 (2004); *Pondexter v. Dretke,* 346 F.3d 142, 146 & 149 (5th Cir.2003) (holding that, pursuant to § 2254(e)(1), state court findings of fact are presumed correct and the petitioner has the burden of rebutting that presumption by clear and convincing evidence), *cert. denied,* 541 U.S. 1045, 124 S.Ct. 2160, 158 L.Ed.2d 736 (2004); *Henderson v. Cockrell,* 333 F.3d 592, 598 (5th Cir.2003) (holding the same), *cert. denied,* 540 U.S. 1163, 124 S.Ct. 1170, 157 L.Ed.2d 1208 (2004); 28 U.S.C. § 2254(e)(1).

Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See Pondexter v. Dretke,* 346 F.3d at 148 (holding the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the

state court's ultimate conclusion was objectively reasonable); *Anderson v. Johnson,* 338 F.3d 382, 390 (5th Cir.2003) (holding a federal habeas court reviews only a state court's decision and not the opinion explaining that decision); *Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir.2002) (*en banc*) (holding that a federal court is authorized by § 2254(d) to review only a state court's decision and not the written opinion explaining that decision), *cert. denied,* 537 U.S. 1104, 123 S.Ct. 963, 154 L.Ed.2d 772 (2003).

### III. *Ineffective Assistance Complaints*

#### A. *Clearly Established Federal Law*

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of trial counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland,* i.e., to establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v.* *Smith,* 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Williams v. Taylor,* 529 U.S. 362, 390–91, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington,* 466 U.S. at 687–91, 104 S.Ct. at 2064–66. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith,* 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington,* 466 U.S. at 690, 104 S.Ct. at 2066.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542 (quoting *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2052). In evaluating prejudice, a federal habeas court must re-weigh the aggravating evidence against the totality of available mitigating evidence. *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542.

In evaluating petitioner's complaints about the performance of his counsel under the AEDPA, the issue before this Court is whether the Texas Court of Criminal Appeals could reasonably have concluded petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir.2003), *cert. denied*, 540 U.S. 1154, 124 S.Ct. 1156, 157 L.Ed.2d 1050 (2004). In making this determination, this Court must consider the underlying *Strickland* standard. *Id.* In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test, this Court's review of the un-adjudicated prong is *de novo*. *See Rompilla v. Beard*, 545 U.S. 374, ——, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005) (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

### B. *Overview of Petitioner's Ineffective Assistance Claim*

Petitioner identifies more than fifty instances of allegedly deficient performance by his trial counsel.[97] When petitioner presented the state habeas court with complaints about the performance of his trial counsel, the state habeas court grouped petitioner's complaints into twenty-four categories and denied state habeas relief on all such claims, concluding petitioner had failed to overcome the presumption of professionally reasonable performance afforded to most strategic decisions made by criminal defense counsel.[98] The state ha-

beas court's conclusions were based on petitioner's failure to present the state habeas court with any evidence showing petitioner's trial counsel had acted in a manner outside the broad scope of objectively reasonable, professional performance. The state habeas court repeatedly concluded petitioner had failed to carry the burden of proof necessary to overcome the strong presumption that the conduct of his trial counsel fell within a wide range of reasonable, professional assistance. *Strickland v. Washington*, 466 U.S. at 687–91, 104 S.Ct. at 2064–66. The state habeas court also concluded many of petitioner's complaints about his trial counsel's performance failed to satisfy the prejudice prong of *Strickland*. In an effort to bring order to petitioner's complaints regarding his trial counsel's performance, this Court will address petitioner's ineffective assistance claims in three broad categories corresponding to the stages of petitioner's trial court proceedings.

### C. *Ineffective Assistance During Pretrial Proceedings*

Petitioner presented the state habeas court, and presents this Court, with numerous complaints about his trial counsel's performance occurring prior to the start of the guilt-innocence phase of petitioner's trial. More specifically, petitioner complains his trial counsel failed to: (1) adequately challenge the admissibility of petitioner's inculpatory post-arrest written and oral statements, (2) adequately challenge the admissibility of physical evidence obtained from the victims' relatives and from petitioner's relatives or from the search of petitioner's grandmother's residence, (3) move to suppress a handwriting exemplar obtained outside the presence of petition-

---

**97.** Petitioner's Petition for Writ of Habeas Corpus, filed June 28, 2004, docket entry no. 8 (henceforth "Petition"), at pp. 22–121.

**98.** State Habeas Transcript, at pp. 222–48.

er's trial counsel, (4) object to improper questions from the prosecutor directed to petitioner during a pretrial hearing held October 12, 1995, (5) warn petitioner any statements petitioner made during the same hearing might later be used against petitioner at trial, and (6) voir dire venire members regarding their ability to give mitigating effect to evidence of petitioner's youth, intoxication, and difficult childhood.

### 1. Inadequate Challenge to Petitioner's Confession

#### a. The Claims

■ Petitioner complains his trial counsel inadequately challenged the admissibility of petitioner's written and oral statements as involuntary during the pretrial hearing on petitioner's motions to suppress. More specifically, petitioner complains his trial counsel failed to: (1) call either Mark Martinez or Tomas Guadalupe to testify petitioner was intoxicated at the time of his arrest, (2) cross-examine prosecution witnesses so as to elicit testimony establishing petitioner was intoxicated at the time of his arrest, or (3) present evidence showing petitioner was intoxicated at the time he gave his written confession.[99]

#### b. State Court Disposition

During the evidentiary hearing in petitioner's state habeas corpus proceeding, however, petitioner presented the state habeas court with no testimony from either Mr. Martinez or Mr. Guadalupe. Instead, petitioner offered the state habeas court only his own, self-serving testimony to establish precisely what Mark Martinez

could have furnished in terms of relevant testimony at the time of petitioner's pretrial suppression hearing. More specifically, petitioner testified Mark Martinez could have testified petitioner was intoxicated at the time of his arrest.[100] Petitioner offered the state habeas court no testimony or other evidence establishing Tomas Guadalupe was available to testify as to any matter relevant to the admissibility of petitioner's statements to police.

The state habeas court had before it the record from petitioner's pretrial suppression hearing which included the *ex parte* hearing before the trial judge in which petitioner's trial counsel advised the court they did not plan to call either Mark Martinez or Tomas Guadalupe to testify during the suppression hearing because to do so might alert the prosecution to the existence of these two witnesses and possibly expose them to interrogation into matters which would have proven inculpatory for petitioner.[101] As the state habeas trial court noted, petitioner made no effort to question his former lead trial counsel during petitioner's state habeas hearing regarding the strategic reasons said counsel chose not to present either of these two witnesses to testify at petitioner's pretrial suppression hearing.[102] The state habeas court concluded petitioner's complaints failed to satisfy either prong of the *Strickland* test.[103]

#### c. No Deficient Performance

Complaints about uncalled witnesses are not favored in federal habeas corpus proceedings because allegations of what a witness would have testified are largely speculative. *Graves v. Cockrell*, 351 F.3d 143,

---

99. Petition, at pp. 25–32.

100. S.F. State Habeas Hearing, Volume 2 of 3, testimony of David Martinez, at pp. 30–31 & 59–60.

101. S.F. Trial, Volume 16, at pp. 2219–20.

102. State Habeas Transcript, at p. 228.

103. State Habeas Transcript, at p. 229.

156 (5th Cir.2003), *cert. denied,* 541 U.S. 1057, 124 S.Ct. 2160, 158 L.Ed.2d 757 (2004); *Evans v. Cockrell,* 285 F.3d 370, 377 (5th Cir.2002); *Sayre v. Anderson,* 238 F.3d 631, 635–36 (5th Cir.2001). Petitioner presented his state habeas court with no testimony from either Mark Martinez or Tomas Guadalupe.

Petitioner faults his trial counsel's performance, in part, by arguing the prosecution would not have been able to cross-examine either of these witnesses during the hearing on petitioner's motions to suppress on any matter unrelated to petitioner's alleged lack of sobriety at the time of petitioner's arrest. Insofar as petitioner complains about the state habeas court's conclusion petitioner failed to satisfy the deficient performance prong of *Strickland,* petitioner's arguments construe the *ex parte* pretrial representations his trial counsel made to the trial court too narrowly. It is apparent petitioner's trial counsel was concerned not solely with what these witnesses might say during cross-examination at petitioner's suppression hearing regarding petitioner's intoxication at the time of his arrest but, more significantly, with what the same witnesses might tell prosecutors about other inculpatory information they possessed. For that reason, as petitioner's counsel explained to the state trial court, said counsel chose not to subpoena either witness from the Rio Grande Valley. Petitioner presented the state habeas court with no evidence establishing his trial counsel acted in an objectively unreasonable manner in choosing not to alert the prosecution to potentially inculpatory information in the possession of these two witnesses. Petitioner presented the state habeas court with no evidence showing his trial counsel's avowed concerns about the potential for the disclosure of new inculpatory information were objectively unreasonable given the information then available to said counsel.[104]

---

104. In fact, petitioner made no effort during his state habeas corpus proceeding to present any evidence concerning the objective reasonableness of his trial counsel's professed reason for not calling Mark Martinez or Tomas Guadalupe to testify on petitioner's behalf during the pretrial hearing on petitioner's motions to suppress. Petitioner did not question his trial counsel regarding the evidentiary basis for said counsel's belief Mark Martinez or Tomas Guadalupe, or both, possessed potentially inculpatory information. Likewise, petitioner failed to call either of those two individuals to testify during his state habeas corpus proceeding to explore the extent of their potential knowledge of inculpatory information prior to petitioner's trial. Petitioner also failed to call petitioner's court-appointed investigator, who apparently spoke with both Mark Martinez and Tomas Guadalupe, to ascertain what he might have known about these witnesses' potential to harm petitioner's case. In short, petitioner failed to present the state habeas court with any evidence showing the fears of petitioner's trial counsel that these witnesses could do harm to petitioner if they spoke with law enforcement officers were objectively unreasonable.

The state habeas court correctly noted the burden lies with the petitioner to overcome the presumption of objective reasonableness afforded a defense counsel's performance. Petitioner made no effort to establish his trial counsel's expressed concerns about the potential harm of calling Mark Martinez and Tomas Guadalupe to testify were unjustified. As explained in the text above, while petitioner's trial counsel mentioned to the state trial court his concern regarding what those witnesses might say on cross-examination during petitioner's pretrial hearing, any reasonable counsel in the same situation would also have been concerned about what those witnesses might tell investigators when they were off the stand. To prevail on this aspect of his ineffective assistance claim, petitioner was obligated to prove his trial counsel's decisions not to call Mark Martinez or Tomas Guadalupe were objectively unreasonable. Assuming petitioner's trial counsel erroneously believed those witnesses could be cross-examined during petitioner's suppression hearing regarding their knowledge of other, inculpatory, information, that error did not render objectively unreasonable said counsel's obvious concerns

The state habeas court correctly noted a convicted defendant must carry the burden of proof and overcome a strong presumption the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington,* 466 U.S. at 687–91, 104 S.Ct. at 2064–66.

During his state habeas hearing, petitioner made no effort to question his trial counsel regarding the objective reasonableness of said counsel's belief these witnesses might furnish the prosecution with inculpatory information had those witnesses been brought to San Antonio prior to petitioner's trial. Petitioner's complaints ignore the obvious possibility that, having been subpoenaed to testify about petitioner's sobriety at the pretrial hearing on petitioner's motions to suppress, these witnesses might have spoken to law enforcement officers in San Antonio about other, inculpatory, information they possessed. Petitioner offered the state habeas court no evidence establishing either of these witnesses would have refused to speak with law enforcement officers prior to petitioner's trial about any inculpatory remarks petitioner might have made to them prior to his arrest or any other inculpatory information of which they might be aware, had law enforcement officers questioned those witnesses once they arrived in San Antonio. Petitioner identifies no legal impediment to prosecutors or law enforce-

ment investigators who wished to discuss either of those subjects with Mark Martinez or Tomas Guadalupe doing so after those witnesses had testified regarding petitioner's sobriety at petitioner's pretrial hearing.[105]

In short, petitioner's trial counsel expressed to the trial court their concern that subpoenaing these two witnesses to testify at the pretrial hearing on petitioner's motions to suppress might open a Pandora's Box and make unspecified inculpatory information, theretofore unknown to the prosecution, available to the prosecution. Petitioner presented the state habeas court with no evidence establishing his trial counsel's concerns in this regard were in any manner objectively unreasonable. Under such circumstances, the state habeas court's conclusion this aspect of petitioner's multifaceted ineffective assistance claim failed to satisfy the deficient performance standard of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### d. *No Prejudice*

Furthermore, the state habeas court's conclusion this aspect of petitioner's inef-

regarding what those witnesses might tell investigators after they left the stand at petitioner's pretrial suppression hearing.

**105.** The inherent presumption underlying this aspect of petitioner's ineffective assistance claim is faulty. Nothing would have legally prevented either Mark Martinez or Tomas Guadalupe from speaking with law enforcement agents about any inculpatory information they might have possessed had they been subpoenaed by petitioner's trial counsel to testify during petitioner's pretrial suppression

hearing. Petitioner offered the state habeas court no evidence showing that his trial counsel's fears as to what these two witnesses might tell investigators, had they been subpoenaed, were unfounded. It is also significant petitioner's former trial counsel testified without contradiction, during petitioner's state habeas corpus proceeding, that petitioner's family did not want to come forward and testify at trial. S.F. State Habeas Hearing, Volume 1 of 3, testimony of Vincent D. Callahan, at pp. 9 & 70.

fective assistance claims failed to satisfy the prejudice prong of *Strickland* was likewise reasonable. Aside from petitioner's own self-serving testimony, petitioner failed to present the state habeas court with any evidence showing either Mark Martinez or Tomas Guadalupe could have offered any helpful testimony relevant to the admissibility of petitioner's written confession or petitioner's volunteered, inculpatory, oral statements. Petitioner's conclusory assertion that Mark Martinez could have testified petitioner was intoxicated at the time of petitioner's arrest was supported by no specific facts showing precisely how Mark Martinez came to possess such knowledge or precisely what else Mark Martinez might have said about petitioner's mental or physical condition at the time of petitioner's arrest. Furthermore, as petitioner acknowledges, the issue of petitioner's alleged intoxication at the time of his arrest was not determinative, under either state or federal law, of the legal question regarding the admissibility of petitioner's written confession which was given nine hours later after petitioner had been given repeated *Miranda* warnings.

In *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), the United States Supreme Court rejected the premise underlying petitioner's first group of ineffective assistance complaints herein, i.e., the argument suggesting the voluntariness of a defendant's confession somehow turns on the subjective state of mind and mental condition of the defendant. *See Colorado v. Connelly*, 479 U.S. at 164–67, 107 S.Ct. at 520–22 (repeatedly emphasizing coercive police activity is a necessary predicate to a finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment). Instead, the Supreme Court held unequivocally the determination a confession was involuntary must be premised on findings: (1) law

enforcement officials employed or directed coercive actions toward the defendant and (2) said coercive conduct was "causally related to the confession." *Id.* at 164–71, 107 S.Ct. at 520–24. Petitioner presented the state habeas court with no evidence showing either Mark Martinez or Tomas Guadalupe possessed any personal knowledge establishing the police engaged in any coercive action which resulted in petitioner's confession. In fact, petitioner failed to present his state habeas court with any evidence, beyond his own self-serving trial testimony, suggesting any such coercion occurred prior to petitioner executing his written confession.

In *Jones v. State*, 944 S.W.2d 642 (Tex. Crim.App.), *cert. denied*, 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d 54 (1997), the Texas Court of Criminal Appeals held evidence of intoxication, while relevant to the issue of the voluntariness of a confession, does not render a confession involuntary *per se.* *Jones v. State*, 944 S.W.2d at 651 (citing *Nichols v. State*, 754 S.W.2d 185, 190 (Tex. Crim.App.1988), *cert. denied*, 488 U.S. 1019, 109 S.Ct. 819, 102 L.Ed.2d 808 (1989)). Rather, Texas law recognizes the proper inquiry as whether the defendant's intoxication rendered him incapable of making an independent, informed decision to confess. *Id.* Petitioner presented his state habeas court with no evidence showing either Mark Martinez or Tomas Guadalupe could have offered any testimony during petitioner's pretrial suppression hearing establishing petitioner was incapable of making an independent, informed decision to confess at the time petitioner gave his written confession. There was no allegation and no evidence before petitioner's state habeas court showing either Mark Martinez or Tomas Guadalupe possessed any personal knowledge regarding petitioner's mental or physical condition at

the time petitioner gave his written confession.

During petitioner's pretrial suppression hearing, both of the San Marcos police officers who arrested petitioner specifically denied they observed anything about his demeanor, appearance, or conduct at the time of petitioner's arrest which suggested petitioner was then intoxicated.[106] At trial, these same two officers repeated their testimony establishing petitioner displayed no overt indications of intoxication at the time of his arrest and furnished additional testimony establishing petitioner made unsolicited comments immediately after his arrest suggesting petitioner fully understood the circumstances of his arrest and the nature of the charge against him.[107] The San Antonio homicide detective who obtained petitioner's written statement testified during petitioner's suppression hearing that petitioner displayed no indication of intoxication during petitioner's custodial interrogation on the afternoon following his arrest.[108] At trial, the same detective testified: (1) he observed no indication petitioner was intoxicated at any time during

106. More specifically, San Marcos Police Officer Jehu Derrickson testified during petitioner's suppression hearing: (1) he noticed nothing indicating petitioner was intoxicated, (2) he did not notice any aroma of alcohol emanating from petitioner, (3) he saw no beer bottles or cans or other alcoholic beverage containers inside the residence where petitioner was arrested, (4) petitioner did not appear intoxicated, (5) petitioner did not slur his speech, (6) petitioner did not stagger when he walked, and (7) petitioner appeared to understand what was going on. S.F. Trial, Volume 16, testimony of Jehu Derrickson, at pp. 2250 & 2257.

San Marcos Police Officer Jeff Caldwell testified during petitioner's suppression hearing: (1) petitioner appeared to understand the Miranda warnings he read to petitioner, (2) he saw no alcoholic beverage containers around the house, (3) when officers discovered a baseball bat in the corner of the room where petitioner was arrested, petitioner volunteered something like "that's not what you're looking for" or "that's not it." S.F. Trial, Volume 16, testimony of Jeff Caldwell, at pp. 2268–71 & 2275–79.

107. More specifically, Officer Derrickson testified at trial: (1) petitioner did not appear intoxicated, did not slur his speech, and did not smell of alcohol, (2) during the short drive to the Hays County Law Enforcement Center, without prompting, petitioner asked whether he was going to San Antonio that night, and, after being informed the answer was negative, petitioner volunteered that he had been aware the residence where he was staying had been under police surveillance, (3) petitioner then asked who ratted on him and, when Officer Derrickson commented the crime had been in the newspapers, petitioner responded by sitting up straight and expressing surprise, and (4) again without prompting, petitioner stated "I killed them just like cockroaches." S.F. Trial, Volume 17, testimony of Jehu Derrickson, at pp. 2594–98.

Officer Caldwell testified at trial: (1) petitioner repeatedly gave an erroneous name and date of birth following arrest, even after petitioner was given his Miranda warnings and law enforcement officers found petitioner's identification in his wallet, (2) petitioner appeared to understand his Miranda warnings and nodded affirmatively after he read each right to petitioner, (3) he did not see any indications petitioner was intoxicated, (4) when another officer examined a baseball bat, petitioner volunteered something like "that's not what you're looking for" or "that's not it." S.F. Trial, Volume 17, testimony of Jeff Caldwell, at pp. 2571–79 & 2582.

108. More specifically, San Antonio Police Homicide Detective Alvin Brown testified during petitioner's suppression hearing: (1) petitioner showed no sign of intoxication during their interview which began at 12:30 p.m. on July 13, 1994, (2) petitioner read and made corrections to Brown's handwritten draft of the statement which petitioner initialed, (3) petitioner then wrote out by hand an addendum to the statement and initialed same, (4) petitioner filled in his own name and address and signed each of the three pages of the statement, and (5) while he sat close to petitioner throughout the interview, he detected no smell of alcohol on petitioner's breath. S.F. Trial, Volume 16, testimony of Alvin Brown, at pp. 2303–15 & 2324.

his interview of petitioner, (2) petitioner indicated he understood the warnings and waivers on each page of the written statement, and (3) before signing his statement, petitioner personally wrote out corrections and a lengthy addition to same at the end of the statement.[109] Significantly, the same detective also testified at trial no promises, threats, or other forms of coercion were employed to elicit or induce petitioner's confession.[110]

Petitioner did not testify or offer any evidence during his pretrial suppression hearing controverting any of the foregoing testimony. At the punishment-phase of his trial, petitioner: (1) denied he had written his confession, (2) claimed he was intoxicated throughout his interview and merely wrote what the officers told him to write, and (3) insisted he had done so because the detective threatened to bring additional charges against him unless he did so.[111] During his state habeas hearing, petitioner testified: (1) he understood he had the right to testify during his suppression hearing but, based on the advice of his counsel, chose not to do so, (2) he could read and write English and had earned a GED, (3) he heard his *Miranda* warnings when they were read to him and nodded in reply thereto but did not understand what was being said to him, (4) his signature appears on his confession but he signed same without reading it first, (5) he wrote the concluding paragraph of his confession but was so intoxicated he did not understand what he was writing, (6) while he did not kill Carolina or Eric Prado, he wrote his confession because he felt guilty about

their deaths, (7) he initialed a pair of changes to his confession, and (8) he wanted Mark Martinez to testify at the punishment-phase of trial that petitioner was drunk and under the influence of marijuana at the time of petitioner's arrest.[112]

Petitioner's state habeas court was faced with a record containing: (1) consistent testimony from several law enforcement officers at petitioner's pretrial suppression hearing and trial regarding petitioner's apparent sobriety, both at the time of petitioner's arrest and when petitioner gave his written confession, and (2) a complete and total absence of any direct testimony from either Mark Martinez or Tomas Guadalupe regarding their personal knowledge of petitioner's alleged intoxication at the time of petitioner's arrest. Additionally, the state habeas court had before it the sworn trial testimony of the police detective who took petitioner's confession establishing no coercion was used to elicit petitioner's confession. The only evidence controverting this testimony consisted of petitioner's punishment-phase trial testimony in which he asserted he had executed his confession to capital murder because officers had threatened to bring unspecified "other charges" against him unless he did so. Under such circumstances, the state habeas court's implicit rejections of petitioner's testimony: (1) he was intoxicated when he was arrested, (2) he was still intoxicated nine hours later when he gave his written confession, and (3) he only executed his confession to capital murder because he had been threatened with un-

**109.** S.F. Trial, Volume 18, testimony of Alvin C. Brown, II, at pp. 2631–49.

**110.** *Id.* at pp. 2628 & 2634–36.

**111.** S.F. Trial, Volume 20, testimony of David Martinez, at pp. 3062–63, 3066–67, & 3085–86.

**112.** S.F. State Habeas Hearing, Volume 2 of 3, testimony of David Martinez, at pp. 14, 20–21, 29–31, 45–53, & 59–60.

specified "other charges," were not only reasonable but fully supported by the evidentiary record before said court. In short, the state habeas court's implicit factual findings rejecting the credibility of petitioner's assertions of intoxication and coercive threats against him were reasonable determinations of the facts in light of the evidence presented during petitioner's state habeas proceeding. Petitioner has presented this Court with no evidence, much less clear and convincing evidence, rebutting the presumption of correctness which this Court must afford the state habeas court's factual finding on this matter. The presumption of correctness the AEDPA affords state court factual determinations applies not only to explicit fact findings but also to "those unarticulated findings" which are necessary to the state court's conclusions of mixed law and fact. *Young v. Dretke,* 356 F.3d 616, 629 (5th Cir.2004); *Valdez v. Cockrell,* 274 F.3d 941, 948 & n. 11 (5th Cir.2001), *cert. denied,* 537 U.S. 883, 123 S.Ct. 106, 154 L.Ed.2d 141 (2002).

In this case, the state habeas court made express conclusions that petitioner's complaints about: (1) his trial counsel's failure to call Mark Martinez or Tomas Guadalupe to testify during petitioner's pretrial suppression hearing and (2) his trial counsel's failure to call petitioner to testify during the same pretrial suppression hearing both failed to satisfy the prejudice prong of *Strickland.* The latter conclusion necessarily implied a factual determination rejecting petitioner's assertion (during his punishment-phase trial testimony) that coercion was applied to induce petitioner's confession; this factual determination is entitled to deference from this Court. *See Pondexter v. Dretke,* 346 F.3d 142, 148 (5th Cir.2003) (holding a state court's express conclusion a petitioner had failed to satisfy the prejudice prong of *Strickland* necessarily implied certain factual findings, including credibility determinations, to which the federal habeas court was required to give deference under the AEDPA), *cert. denied,* 541 U.S. 1045, 124 S.Ct. 2160, 158 L.Ed.2d 736 (2004).

Petitioner also complains his trial counsel failed to elicit unspecified testimony on cross-examination from unidentified prosecution witnesses, which petitioner asserts would have established petitioner was intoxicated at the time of his arrest. Petitioner neither identifies these prosecution witnesses, nor does he inform this Court as to the nature of the helpful testimony these unidentified witnesses allegedly could have provided. As explained at length above, both the San Marcos police officers who arrested petitioner and the San Antonio homicide detectives who interviewed petitioner testified without contradiction during petitioner's pretrial suppression hearing that petitioner displayed no overt indications of intoxication, either at the time of his arrest or when he was furnishing his written confession. Conclusory assertions on an ultimate issue do not furnish a basis for federal habeas relief. *See Kinnamon v. Scott,* 40 F.3d 731, 735 (5th Cir.) (holding a petitioner's speculative complaints of ineffective assistance by appellate counsel did not warrant federal habeas relief), *cert. denied,* 513 U.S. 1054, 115 S.Ct. 660, 130 L.Ed.2d 595 (1994); *Anderson v. Collins,* 18 F.3d 1208, 1221 (5th Cir.1994) (holding absent a specific, affirmative showing of precisely what evidence or testimony was rendered unavailable due to a trial counsel's failure to investigate, develop, and present same, i.e., a showing of exactly what the missing evidence or testimony would have been, a court cannot begin to apply the *Strickland* analysis because it is very difficult to determine whether the defendant was prejudiced by any such deficiencies in counsel's performance).

The same principle applies to petitioner's complaint about his trial counsel's failure to present unspecified evidence showing petitioner was intoxicated at the time he gave his confession. As explained above, petitioner's assertions he was intoxicated when he gave his confession (which assertions petitioner made during his punishment-phase trial testimony and state habeas hearing testimony) were implicitly rejected by the state habeas court. The state habeas court's implicit rejection of petitioner's claim he was intoxicated when he gave his confession is a factual determination to which this Court must give statutory deference under the AEDPA. The testimony of the San Antonio homicide detective who helped secure petitioner's written confession, given at both petitioner's pretrial suppression hearing and petitioner's trial, fully supports the state habeas court's implicit factual determination.

■ Having independently reviewed the entire record from petitioner's pretrial suppression hearing, trial, and state habeas corpus proceeding, this Court concludes there is no reasonable probability that, but for the failure of petitioner's trial counsel to: (1) call Mark Martinez or Tomas Guadalupe to testify during petitioner's pretrial suppression hearing, (2) cross-examine unspecified prosecution witnesses during the same hearing, or (3) call petitioner to testify during the pretrial suppression hearing, the outcome of either phase of petitioner's capital murder trial would have been any different. Moreover, given the state habeas court's appropriate, implicit, factual determination rejecting petitioner's proffered "I was so drunk I didn't know what I was doing" testimony, this Court concludes there is no possibility that either petitioner or his two friends

could have furnished the state trial court with any relevant testimony which would have had any impact on the outcome of petitioner's pretrial suppression hearing. For the foregoing reasons, the state habeas court's conclusion that this portion of petitioner's ineffective assistance claim failed to satisfy the prejudice prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### 2. Inadequate Challenge to Petitioner's Oral Statements

#### a. The Claims

Petitioner complains his trial counsel failed to present evidence challenging as involuntary and inadmissible under state statute several inculpatory oral statements petitioner made shortly after his arrest.[113] More specifically, petitioner argues his trial counsel failed to present the state trial court with evidence, presumably petitioner's own testimony, establishing: (1) the statements in question were the products of custodial interrogation and, therefore, inadmissible under state law because they were never reduced to writing and (2) petitioner was intoxicated at the time he made those statements.[114]

#### b. State Court Disposition

The state habeas court rejected this portion of petitioner's ineffective assistance claim, finding petitioner had failed to present any additional evidence, beyond that implicitly rejected by the trial court during

**113.** The oral statements in question are outlined in the text, *supra* notes 39–40.

**114.** Petition, at pp. 32–33.

petitioner's pretrial suppression hearing, showing petitioner's oral statements were the products of interrogation.[115] For unknown reasons, the state habeas court ignored petitioner's alternative complaint that his trial counsel had failed to introduce unspecified evidence showing petitioner was intoxicated at the time petitioner made his oral statements.

### c. *No Deficient Performance*

■ The state habeas court had before it the testimony of two San Marcos police officers from petitioner's pretrial suppression hearing regarding the circumstances under which petitioner volunteered several inculpatory oral statements. Those officers carefully explained petitioner's comments had not been made in response to any form of interrogation but, rather, had been spontaneously volunteered by petitioner either shortly after his arrest or during the brief drive from petitioner's grandmother's residence to the Hays County Jail.[116] During the punishment-phase of his trial, petitioner testified he was intoxicated at the time of his arrest and gave his written confession but offered no testimony suggesting any of the several inculpatory oral statements he made to San Marcos police officers shortly after his arrest had been solicited by those officers. The state habeas court correctly noted petitioner offered no testimony during his state habeas corpus hearing challenging this aspect of the two San Marcos police officers' testimony.

While petitioner did testify (at trial and during his state habeas hearing) he was intoxicated at the time of his arrest, he never offered the state habeas court any testimony suggesting his inculpatory, post-arrest, oral statements had been solicited by law enforcement officers or agents. Petitioner failed to present the state habeas court with any evidence supporting the contention that his inculpatory, oral statements had been solicited by the police during a direct or indirect interrogation. Thus, petitioner furnished the state habeas court with no evidentiary basis for finding any of petitioner's inculpatory, oral statements were the products of a custodial interrogation.

Therefore, the state habeas court had before it no evidence showing petitioner's trial counsel acted in an objectively unreasonable manner in failing to attempt to prove the petitioner's oral statements in question were solicited by law enforcement officers. In fact, petitioner has failed to allege any facts in this Court suggesting petitioner's inculpatory, oral statements were anything other than spontaneous utterances made by petitioner without any prompting from law enforcement officers. Petitioner's trial counsel cannot be faulted for failing to complete a task which petitioner's state and federal habeas counsel have been unwilling to attempt.

Petitioner's trial counsel owed petitioner no duty to attempt to prove petitioner's inculpatory, oral statements were the products of a custodial interrogation when petitioner is unable to allege any specific

---

115. State Habeas Transcript, at p. 230.

116. More specifically, Officer Derrickson testified during petitioner's pretrial suppression hearing: (1) petitioner asked several questions during their drive to the jail following petitioner's arrest including "who ratted on me?" and (2) petitioner also volunteered the highly inculpatory "I killed them just like cockroaches" without any prompting from

himself. S.F. Trial, Volume 16, testimony of Jehu Derrickson, at pp. 2243–44. Officer Caldwell testified during the same pretrial hearing petitioner saw police officers examining a baseball bat and announced without any prompting "that's not what you're looking for" or "that's not it." S.F. Trial, Volume 16, testimony of Jeff Caldwell, at pp. 2270–71.

facts or furnish any evidence showing the statements in question to be anything more than the products of petitioner's own braggadocio. *See Smith v. Collins*, 977 F.2d 951, 960 (5th Cir.1992) ("The defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources."), *cert. denied*, 510 U.S. 829, 114 S.Ct. 97, 126 L.Ed.2d 64 (1993). There was nothing objectively unreasonable with the failure of petitioner's trial counsel to pursue these claims.

The state habeas court's implicit conclusion that this aspect of petitioner's ineffective assistance claim failed to satisfy the deficient performance prong of *Strickland* is neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

#### d. *No Prejudice*

As explained above, petitioner has alleged no specific facts or evidence suggesting his inculpatory, oral statements were the product of custodial interrogation. The testimony from both his pretrial suppression hearing and trial established petitioner volunteered all his inculpatory, post-arrest, oral statements after having been given his *Miranda* warnings.[117] Absent some fact-specific allegation showing how an alleged deficiency in his trial counsel's performance impacted the outcome of either phase of petitioner's trial, this aspect of petitioner's ineffective assistance claim also fails to satisfy the prejudice prong of *Strickland*. To satisfy the prejudice prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. 510, 534, 123 S.Ct. 2527, 2542, 156 L.Ed.2d 471 (2003); *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (quoting *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2052). Petitioner's conclusory allegations in support of his second ineffective assistance claim do not approach the standard of specificity necessary to satisfy the prejudice prong of *Strickland*. Thus, the state habeas court's implicit conclusion this aspect of petitioner's ineffective assistance claims fails to satisfy *Strickland's* prejudice prong was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.[118]

117. *See supra* note 16.

118. For the reasons set forth in Section II. C.1.d. above, petitioner's complaint that his trial counsel failed to establish petitioner's inculpatory oral statements were made while petitioner was intoxicated also fail to satisfy *Strickland's* prejudice prong. To reiterate: (1) the state habeas court implicitly rejected the credibility of petitioner's testimony suggesting he was intoxicated at the time of his arrest; (2) that rejection was wholly reasonable given the consistent testimony of a pair of San Marcos police officers who saw and spoke with petitioner immediately after petitioner's arrest and who testified they observed no indications petitioner was intoxicated; (3) under both state and federal law, the question of petitioner's intoxication was not controlling

### 3. Failure to Challenge Admission of Physical Evidence

#### a. The Claims

Petitioner complains his trial counsel failed to present evidence, including petitioner's testimony, showing petitioner had standing to challenge the admission of certain items of personal property obtained by law enforcement officers from the crime scene and the residence of petitioner's grandmother.[119] More specifically, petitioner complains his trial counsel failed to challenge the admission of: (1) a backpack found at petitioner's grandmother's residence shown to law enforcement officers by petitioner's relatives during a consent search of the residence (which contained, among other items, a black leather vest later identified as belonging to Eric Prado's uncle),[120] (2) other clothing items obtained during the consent search of petitioner's grandmother's residence by law enforcement officers and later identified as belonging to Eric Prado,[121] (3) items of Carolina Prado's personal property given to law enforcement officers by petitioner's uncle,[122] and (4) a gym bag found after the murders in a storage building located on the Prado residence given to law enforcement officers by the victims' relatives (which apparently contained adult magazines).[123]

on the issue of the admissibility of petitioner's spontaneous, inculpatory, oral statements; and (4) petitioner has identified no applicable legal authority rendering his inculpatory oral statements inadmissible simply because he made same while he was intoxicated.

**119.** Petition, at pp. 33–38.

**120.** At trial, a San Antonio homicide detective testified: (1) he and another officer were directed to a gym bag by petitioner's grandmother while they were conducting a consent search of her residence, i.e., the same San Marcos residence where petitioner had been arrested only hours before, and (2) the backpack, which was identified at trial as State Exhibit No. 67, contained a black leather vest which was identified at trial as State exhibit No. 14. S.F. Trial, Volume 18, testimony of Alvin C. Brown, II, at pp. 2618–26. During the same consent search, detective Brown also recovered a Dallas Cowboys baseball cap (identified at trial as State Exhibit No. 18) and a pair of tennis shoes (identified as State Exhibit No. 17). *Id.* at pp. 2625–26. Petitioner's uncle, Guadalupe Martinez, gave Detective Brown a shirt (identified as State Exhibit No. 68) and a pair of trousers. *Id.* at pp. 2624–25.

Belinda Prado testified during the guilt-innocence phase of trial: (1) when he left her home after committing the murders, petitioner wore boots, a white shirt, black pants, and a black leather vest that belonged to her uncle and (2) State Exhibit No. 14 was the vest petitioner wore on the date of the murders.

S.F. Trial, Volume 17, testimony of Belinda Prado, at pp. 2479–80.

A San Antonio police officer who interviewed Belinda Prado shortly after the murders testified at trial Belinda's description of the clothing worn by petitioner when he left her home after committing the murders consisted of black pants, a white shirt, and a black leather vest with lacing on one side. S.F. Trial, Volume 17, testimony of Gary Grona, at pp. 2451–52.

**121.** During the guilt-innocence phase of petitioner's trial, Belinda Prado identified State Exhibit No. 18, the Dallas Cowboys baseball cap, and State Exhibit No. 17, the tennis shoes, as belonging to her late-brother Eric. S.F. Trial, Volume 17, testimony of Belinda Prado, at pp. 2487–88.

**122.** During the guilt-innocence phase of petitioner's trial, a San Marcos police officer testified he was summoned to the petitioner's grandmother's address on July 20, 1994, and petitioner's uncle Guadalupe Martinez gave him a Texas identification card and a Southwestern Bell telephone calling card both bearing the name of Carolina Prado. S.F. Trial, Volume 18, testimony of Steven David Peyton, at pp. 2609–12.

**123.** During the pretrial suppression hearing, Carolina Prado's sister Rosemary identified State Exhibit No. 7 as a blue gym bag belonging to petitioner which she and her boyfriend found in a shack beside her late-sister's resi-

### b. *State Court Disposition*

On direct appeal, petitioner challenged the admission of the items of clothing and "porn magazines" identified above.[124] The Texas Court of Criminal Appeals: (1) noted petitioner conceded he lacked standing to contest the consent search of his grandmother's residence and (2) held, as the State had argued, even conceding petitioner possessed a privacy interest in the contents of the closed containers inspected during the consent search, the admission of the clothing items in question was harmless.[125]

In his state habeas corpus application, petitioner attacked as ineffective the performance of his trial counsel for failing to adequately challenge the admission of the physical evidence in question, including the adult magazines.[126] Petitioner testified during his state habeas corpus hearing the white shirt, black pants, and tennis shoes found at his grandmother's residence belonged to him, not to Eric Prado, and complained his trial counsel failed to show him all the physical evidence possessed by the prosecution prior to trial, but offered no evidence showing he had a reasonable expectation of privacy in either Carolina Prado's residence or his grandmother's residence or in any closed container found at either location.[127] The state habeas trial court concluded: (1) petitioner had failed to present any evidence showing he possessed a privacy interest in either his grandmother's residence or Carolina Prado's residence, or in any item found inside either location, (2) the State had demonstrated a valid third-party consent search occurred at petitioner's grandmother's residence, (3) the items found by the victims' relatives at the late Carolina Prado's residence were not the fruit of an illegal search, and (4) this aspect of petitioner's ineffective assistance claim failed to satisfy *Strickland's* prejudice prong.[128]

### c. *No Deficient Performance*

Because the state habeas court failed to address *Strickland's* deficient performance prong in connection with this aspect of petitioner's multi-faceted ineffective assistance claim, this Court's analysis of same is necessarily *de novo*. *See Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005) (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of

---

dence a few days after the murders. S.F. Trial, Volume 16, testimony of Rosemary Ramirez, at pp. 2283–85. However, the bag in question was never identified or admitted into evidence during petitioner's trial.

**124.** Appellant's Brief, at pp. 13–18. Petitioner's brief on direct appeal quite correctly did not include any citation to the part of the record where the "porn magazines" were admitted into evidence. That is because those magazines were never admitted into evidence during either phase of petitioner's trial. Instead, during his testimony at the punishment-phase of his trial, petitioner admitted on cross-examination he was the owner of State Exhibit No. 7 and the blue gym bag in question contained "adult magazines" which he read for the articles. S.F. Trial, Volume 20,

testimony of David Martinez, at pp. 3095–96. While the prosecution did make reference to the magazines during its closing argument (S.F. Trial, Volume 20, at p. 3134), petitioner admitted in his appellant's brief the magazines themselves had never been admitted into evidence. *Id.* at p. 16.

**125.** *Martinez v. State*, No. 72,288 (Tex.Crim. App. Nov. 4, 1998), slip op. at pp. 13–17.

**126.** State Habeas Transcript, at pp. 24–25.

**127.** S.F. State Habeas Hearing, Volume 2 of 3, testimony of David Martinez, at pp. 22 & 65–66.

**128.** State Habeas Transcript, at pp. 231–32.

prejudice); *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

Insofar as petitioner complains his trial counsel failed to adequately challenge the admission of the adult magazines contained in State Exhibit No. 7, that complaint is of no consequence. Neither State Exhibit No. 7 nor its contents were admitted into evidence during petitioner's trial.[129]

■ Insofar as petitioner complains his trial counsel failed to present the trial court with evidence showing petitioner possessed a constitutionally recognized privacy interest in the backpack and clothing petitioner left at his grandmother's residence when he was arrested, petitioner failed to present the state habeas court with any evidence, and has failed to allege any specific facts in this Court, showing he ever possessed a reasonable expectation of privacy in any of his victims' items of personal property which he left at his grandmother's residence at the time of his arrest.

Having conducted a *de novo* review of this portion of petitioner's ineffective assistance claim, this Court independently concludes petitioner has failed to satisfy the deficient performance prong of *Strickland.* Petitioner's trial counsel cannot be faulted for failing to present the trial court with evidence petitioner failed to introduce during his state habeas corpus proceeding (and which evidence petitioner still fails to identify with any degree of factual specificity in his pleadings in this Court). During his state habeas corpus proceeding, petitioner failed to demonstrate any evidentiary basis existed prior to his trial for challenging the admission of his victims' clothing or any of the other property found at petitioner's grandmother's residence. Therefore, petitioner failed to overcome the presumption of objective reasonableness ordinarily afforded a trial counsel's performance. Absent a showing of both an evidentiary and legal basis for attacking the admission of the physical evidence in question, petitioner's trial counsel's failure to do so does not fall outside the broad parameters of objectively reasonable professional performance.

### d. *No Prejudice*

Petitioner presented the state habeas court with no evidence establishing any arguable legal basis existed for challenging the admissibility of any of the physical evidence in question. While petitioner complains his trial counsel failed to call him to testify during the pretrial suppression hearing regarding the property in question, petitioner offered the state habeas court no testimony establishing a potentially viable ground existed for seeking the exclusion of any of the physical evidence in question. More specifically, petitioner furnished no testimony establishing he possessed a reasonable expectation of privacy in either: (1) the blue gym bag found after the murders inside the storage shed at Carolina Prado's residence or (2) the backpack and other items found inside petitioner's grandmother's residence following petitioner's arrest. Moreover, peti-

**129.** Likewise, while petitioner complains the prosecution's mental health expert, Dr. Gregorio Pina, III, used petitioner's affectation for pornography as one of the bases supporting his conclusion regarding petitioner's future dangerousness, petitioner identifies no arguable legal basis for excluding Dr. Pina's opinion testimony simply because it was based, in part, on the fact petitioner owned "adult magazines" found after the murders in the blue gym bag inside Carolina Prado's storage shed. Petitioner identifies no legal authority for excluding expert testimony like Dr. Pina's punishment-phase opinion testimony simply because it is based in part on hearsay or other forms of inadmissible evidence.

tioner offered the state habeas court no evidence regarding the precise location where either Carolina Prado's identification and telephone calling card or the clothing in question (i.e., the baseball cap, white shirt, black slacks, and tennis shoes) were found or the circumstances surrounding their discovery. Thus, the state habeas court had no evidence before it from which to conclude an arguable legal basis existed for challenging the admission at trial of any of the physical evidence in question.

■■■ The state habeas court's conclusion that this aspect of petitioner's ineffective assistance claim failed to satisfy the prejudice prong of *Strickland* was a reasonable application of clearly established federal law. Disregarding all the physical evidence linking petitioner's clothing to the crimes, the evidence of petitioner's guilt was overwhelming. Shortly after petitioner fled the scene, Belinda Prado identified petitioner to her grandparents and police officers as her late-brother's murderer. Petitioner made no effort to impeach her eyewitness trial testimony on that subject. Petitioner's confession established his culpability in Carolina's murder beyond any doubt. Likewise, the petitioner's: (1) well-documented history of explosive, violent conduct, (2) unrepentant demeanor during his punishment-phase trial testimony, and (3) repudiation of his confession and obstinate refusal to accept responsibility for his horrific crimes, combined to virtually guarantee the jury would answer the two capital sentencing special issues in a manner favorable to the prosecution. There is no reasonable probability the admission of the clothing items and other personal property found at petitioner's grandmother's residence had any impact on the outcome of either phase of petitioner's trial. The

state appellate court correctly held the allegedly erroneous admission of the clothing items and other personal property linked to the victims found at petitioner's grandmother's residence shortly after petitioner's arrest to be harmless, at best. Under such circumstances, the state habeas court's holding that this aspect of petitioner's ineffective assistance claim failed to satisfy *Strickland's* prejudice prong was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

4. *Failure to Challenge Handwriting Exemplars*

a. *The Claim*

Petitioner complains his trial counsel failed to move to suppress the handwriting exemplars obtained outside the presence of his trial counsel on Fifth and Sixth Amendment grounds.[130]

b. *State Court Disposition*

The state habeas court concluded petitioner's complaint failed to satisfy the prejudice prong of *Strickland* because: (1) clearly established federal law holds the Fifth and Sixth Amendments inapplicable to requests for handwriting exemplars and (2) petitioner presented no evidence sufficient to overcome the presumption of reasonableness afforded most strategic decisions by trial counsel.[131]

c. *No Deficient Performance*

■■■ The state habeas court correctly concluded petitioner's trial counsel could

---

**130.** Petition, at pp. 38–43.

**131.** State Habeas Transcript, at pp. 232–33.

not be faulted for failing to pursue a frivolous legal argument. The Supreme Court has held the taking of handwriting exemplars does not implicate a criminal defendant's Fifth or Sixth Amendment rights because such exemplars are not testimonial in nature and the taking of exemplars is not a critical stage in a criminal proceeding entitling the defendant to the assistance of counsel. *Gilbert v. California,* 388 U.S. 263, 266–67, 87 S.Ct. 1951, 1953, 18 L.Ed.2d 1178 (1967). Petitioner refuses to acknowledge the existence of the foregoing holding and fails to furnish any argument distinguishing the holding of that opinion from petitioner's situation. In sum, there was no arguable legal basis available to petitioner's trial counsel to support a motion to suppress the handwriting exemplars in question.

The failure of petitioner's trial counsel to present a facially frivolous argument did not cause the performance of said counsel to fall below an objective level of reasonableness. *See Johnson v. Cockrell,* 306 F.3d 249, 255 (5th Cir.2002) (holding there was nothing deficient in counsel's failure to object to the admission of psychiatric testimony that was admissible under then-existing precedent), *cert. denied,* 538 U.S. 926, 123 S.Ct. 1573, 155 L.Ed.2d 319 (2003); *Robison v. Johnson,* 151 F.3d 256, 261 (5th Cir.1998) (nothing deficient regarding trial counsel's failure to seek admission of a document the state court concluded was inadmissible), *cert. denied,* 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999); *Emery v. Johnson,* 139 F.3d 191, 198 (5th Cir.1997) (failure to assert a meritless objection cannot be the grounds for a finding of deficient performance), *cert. denied,* 525 U.S. 969, 119 S.Ct. 418, 142 L.Ed.2d 339 (1998); *Meanes v. Johnson,* 138 F.3d 1007, 1012 (5th Cir.) (holding counsel was not constitutionally deficient for failing to raise an objection if, at the time of trial, the objection would have been

futile in light of existing state law and the right asserted in the proposed objection was not clearly established), *cert. denied,* 525 U.S. 968, 119 S.Ct. 417, 142 L.Ed.2d 338 (1998); *Sones v. Hargett,* 61 F.3d 410, 415 n. 5 (5th Cir.1995) ("Counsel cannot be deficient for failing to press a frivolous point"); *United States v. Gibson,* 55 F.3d 173, 179 (5th Cir.1995) ("Counsel is not required by the Sixth Amendment to file meritless motions"); *Koch v. Puckett,* 907 F.2d 524, 527 (5th Cir.1990) ("[C]ounsel is not required to make futile motions or objections"); *Murray v. Maggio,* 736 F.2d 279, 283 (5th Cir.1984) ("Counsel is not required to engage in the filing of futile motions").

The state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the deficient performance prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusions based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### d. *No Prejudice*

■■■ Given the Supreme Court's clear holding in *Gilbert v. California,* there is no reasonable probability that, but for the failure of petitioner's trial counsel to raise patently frivolous Fifth and Sixth Amendment challenges to the admissibility of petitioner's handwriting exemplars, the outcome of either phase of petitioner's trial would have been different. During his state habeas corpus hearing, petitioner admitted he wrote the note identified at trial as State Exhibit No. 3, i.e., the note Belinda Prado testified at trial petitioner wrote and directed her to take to her grandmoth-

er.[132] Thus, even if petitioner's trial counsel had succeeded in getting the original handwriting exemplar suppressed on the ground it was obtained outside the presence of petitioner's trial counsel, under the Supreme Court's holding in *Gilbert*, no legal impediment existed to prevent the prosecution from securing a trial court order directing the taking of a second handwriting exemplar from petitioner, this time in his trial counsel's presence. In view of petitioner's admission he wrote the note in question, there is no reasonable probability the prosecution's handwriting expert's trial testimony (opining petitioner's handwriting appeared on the note) would have been any different had the expert compared the note with a second handwriting exemplar obtained in the presence of petitioner's trial counsel.

Moreover, petitioner failed to present the state habeas court with any evidence showing the state's handwriting expert would have rendered a different opinion regarding the authorship of the note in question had the expert been unable to compare the note with petitioner's handwriting exemplar. The reason for this omission from petitioner's evidence might have been the fact the prosecution's handwriting expert also had available for comparison purposes petitioner's handwriting from the final portion of petitioner's written confession. In short, petitioner presented the state habeas court with no evidence showing the absence of the handwriting exemplar would have had any impact on the prosecution expert's opinion or on the outcome of either phase of petitioner's capital trial.

Accordingly, the state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy Strickland's prejudice prong was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusions based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### 5. Hearing on Petitioner's Motion to Substitute Counsel

#### a. The Claim

Petitioner argues his trial counsel rendered ineffective assistance during a pretrial hearing held October 12, 1995, on petitioner's *pro se* motion to substitute counsel.[133] More specifically, petitioner complains his trial counsel remained silent and failed to object when, during the hearing in question, the prosecutor elicited threatening comments from petitioner (which comments were later admitted into evidence during the punishment-phase of petitioner's trial despite the petitioner's belief the comments constituted impermissible products of an un-counseled custodial interrogation).

#### b. State Court Disposition

On October 12, 1995, the trial court took a brief pause during individual voir dire to address petitioner's *pro se* motion to substitute counsel. At that time, the following took place:

> THE COURT: Case number 94–CR–5818, styled the State versus David Martinez, Jr. Motion for Substitute of [sic] Counsel. State's ready?
>
> MR. LUITJEN: Yes, sir.

---

**132.** S.F. State Habeas Hearing, Volume 2 of 3, testimony of David Martinez, at pp. 42 & 44.

**133.** Petition, at pp. 43–64.

THE COURT: Defendant ready? Mr. Martinez, this is your motion so you're going to have to elaborate on it.

DEFENDANT: On my motion or the reason for substitute counsel?

THE COURT: Yeah. You filed the motion. I'm ready to hear the motion.

DEFENDANT: Well, as you can see, I had asked before for all the tangible evidence.

THE COURT: Do you want to come up here? Come up here. Okay. Elaborate on the motion.

DEFENDANT: I asked before for all the information, like witnesses' statements and so forth to be able to prepare for my case. My attorneys haven't got all that for me. Then to serve for my witnesses before my trial came up before the end of the jury selection ended so that we would be ready to go to trial, and my witnesses would be there and so forth. And then I had asked them, I didn't put it on here but when I had asked them for my motion for speedy trial, they were supposed to set a motion for my speedy trial. It doesn't mean it's going to get granted, but that's my right for a speedy trial, to set a motion in the Court. They refused me that right, too. They violated my right there, too.

All I'm saying is that I want—I'm not saying this to delay the Court, all I want is substitute counsel. I don't care what DA prosecutes against me. It doesn't make a difference. I just want somebody that's going to defend me in my case. Not somebody that's going to sit down there and go along with the DA. The DA can make all his smart remarks all he wants. That doesn't make no difference. I'm not worried about what the DA has got against me. That will all take place

and take care of itself in due time. All I'm saying is these are the reasons I want substitute counsel.

THE COURT: Okay. Denny Callahan, do you wish to answer these charges? Anything?

MR. CALLAHAN: I invoke the attorney/client privilege, Your Honor.

THE COURT: Okay. Donald.

MR. ROUSH: I do the same.

THE COURT: Do the same what?

MR. ROUSH: I invoke the attorney/client privilege.

THE COURT: I knew what you meant, but for the record I have to explain it. State wish to say anything?

MR. LUITJEN: There's lots of things I'd like to say, Judge, but I don't think—

THE COURT: Concerning this motion.

MR. LUITJEN: Right. I don't think that—I want to again put on the record that albeit the Defendant doesn't seem to think that his attorneys are doing anything for him, they have had full discovery of our file. It's been open to them. They have had an opportunity to review the file in any detail they wish to and that opportunity continues to exit. He indicates in his motion that there are tangible documents in our possession that his lawyers have told him he can't have copies of, but yet he doesn't seem to see fit to inform us what he's talking about.

Again, point out on the record that we have an open file in this case and they are entitled to look at it any time they wish, and they have. They have actually written on the file that they have done so.

DEFENDANT: So-called State's witnesses and so forth, statements they have against me. I have not seen

none of that to tell them what was going on with the case and stuff. You all are the ones collaborating between each other. It's like a set thing. This case is just ready to go in, and there's something already been planned for me and stuff, you know. I'm not going to go out like that. If you're going to kill me, you're going to kill me the right way, not like that. See what I'm saying?

MR. LUITJEN: We're definitely going to kill you the right way. The reason we're going to do it the right way is—

DEFENDANT: Yeah. I'll tell you something else. You ain't holding me down, you know. Don't come off like that. I'm saying something right. You want to get technical, we can go. You know what I'm saying?

MR. LUITJEN: No. Tell me what you mean. What are you trying to tell me?

DEFENDANT: You think I'm a chump because my case or whatever. I'm innocent, but you can believe what you want to believe. If you want to go, we can go, man. You know what I'm saying?

MR. LUITJEN: Go where? What do you want to do?

DEFENDANT: If you think you're bad enough, just step up. You know what I'm saying?

MR. LUITJEN: I'll step up. What are you going to do about it?

DEFENDANT: Take off these bracelets and we can go, shit.

MR. LUITJEN: Is that your problem? You just want to fight or do you want to talk about the law?

DEFENDANT: You're the one starting all this bull shit, man.

MR. LUITJEN: What did I do? I didn't file this motion.

DEFENDANT: I'm talking about you saying that I'm guilty. I'm going to die. Well, I'm going to die the right way. You know? I'm going to fight my case, fight for my life, man. See what I'm saying?

MR. LUITJEN: And you think that you've got—

MR. CALLAHAN: Objection, argumentative.

MR. LUITJEN: I'm sorry.

MR. CALLAHAN: Objection argumentative.

THE COURT: The objection is overruled. Let him get it off his chest.

MR. LUITJEN: What else?

DEFENDANT: So you don't know me, man. Don't just step up like that, you know. I'm just saying that—

MR. LUITJEN: Are you threatening me?

DEFENDANT: No. I'm just saying you don't know me. All right?

THE COURT: What do you mean he doesn't know you?

DEFENDANT: He doesn't know me to be making—

THE COURT: He doesn't know you?

DEFENDANT: He don't know me.

THE COURT: You don't know him.

DEFENDANT: I haven't said nothing about him. Whatever he's about and stuff. I'm not going to go that way. See what I'm saying? That's not for me to know. He's supposed to deal with his case, not his personal beliefs that I'm guilty or whatever. That's not what's on trial. I'm on trial. The fact that I'm accused of capital murder, not what his beliefs are, that his personal vendetta that he wants to get me or whatever and stuff. That's not what's on trial. That's what I'm trying to get at. You see what I'm say-

ing? If it's going to be like that, no big deal then, you know.

MR. LUITJEN: Why are you threatening me? Why do you want to fight me?

DEFENDANT: No. If I was going to threaten—Like I said, if I'm going to threaten you, I'm not going to talk about it.

MR. LUITJEN: No. You'll sneak up on me and hit me in the back of the head with a baseball bat? Is that what you're telling me?

DEFENDANT: No. I'm going to get you right in front of the face, man. What are you talking about?

MR. LUITJEN: What am I talking about?

THE COURT: You think he's going to stand there and let you hit him?

DEFENDANT: Well, he can come to.

THE COURT: He can kill you. You don't know him.

DEFENDANT: He might as well go for it. Might as well snap my legs.

MR. CALLAHAN: Your Honor, we're outside the motion. This is irrelevant.

THE COURT: Yeah, we are. Anything else on the motion? I just want to get it off his chest. Anything else?

DEFENDANT: The motion is there.

MR. LUITJEN: I'd like for the record to reflect what he says and what his allegations are and what he thinks has gone wrong.

THE COURT: What do you want the record to reflect?

MR. LUITJEN: Well, he says his lawyers have failed to afford him a diligent search of important witnesses.

THE COURT: He made a statement about that. He wants the statement of all the witnesses. He's not entitled to that.

MR. LUITJEN: No. He's saying a search for witnesses, not just statements.

THE COURT: Well, he's got a good investigator, Carrasco.

MR. LUITJEN: I know, Judge. I think the record should also reflect that Mr. Carrasco was here yesterday for at least an hour talking to him.

THE COURT: Let the record so reflect.

DEFENDANT: That was the second time he's seen me in 15 months since I've been incarcerated.

MR. LUITJEN: It's because of your attitude.

DEFENDANT: No. He's never talked to me. I never told him nothing. That's the whole point.

MR. LUITJEN: You're not going to blame your lawyers because you won't talk to your investigator, are you?

DEFENDANT: How am I supposed to go get him? He's the one that's supposed to come see me. I don't have a number. How am I supposed to go get him? I'm incarcerated, remember?

MR. LUITJEN: He said he's been over there to talk to you twice.

MR. CALLAHAN: Once here and once over there. That's twice.

MR. LUITJEN: And you didn't talk to him.

DEFENDANT: Over there and that's it. He just came and introduced himself and he left. That's all it was. How am I supposed to tell my investigator anything if I don't have his number or nothing else?

MR. LUITJEN: You seem to be fairly capable of mouthing off and talking. It doesn't seem to be impossible for you to make a point.

DEFENDANT: My attorneys don't come see me in the county jail to let me know what the hell is going on with my case, and so forth, or let me know what my investigator's numbers are so I can call and talk to him myself.

MR. LUITJEN: What do you not know about your investigator?

DEFENDANT: I've requested everything. I've told them, I've yelled at them and everything. It doesn't seem to work. You know what I'm saying?

MR. LUITJEN: Yeah. Yelling usually doesn't work.

DEFENDANT: I've gone the right way about it. In the beginning I didn't care about this damn case. I wanted to get it over with, whatever. I didn't care what you did or not.

MR. LUITJEN: You wanted the death penalty, didn't you?

DEFENDANT: Did I? You tell me.

MR. LUITJEN: That's what you said.

DEFENDANT: You tell me.

MR. LUITJEN: I'm asking you.

DEFENDANT: You tell me. Were you there?

MR. LUITJEN: You said you didn't care. Is it true that you said you wanted the death penalty?

MR. CALLAHAN: We're outside the motion, Your Honor. Irrelevant.

MR. LUITJEN: I'll withdraw the question.

THE COURT: Anything else?

DEFENDANT: That's it.

THE COURT: Motion for substitute counsel will be denied. See you all at 2:00 o'clock. This goes with you.

DEFENDANT: I'm going to tell you right now you need to handcuff me. I'm not going to go back on that. You need to handcuff me to the chair.

THE COURT: If you wish to be handcuffed, we'll be glad to do that. We'll do that. Not only that, we'll gag you.

DEFENDANT: Do that, too, then. Shit. Fuck you all.[134]

At the punishment-phase of petitioner's trial, the prosecution called a Bexar County court security officer who testified: (1) on October 10, 1995, petitioner demanded to be placed in handcuffs and threatened to "go off" against his own attorneys unless he was restrained and (2) two days later, during the hearing detailed above, petitioner threatened to strike the prosecutor in the face.[135] During petitioner's cross-examination at the punishment-phase of trial, the petitioner and prosecuting attorney Luitjen debated the accuracy of the court reporter's record from the October 12, 1995 hearing, with petitioner arguing a specific threat by Luitjen to kill petitioner had been deliberately omitted from the record and claiming Luitjen's provocative remarks had provoked him to respond in kind.[136]

During petitioner's state habeas hearing, his former lead trial counsel testified, in part, he: (1) considered the verbal confrontation between petitioner and prosecutor Luitjen during the pretrial hearing to be "macho talk" akin to a man with a sharp stick poking at a barking dog, (2) did not view the petitioner's verbal exchange with the prosecutor and trial court as a custodial interrogation, and (3) did not foresee the possibility the prosecution would use the exchange as evidence

**134.** S.F. Trial, Volume 12, at pp. 1707–18.

**135.** S.F. Trial, Volume 19, testimony of Ruben Martinez Ramon, at pp. 3009–18.

**136.** S.F. Trial, Volume 20, testimony of David Martinez, at pp. 3110–14.

against petitioner.[137] The state habeas court concluded the heated exchange between petitioner and the prosecuting attorney during the pretrial hearing in question did not constitute a custodial interrogation and, therefore, petitioner's complaints regarding his trial counsel's allegedly deficient performance during the hearing failed to satisfy either prong of *Strickland*.[138]

### c. No Deficient Performance

It is undisputed petitioner himself precipitated the exchange, long after he received multiple *Miranda* warnings, by filing a *pro se* motion seeking to have his trial counsel replaced. In short, petitioner was asking the trial court to dismiss his trial counsel. This fact obviously created a potential conflict of interest for petitioner's trial counsel and fully justified said counsel's invocation of the attorney-client privilege when called upon to address petitioner's motion. Thus, any reticence on the part of petitioner's trial counsel to more actively participate in the hearing in question can hardly be considered objectively unreasonable. Furthermore, most of the inquiries directed to petitioner by the trial judge and prosecutor during the pretrial hearing reflected their joint frustration over petitioner's refusal to explain in a fact-specific manner precisely what it was

he felt his trial counsel had failed to do for him.[139] Petitioner's trial counsel did not completely abandon petitioner during the pretrial hearing; instead, said counsel voiced timely relevance objections and an unsuccessful objection to the prosecution's clearly argumentative comments.

Petitioner has failed to identify any clearly established federal legal authority recognizing the exchanges between himself, the prosecutor, and the trial judge in open court on October 12, 1995, as a form of "custodial interrogation" within the meaning of the Supreme Court's Fifth Amendment jurisprudence.

▇▇▇ The same is true for petitioner's contentions he was denied his Sixth Amendment right to the assistance of counsel. The non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989), precludes this Court from extending the Fifth and Sixth Amendment principles announced by the Supreme Court in *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), and *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), to petitioner's remarks made dur-

---

**137.** S.F. State Habeas Hearing, Volume 1 of 3, testimony of Vincent D. Callahan, at pp. 36–40.

**138.** State Habeas Transcript, at pp. 233–34.

**139.** The only specific complaint petitioner voiced during the hearing, i.e., the failure of his trial counsel to furnish petitioner with copies of the prosecution's witness statements, was frivolous. This Court takes judicial notice of the fact, during the time of petitioner's capital murder trial, the policy of the Bexar County District Attorney's office was to afford criminal defense counsel full discovery of the prosecution's case file, in-

cluding witness statements, but not to furnish copies of witness statements or other documentary evidence. Petitioner possessed no right, constitutional, statutory, or otherwise to personally examine witness statements or the physical evidence in the custody of law enforcement agencies prior to his trial. Petitioner has alleged no facts showing his trial counsel were denied adequate pretrial access to any of the prosecution's evidence. Nor has petitioner alleged any specific facts showing he was "prejudiced" within the meaning of *Strickland* by his trial counsel's failure to show witness statements and physical evidence to petitioner prior to trial.

ing an on-the-record hearing in open court on petitioner's *pro se* motion to replace his trial counsel conducted in the presence of petitioner's court-appointed counsel. ·

Under the holding in *Teague*, federal courts are generally barred from applying new constitutional rules of criminal procedure retroactively on collateral review. *Caspari v. Bohlen*, 510 U.S. 383, 389–90, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994). A "new rule" for *Teague* purposes is one which was not dictated by precedent existing at the time the defendant's conviction became final. *See O'Dell v. Netherland*, 521 U.S. 151, 156, 117 S.Ct. 1969, 1973, 138 L.Ed.2d 351 (1997) (holding that a "new rule" either "breaks new ground," "imposes a new obligation on the States or the Federal Government," or was not "dictated by precedent existing at the time the defendant's conviction became final"). Under this doctrine, unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *Id.*

The holding in *Teague* is applied in three steps: first, the court must determine when the petitioner's conviction became final; second, the court must survey the legal landscape as it then existed and determine whether a state court considering the petitioner's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution; and third, if the rule advocated by the petitioner is a new rule, the court must determine whether the rule falls within one of the two narrow exceptions to the non-retroactivity principle. *See Caspari v. Bohlen*, 510 U.S. at 390, 114 S.Ct. at 953.

The only two exceptions to the *Teague* non-retroactivity doctrine are reserved for: (1) new rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense and (2) "watershed" rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding, i.e., a small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty. *O'Dell v. Netherland*, 521 U.S. at 157, 117 S.Ct. at 1973. A conviction becomes final for *Teague* purposes when either the United States Supreme Court denies a certiorari petition on the defendant's direct appeal or the time period for filing a certiorari petition expires. *Caspari v. Bohlen*, 510 U.S. at 390, 114 S.Ct. at 953. Petitioner's conviction became final for *Teague* purposes on October 4, 1999, i.e., the date the United States Supreme Court denied petitioner's application for writ of certiorari. *Caspari v. Bohlen*, 510 U.S. at 390, 114 S.Ct. at 953 ("A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied."). *Teague* remains applicable after the passage of the AEDPA. *See Horn v. Banks*, 536 U.S. 266, 268–72, 122 S.Ct. 2147, 2148–51, 153 L.Ed.2d 301 (2002) (applying *Teague* in an AEDPA context); *Robertson v. Cockrell*, 325 F.3d 243, 255 (5th Cir.) (recognizing the continued vitality of the *Teague* non-retroactivity doctrine under the AEDPA), *cert. denied*, 539 U.S. 979, 124 S.Ct. 28, 156 L.Ed.2d 691 (2003).

None of the Supreme Court opinions relied upon by petitioner in his pleadings

before this Court address factual scenarios similar to petitioner's.[140] Unlike those cases, which all dealt with attempts by law enforcement officers to surreptitiously secure incriminating statements from a criminal defendant after the defendant's Sixth Amendment right to counsel had attached, petitioner's trial counsel was physically present throughout the pretrial hearing on October 12, 1995. None of the Supreme Court opinions relied upon by petitioner, nor any other Supreme Court opinion this Court has independently examined, include any suggestion a criminal defendant voluntarily proceeding *pro se* before a trial court for the purpose of voicing complaints about the performance of his court-appointed trial counsel is deprived of his Sixth Amendment right to counsel when he is questioned in the presence of his trial counsel by the trial court or prosecution regarding the specific complaints the de-

fendant has with his trial counsel's performance.

Petitioner argues his trial counsel's failure to more vigorously object to the trial judge's and prosecutor's questions to petitioner, as well as said counsel's failure to admonish petitioner his responses to the trial judge's and prosecutor's questions could be used against petitioner at trial, deprived petitioner of his right to the effective assistance of counsel. Yet, the comments most damning to petitioner at trial were made by petitioner during the pretrial hearing not in response to any questions by the prosecutor or trial judge but, rather, were volunteered spontaneously by petitioner and reflected petitioner's frustrations with his trial counsel's performance and the prosecutor's remarks promising "to kill" petitioner. The prosecution's lone comment about intending to "kill" petitioner "the right way" was, in

---

**140.** In *Estelle v. Smith,* the Supreme Court held the admission at the punishment-phase of a Texas capital murder trial of a psychiatrist's testimony regarding his findings as to the defendant's future dangerousness violated the defendant's rights under both the Fifth and Sixth Amendments where: (1) the defendant was never advised prior to the psychiatric interview his statements could be used against him at the punishment-phase of trial, (2) the defendant's counsel was not advised in advance of either the interview or even the fact a psychiatrist had been selected by the trial court to make a competency examination of the defendant, (3) the defense offered no psychiatric testimony or evidence at trial, and (4) the psychiatrist then testified at trial as to his findings regarding the petitioner's future dangerousness based upon the information he elicited from the defendant during the pretrial interview. *Estelle v. Smith,* 451 U.S. 454, 463–71, 101 S.Ct. 1866, 1873–77, 68 L.Ed.2d 359 (1981). The Supreme Court held a criminal defendant who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. *Id.* at 468, 101 S.Ct. at 1876.

In *Massiah v. United States,* the Supreme Court found violations of a criminal defendant's Fifth and Sixth Amendment rights where law enforcement officers encouraged a co-defendant to approach the defendant while both were out on bond following arrest and solicit petitioner's admissions concerning their criminal activity while a radio transmitter relayed the conversation back to the law enforcement officers. *Massiah v. United States,* 377 U.S. 201, 203–06, 84 S.Ct. 1199, 1201–03, 12 L.Ed.2d 246 (1964).

Likewise, in *Maine v. Moulton,* the Supreme Court found a Sixth Amendment violation where law enforcement officers intercepted conversations between co-defendants where one co-defendant was acting as an undercover agent for the state. *Maine v. Moulton,* 474 U.S. 159, 176–77, 106 S.Ct. 477, 487–88, 88 L.Ed.2d 481 (1985).

In *United States v. Henry,* the Supreme Court found a Sixth Amendment violation precluded the admission of statements a defendant made to a paid jailhouse informant outside the presence of the defendant's counsel. *United States v. Henry,* 447 U.S. 264, 272–75, 100 S.Ct. 2183, 2188–89, 65 L.Ed.2d 115 (1980).

fact, a response to petitioner's diatribe against the prosecution. Petitioner offers no factual basis for suggesting his trial counsel should have reasonably foreseen the petitioner would respond to the trial judge's and prosecutor's comments and questions with threats of physical violence or an offer to fight the prosecutor. The premise underlying this aspect of petitioner's multi-faceted ineffective assistance claim, i.e., petitioner's proposed rule declaring any comment or question directed to a represented criminal defendant by a trial judge or prosecutor during a hearing in open court is necessarily a form of "custodial interrogation," would constitute a "new rule of constitutional criminal procedure" for purposes of *Teague* analysis. Petitioner's proposed new rule does not fall within either of the recognized exceptions to the *Teague* non-retroactivity doctrine.

Petitioner testified during his state habeas hearing: (1) his trial counsel never advised him to stop talking during the October 12, 1995 hearing, (2) he believed the trial judge was prejudiced against him, (3) his trial counsel would not listen to him, (4) he did not trust his trial counsel and refused to cooperate with said counsel, (5) his trial counsel refused to file speedy trial and other motions petitioner requested, (6) he wanted his trial counsel to argue petitioner's innocence based on a showing peti-

tioner was not present at the time of the murders, but he was unable or unwilling to give his trial counsel the names of his alibi witnesses, and (7) he objected to his trial counsel's efforts to pursue an insanity defense.[141]

During the same hearing, petitioner's former lead trial counsel testified in pertinent part: (1) he did not consider the petitioner's exchanges with the trial court and prosecutor to be a form of custodial interrogation, (2) his experience had taught him the best course of action when dealing with prosecutor Luitjen's aggressive nature was to allow him enough rope to hang himself, and (3) he did not foresee the prosecution would utilize petitioner's violent threats as evidence during the punishment-phase of petitioner's trial.[142] Given the state habeas court's conclusion the petitioner's exchanges with the trial court and prosecution did not constitute "custodial interrogation" and the absence of any clearly established federal case law to the contrary, there does not appear to be anything objectively unreasonable with the first of petitioner's trial counsel's subjective conclusions. Petitioner failed to present the state habeas court with any evidence showing his trial counsel's subjective belief prosecutor Luitjen might "hang himself" if given enough rope was objectively unreasonable.[143]

---

141. S.F. State Habeas Hearing, Volume 2 of 3, testimony of David Martinez, at pp. 8–13, 15, 18, 20–21, 23–24, 27, 29, 31–40, & 54–66.

142. S.F. State Habeas Hearing, Volume 1 of 3, testimony of Vincent D. Callahan, at pp. 18 & 36–40.

143. In fact, petitioner made no effort during his state habeas hearing to explore with petitioner's trial counsel the factual or evidentiary basis for said counsel's subjective belief that, if given enough rope, prosecutor Luitjen might hang himself. Petitioner did not question his former lead trial counsel concerning the nature of his previous encounters with

prosecutor Luitjen or the factual basis supporting his former trial counsel's strategic decision not to participate more vigorously during the pretrial hearing on October 12, 1995. As explained above, the fact petitioner had filed a *pro se* motion seeking to replace his trial counsel clearly furnishes an objectively reasonable basis for petitioner's trial counsel to refrain from interrupting a hearing held by the trial court for the stated purpose of permitting petitioner to get his complaints regarding his trial counsel "off his chest."

Petitioner made no effort to explore the objective evidentiary basis for petitioner's trial counsel's belief there was a strategic bene-

In hindsight, petitioner's trial counsel could have been more vigilant during the pretrial hearing in anticipating the possibility the prosecution might have an ulterior motive in verbally prodding petitioner, i.e., to manufacture punishment-phase evidence. However, hindsight is not the standard by which the objective reasonableness of a trial counsel's performance is judged under the first prong of *Strickland.* In fact, the Supreme Court has repeatedly emphasized the importance of disregarding hindsight when evaluating a counsel's performance. *See Wiggins v. Smith,* 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time); *Bell v. Cone,* 535 U.S. at 698, 122 S.Ct. at 1852 ("'A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'") (quoting *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065). The state habeas court could have reasonably concluded the failure of petitioner's trial counsel to anticipate the prosecution's use as punishment-phase evidence of petitioner's provocative remarks during the pretrial hearing was

not objectively unreasonable. A criminal defense counsel is not required to exercise clairvoyance during the course of a criminal trial. *See Sharp v. Johnson,* 107 F.3d 282, 290 n. 28 (5th Cir.1997) (citing *Garland v. Maggio,* 717 F.2d 199, 207 (5th Cir.1983), for the principle "clairvoyance is not a required attribute of effective representation"); *Lackey v. Johnson,* 116 F.3d 149, 152 (5th Cir.1997) (holding trial counsel was not ineffective for failing to discover evidence about which the defendant knew but withheld from his counsel).

Under such circumstances, the state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the first *Strickland* prong was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### d. *No Prejudice*

Because the jury heard no testimony regarding petitioner's threats against his own counsel or the prosecutor until the punishment-phase of petitioner's trial, any deficiency in the performance of petitioner's trial counsel during the October 12, 1995 pretrial hearing could not have "prejudiced" petitioner within the meaning of

fit to be gained by not objecting to prosecutor Luitjen's unprofessional conduct during the pretrial hearing. For instance, petitioner failed to inquire whether his former trial counsel had personal knowledge of, or had heard about, any instance in which prosecutor Luitjen's aggressive behavior had benefitted a criminal defendant. In sum, petitioner failed to present the state habeas court with any evidence showing his trial counsel's subjective belief prosecutor Luitjen might "hang

himself" if permitted to continue to behave unprofessionally before the trial court was objectively unreasonable. The state habeas court correctly pointed out a presumption of reasonableness is afforded to most strategic decisions made by counsel and the burden is on a defendant challenging his counsel's performance to demonstrate said performance was objectively unreasonable. *Strickland v. Washington,* 466 U.S. at 687–91, 104 S.Ct. at 2064–66.

*Strickland* during the guilt-innocence phase of petitioner's trial.

As explained in Section I.H.1. above, the prosecution presented evidence during the punishment-phase of trial establishing petitioner: (1) had committed a string of convenience store burglaries while still a teenager, (2) committed another burglary only days after receiving a probated sentence for his first string of burglaries, (3) thereafter engaged in violent and disruptive behavior while in the custody of the Texas Youth Commission ("TYC"), (4) sexually assaulted a young woman only weeks after his release from the TYC, (5) pleaded guilty to attempted sexual assault and received a probated sentence, (6) violated the terms of his probation and attempted to flee when officers came to arrest him on a motion-to-revoke warrant, (7) subsequently went to prison and, when released on parole, refused to participate in sex offender group therapy, refused to cooperate with a psychological counselor's efforts to address petitioner's aggressive sexual behavior, and violated other terms of his parole, (8)

engaged in numerous instances of disruptive, threatening behavior during his pretrial detention, and (9) while highly intelligent, displayed classic indications of an anti-social personality, including a poor ability to empathize with others.[144]

In addition, petitioner's jury also had before it extensive evidence establishing the horrific details of petitioner's offense, including: (1) a series of grisly crime scene and autopsy photographs and a crime scene videotape recording,[145] (2) graphic testimony from the medical examiner and detailed autopsy reports documenting the extensive damage to each victim's head and the lack of any indications of defensive wounds or defensive injuries to either victim,[146] (3) the unchallenged punishment-phase testimony of Belinda Prado establishing petitioner brutally murdered her brother while she watched, threatened to kill her if she said anything, and then sexually molested her,[147] and (4) petitioner's own punishment-phase testimony recanting his written confession (in-

---

**144.** *See supra* notes 61–76 and accompanying text.

**145.** The state trial court admitted numerous crime scene and autopsy photographs detailing the extensive injuries to Carolina and Eric Prado, including State Exhibit Nos. 4, 5, 28, 35, 77, 78, 81, & 82. All but the last two of these photographs appear in S.F. Trial, Volume 21.

Furthermore, the trial court admitted numerous crime scene photographs showing the massive amounts of blood and tissue splattered throughout the bedroom where Carolina Prado was murdered, as well as the bloody baseball bat found wrapped in towels in the living room where Eric Prado was murdered, including State Exhibit Nos. 30–33, 38, 40, 42, 47–50, & 53. All but State Exhibit No. 48 appear in S.F. Trial, Volume 21. The videotape recording made of the crime scene, State Exhibit No. 20, was admitted into evidence but does not appear among the trial exhibits transmitted to this Court by respondent. Petitioner's trial counsel testi-

fied during petitioner's state habeas hearing: (1) as reflected in the photographs, the crime scene was "extraordinarily bloody" and (2) this was an "explosive, violent offense." S.F. State Habeas Hearing, Volume 1 of 3, testimony of Vincent D. Callahan, at pp. 21 & 30.

Collectively, the crime scene photographs and photographs of the victims' bodies amply documented the murders of Carolina and Eric Prado as brutal. Given the nature of the petitioner's crimes and his inability to either rationally explain or accept responsibility for same, there was nothing objectively unreasonable with petitioner's trial counsel's initial trial strategy of urging an insanity defense.

**146.** *See supra* notes 34–35 and accompanying text. The autopsy reports on Carolina and Eric Prado were admitted into evidence as State Exhibit Nos. 75 & 75 and appear in S.F. Trial, Volume 21.

**147.** S.F. Trial, Volume 19, testimony of Belinda Prado, at pp. 2985–96.

cluding the portion in which he expressed remorse for committing the murders), insisting the jury had "convicted an innocent man," and admitting he felt no remorse for the deaths of Carolina and Eric Prado "because I did not kill them."[148] Most significantly, the jury also had before it petitioner's defiant demeanor throughout his punishment-phase cross-examination by prosecutor Luitjen, during which petitioner repeatedly denied he had ever: (1) committed any of the criminal offenses, other than the burglaries, for which he had previously been convicted, (2) murdered either Carolina or Eric Prado, (3) molested Belinda Prado, or (4) read his written confession before signing same.[149]

At the punishment-phase of trial, petitioner's jury had before it all of the foregoing evidence and two special issues inquiring whether: (1) there was a probability petitioner would commit future acts of criminal violence and (2) any mitigating evidence warranted a life sentence, rather than the death penalty. The punishment-phase evidence amply demonstrated petitioner's long history of violent conduct and repeated refusal to conform his conduct to societal expectations. Considering petitioner's punishment-phase testimony along with the horrific nature of petitioner's offense, there is no possibility or reasonable probability any deficiency in petitioner's trial counsel's performance during the Oc-

tober 12, 1995 hearing had any impact on the outcome of the punishment-phase of petitioner's capital trial.[150]

The bailiff who testified petitioner had threatened both his own counsel and the prosecutor during pretrial proceedings, furnished petitioner's jury with what amounted to a drop of water into a ocean of evidence already establishing petitioner's propensity for violent conduct and pathological refusal to conform his behavior to societal norms. Even if greater prescience on the part of petitioner's trial counsel during the October 12, 1995 hearing had succeeded in stopping petitioner from threatening the prosecutor on the record, petitioner offers no rationale for excluding the same bailiff's punishment-phase testimony regarding petitioner's spontaneous threats against his own trial counsel made on October 10, 1995. Thus, even if petitioner's trial counsel had convinced petitioner not to respond to the prosecutor's unprofessional provocations during the October 12, 1995 hearing by making threats against the prosecutor, the prosecution still had available evidence showing the petitioner had threatened his own trial counsel and demanded to be physically restrained two days before. Additionally, during petitioner's punishment-phase cross-examination, the jury witnessed petitioner and prosecutor Luitjen repeat their verbal sparring match

---

148. S.F. Trial, Volume 20, testimony of David Martinez, at pp. 3062–64, 3068, 3074, 3086, 3102, 3114–15, 3117, 3119–20, & 3127.

149. *Id.*

150. Petitioner admitted during his state habeas hearing testimony he did not trust his trial counsel and did not cooperate with him. S.F. State Habeas Hearing, Volume 2 of 3, testimony of David Martinez, at pp. 11, 15, 54, 56, 61–63, & 65–66. During the same hearing, petitioner's former lead trial counsel testified: (1) petitioner never gave him any names of persons who could corroborate petitioner's

alibi, (2) he was unable to get a firm answer from petitioner regarding what happened on the night of the murders, and (3) he felt petitioner was less than honest with him, in part, because of the difference in their ages and race. S.F. State Habeas Hearing, Volume 1 of 3, *testimony of Vincent D. Callahan*, at pp. 59–65. Under such circumstances, the state habeas court could have reasonably concluded there was no reasonable probability petitioner would have heeded any warnings petitioner's trial counsel might have given petitioner during the October 12, 1995 hearing.

from October 12, 1995; during that confrontation, petitioner insisted the court reporter had failed to accurately record their exchanges at the earlier pretrial hearing.[151] Petitioner's meager mitigating evidence was undermined completely by petitioner's belligerent refusal to accept responsibility for his crimes during his punishment-phase testimony.[152] Under such circumstances, there is no reasonable probability that, but for any deficiency in the performance of petitioner's trial counsel during the October 12, 1995 hearing, the outcome of the punishment-phase of petitioner's trial would have been any different.

The state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the prejudice prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusions based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### 6. *Voir Dire*

#### a. *The Claim*

Petitioner complains his trial counsel failed to adequately voir dire members of the jury venire regarding their ability, or willingness, to give mitigating effect to petitioner's youth, intoxication, and difficult childhood.[153]

#### b. *State Court Disposition*

The state habeas court: (1) found petitioner had failed to allege any specific facts identifying precisely what additional questions his trial counsel should have asked members of the jury venire during voir dire or explaining how that alleged deficiency in said counsel's performance impacted the outcome of either phase of petitioner's capital trial and (2) concluded petitioner's conclusory complaint failed to satisfy either prong of *Strickland.*[154]

#### c. *No Deficient Performance*

As the state habeas court noted, petitioner does not suggest any specific additional questions his trial counsel should have asked venire members during voir dire or explain how the failure to ask these questions rendered the performance of his trial counsel objectively unreasonable. On the contrary, petitioner argues in a conclusory fashion: (1) the prosecution engaged in unspecified questioning which "conditioned" potential jurors dur-

---

**151.** S.F. Trial, Volume 20, testimony of David Martinez, at pp. 3110–14. During the petitioner's punishment-phase cross-examination, petitioner and prosecutor Luitjen re-enacted a substantial portion of their confrontation from the October 12, 1995 pretrial hearing in front of the jury. *Id.*

**152.** During petitioner's state habeas hearing, petitioner's former trial counsel testified petitioner's refusal to express remorse or accept responsibility for his offenses before the jury fundamentally undermined said counsel's efforts to secure a life sentence for petitioner. S.F. State Habeas Hearing, Volume 1 of 3, testimony of Vincent D. Callahan, at pp. 73–76.

**153.** Petition, at p. 73.

**154.** State Habeas Transcript, at p. 238. As the state habeas court noted, petitioner presented his complaint about his trial counsel's alleged inadequate voir dire performance in connection with petitioner's other complaints of ineffective assistance during the guilt-innocence phase of trial. However, under the Texas capital sentencing scheme, petitioner's jury would have had no opportunity to consider the "mitigating" effect of petitioner's youth, intoxication, or difficult childhood until the punishment-phase of trial.

ing voir dire to "reject" petitioner's mitigating evidence, and (2) petitioner's trial counsel "engaged in a voir dire that was very abstract, and obviously confusing to the various panelists." These conclusory complaints do not satisfy the deficient performance prong of *Strickland*.

In evaluating the performance of counsel, a court must indulge a strong presumption said counsel's conduct fell within the wide range of reasonable professional assistance; therefore, the defendant must overcome the presumption that, under the circumstances, the challenged action constituted sound trial strategy. *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2064, 2065, 80 L.Ed.2d 674 (1984). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. at 2066. Thus, the burden is on petitioner to allege specific facts which show his trial counsel's failure to ask the members of petitioner's jury venire, who eventually sat on petitioner's jury, specific questions during voir dire fell outside the wide range of presumptively reasonable professional performance. *See Amos v. Scott*, 61 F.3d 333, 346 (5th Cir.) (holding the burden is on the petitioner to allege facts which, if proven, entitle him to relief), *cert. denied*, 516 U.S. 1005, 116 S.Ct. 557, 133 L.Ed.2d 458 (1995).

Petitioner has not alleged any specific facts identifying any specific areas of potential voir dire inquiry, much less any specific questions, which he contends his trial counsel should have asked any identified member of the jury venire. Petitioner's complaints about his trial counsel's allegedly "very abstract" and "obviously confusing" voir dire are of no assistance to the Court. In short, petitioner does not suggest how his trial counsel should have gone about inquiring during voir dire regarding the venire members' feelings about petitioner's youth, intoxication, or difficult childhood. Nor does petitioner suggest any specific reasons why said counsel's failure to ask those specific questions was objectively unreasonable.

During petitioner's state habeas corpus hearing, petitioner did not examine his former trial counsel regarding counsel's reasons for conducting voir dire as he did. Likewise, petitioner failed to present the state habeas court with any evidence establishing the failure of his trial counsel to voir dire venire members on whether they could consider specific types of evidence as "mitigating" in nature was objectively unreasonable. In that regard, petitioner offers this Court no specific factual allegations suggesting how questions to venire members, of the type petitioner vaguely describes, would have benefitted petitioner at either phase of his capital trial. Petitioner alleges no specific facts showing his trial counsel was aware, or should have been aware, during voir dire of any identified venire member who possessed an inability or unwillingness to give mitigating effect to any evidence petitioner's trial counsel intended to rely upon as "mitigating" at the punishment-phase of trial.

As this Court has noted in the past, the selection of a jury is more art than science. *Salazar v. Dretke*, 393 F.Supp.2d 451, 495 (W.D.Tex.2005); *Cordova v. Johnson*, 993 F.Supp. 473, 530 (W.D.Tex. 1998), *appeal denied*, 157 F.3d 380 (5th Cir.1998), *cert. denied*, 525 U.S. 1131, 119 S.Ct. 922, 142 L.Ed.2d 971 (1999). Petitioner's trial counsel was not obligated to examine every venire member during voir dire concerning precisely what evidence each venire member might consider to be "mitigating" in nature, as opposed to "aggravating" in character. *See Smith v. Collins*, 977 F.2d 951, 960 (5th Cir.1992) ("The defense of a criminal case is not an

undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources."), *cert. denied*, 510 U.S. 829, 114 S.Ct. 97, 126 L.Ed.2d 64 (1993).

Petitioner acknowledges the prosecution addressed the issue of mitigation during its voir dire examination of the jury venire. Petitioner's trial counsel could have reasonably relied on the information regarding the venire members' views on that subject gleaned by the prosecution's voir dire examination. *See Mayo v. Cockrell*, 287 F.3d 336, 341 (5th Cir.) (holding trial counsel acted in an objectively reasonable manner in relying on the state trial judge's generic juror screening questions and the jurors' written questionnaire answers to identify those members of the jury venire who were unqualified for jury service), *cert. denied*, 537 U.S. 975, 123 S.Ct. 443, 154 L.Ed.2d 332 (2002). Petitioner made no effort to present the state habeas court with any evidence showing his trial counsel's reliance, if any, on the venire members' responses to the prosecution's voir dire questions regarding their attitudes toward various types of potentially "mitigating" evidence was objectively unreasonable.

Under such circumstances, the state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the deficient performance prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### d. *No Prejudice*

■ Because petitioner's jury was faced with no specific issues regarding the "mitigating" effect of any evidence of petitioner's youth, intoxication, or difficult childhood until the punishment-phase of trial, any alleged deficiency in petitioner's trial counsel's voir dire examination of potential jurors on these subjects could not have "prejudiced" petitioner within the meaning of *Strickland* during the guilt-innocence phase of petitioner's trial.

There are several reasons why this alleged deficiency in petitioner's trial counsel's performance fails to satisfy *Strickland's* prejudice prong. Chief among these is the overwhelming evidence before the jury at the punishment-phase of petitioner's capital trial supporting an affirmative answer to the future dangerousness special issue and a negative answer to the mitigation issue.[155] Second, petitioner's purportedly "mitigating" evidence was not only extremely weak but double-edged in nature. For instance, petitioner's jury was free to consider evidence of the petitioner's youth as potentially detrimental to petitioner's chances for a life sentence because petitioner's then-current youth portended many years, if not decades, of incarceration before the petitioner achieved sufficient maturity that petitioner's well-documented propensity for violent conduct could be expected to diminish. Likewise, evidence of petitioner's purportedly difficult childhood could easily be construed by the jury as indicating the petitioner, the product of a dysfunctional family, was a "broken" human being likely to retain an anti-social personality forever. Finally, depending upon the jurors' personal proclivities, a request for a life sentence premised upon evidence showing the petitioner was voluntarily intoxicated at the time of

**155.** *See supra* notes 145–50 and accompany-ing text.

his offense might be construed by the jury as yet another attempt by petitioner to cast responsibility for his offense on anyone and anything other than himself. *See Boyle v. Johnson,* 93 F.3d 180, 187–88 (5th Cir.1996) (recognizing the double-edged quality of evidence showing the defendant's voluntary intoxication), *cert. denied,* 519 U.S. 1120, 117 S.Ct. 968, 136 L.Ed.2d 853 (1997); *Kelly v. Lynaugh,* 862 F.2d 1126, 1132 (5th Cir.1988) (recognizing evidence of the defendant's voluntary intoxication could prove offensive to the jury), *cert. denied,* 492 U.S. 925, 109 S.Ct. 3263, 106 L.Ed.2d 608 (1989). Given petitioner's refusal to express remorse or accept responsibility for his crimes during his punishment-phase trial testimony, the latter possibility appears likely.

Finally, petitioner's testimony during the punishment-phase of his trial undermined his trial counsel's efforts to rely upon petitioner's youth, intoxication, or difficult childhood as reasons for giving petitioner a life sentence. More specifically, in addition to denying any responsibility for Carolina or Eric Prado's deaths, during his trial testimony petitioner admitted he was intoxicated on the night of the murders and when he wrote his confession but insisted he had never had a drug or alcohol problem, and testified his parents separated when he was five but offered no specific facts or details concerning any alleged abuse or neglect he claimed to have suffered as a child.[156]

■ "If the facts adduced at trial point so overwhelmingly to the defendant's guilt that even the most competent attorney would be unlikely to have obtained an acquittal, then the defendant's ineffective assistance claim must fall." *Green v. Lynaugh,* 868 F.2d 176, 177 (5th Cir.), *cert. denied,* 493 U.S. 831, 110 S.Ct. 102, 107

L.Ed.2d 66 (1989). The same principle applies to the special issues facing a sentencing jury during the punishment-phase of a Texas capital murder trial. *See Miniel v. Cockrell,* 339 F.3d 331, 347–48 (5th Cir.2003) (where evidence of the defendant's propensity for violence overwhelmed the family's proposed mitigating testimony regarding defendant's history of childhood physical abuse and substance abuse, petitioner was not prejudiced by the failure of his trial counsel to present such mitigating evidence), *cert. denied,* 540 U.S. 1179, 124 S.Ct. 1413, 158 L.Ed.2d 81 (2004); *Harris v. Cockrell,* 313 F.3d 238, 244 (5th Cir.2002) (holding the failure to present double-edged evidence regarding the petitioner's allegedly abusive childhood was not prejudicial when viewed in the context of the petitioner's overall stable family background and the petitioner's history of violent conduct while incarcerated), *cert. denied,* 540 U.S. 1218, 124 S.Ct. 1503, 158 L.Ed.2d 152 (2004); *Ladd v. Cockrell,* 311 F.3d 349, 359–60 (5th Cir.2002) (holding a petitioner was not prejudiced by his trial counsel's failure to present double-edged evidence of the petitioner's low childhood IQ, drug treatment as a child for psycho-motor problems, and good behavior in an institutional setting where this same evidence was undermined by the petitioner's significantly higher IQ scores as an adult and the overwhelming evidence of the petitioner's future dangerousness); *Boyd v. Johnson,* 167 F.3d 907, 911 (5th Cir.) (holding a petitioner was not prejudiced by his trial counsel's failure to introduce evidence showing the petitioner was borderline mentally retarded where the petitioner's offense was cold-blooded and calculated and the petitioner had a track record of violent conduct), *cert. denied,* 527 U.S. 1055, 120 S.Ct. 20, 144 L.Ed.2d 824 (1999).

---

**156.** S.F. Trial, Volume 20, testimony of David Martinez, at pp. 3060–64.

In view of the wealth and weight of the prosecution's punishment-phase evidence, petitioner's refusal to accept responsibility or express remorse for his crimes, and the meager weight (and potentially double-edged nature) of petitioner's purportedly "mitigating" evidence of his youth, intoxication, and difficult childhood, there is no reasonable probability that, but for the failure of petitioner's trial counsel to conduct unspecified, additional, voir dire examination of venire members, petitioner's jury would have answered either of the two capital sentencing special issues before it at the punishment-phase of trial differently.

Accordingly, the state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy *Strickland's* prejudice prong was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

## D. *Ineffective Assistance at Guilt–Innocence Phase*

Petitioner presented the state habeas court, and presents this Court, with numerous complaints about his trial counsel's performance occurring during the guilt-innocence phase of petitioner's trial. More specifically, petitioner complains his trial counsel failed to: (1) object to the prosecution's opening statement references to petitioner as a "mass murderer," (2) make an opening statement on petitioner's behalf,

(3) object to lay testimony identifying stains on a baseball bat and petitioner's clothing as "blood," (4) present evidence showing petitioner was intoxicated on the night of the murders and guilty only of Eric Prado's murder but not Carolina's, (5) request a lesser-included offense jury instruction regarding murder, (6) object to the prosecution's comment during closing argument on petitioner's failure to testify, and (7) present exculpatory evidence showing (a) the lack of a substantial amount of blood on petitioner's boxer shorts, (b) the bloody hand-print and footprint on Carolina Prado's bed sheet did not belong to petitioner, and (c) petitioner owned the clothing petitioner took from the Prado residence after the murders.

### 1. *No Objection to the Prosecutor's Opening Statement*

#### a. *The Claim*

Petitioner complains his trial counsel should have objected to the prosecutor's references to petitioner as a "mass murderer" during opening argument.[157]

#### b. *State Court Disposition*

During his testimony at petitioner's state habeas hearing, petitioner's former trial counsel conceded the prosecutor's remarks were inflammatory and harmful but pointed out petitioner's offense was distinctly bloody, explosive, and violent.[158] The state habeas court found the prosecutor's comments "were supported by the evidence" and concluded this complaint satisfied neither prong of *Strickland*.[159]

---

157. Petition, at pp. 64–65.

158. S.F. State Habeas Hearing, Volume 1 of 3, testimony of Vincent D. Callahan, at pp. 17–18, 21, & 30.

159. State Habeas Transcript, at pp. 234–35.

### c. No Deficient Performance

■ As explained above, the crime scene photographs and other trial evidence, including Belinda Prado's unchallenged testimony, established the petitioner committed the unprovoked, intensely brutal, senseless murder of two individuals while they slept.[160] The grisly nature of the evidence before petitioner's jury at the guilt-innocence phase of trial cannot be overstated. Petitioner splattered Carolina Prado's bedroom walls and ceiling with her blood and brain matter. Petitioner then beat a sleeping Eric Prado to death in a similar manner. The state habeas court determined the prosecutor's references in his opening argument to petitioner's crimes as "mass murder" were supported by the evidence. Petitioner argues, but fails to identify any legal support for his contention that "mass murder" necessarily connotes a crime involving a large number of victims. Petitioner identifies no "clearly established" federal law precluding a prosecutor's reference to "mass murder" or other, similar terms during jury argument where the evidence amply demonstrates the crime in question involved multiple victims and a degree of savage barbarity abhorrent to any rational mind.

This Court's independent review of applicable case law yielded no opinions defining the term "mass murder" as narrowly as urged by petitioner herein. On the contrary, almost two decades ago, three members of the United States Supreme Court employed precisely that term in reference to the murder of six members of a family. See Nebraska Press Assoc. v. Stuart, 427 U.S. 539, 572, 96 S.Ct. 2791, 2809, 49 L.Ed.2d 683 (1976) (concurring opinion of Justices Brennan, Stewart, and Marshall) (referring to the murder of six members of the Kellie family as "premeditated mass murder"). The Third Circuit recently rejected a challenge to prosecutorial jury argument referring to a triple homicide as a "mass murder." Thornburg v. Mullin, 422 F.3d 1113, 1134 (3rd Cir. 2005). The Sixth Circuit has repeatedly referred to state death penalty statutes authorizing capital punishment for the murder of two or more persons as "mass murder" provisions. See Lorraine v. Coyle, 291 F.3d 416, 419–20 (6th Cir.2002), corrected on rehearing 307 F.3d 459 (6th Cir.2002) (referring to Ohio death penalty statute's multiple murder provision as a "mass murder" provision), cert. denied, 538 U.S. 947, 123 S.Ct. 1621, 155 L.Ed.2d 489 (2003); Coleman v. Mitchell, 268 F.3d 417, 443 (6th Cir.2001) (referring to Ohio's multiple homicide statute as that state's "mass murder" provision); Carter v. Bell, 218 F.3d 581, 592 (6th Cir.2000) (referring to the multiple homicide provision of a former Tennessee death penalty statute as that state's "mass murder" statute). In sum, federal courts and even Supreme Court Justices have employed the term "mass murder" in contexts not entirely dissimilar to the one in which petitioner's prosecutor employed the same term.

Given the nature of petitioner's crimes and the graphic nature of the evidence the prosecution was about to present the jury, the state habeas court's conclusion the prosecutor's comments were unobjectionable was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

During petitioner's state habeas hearing, his former trial counsel conceded he

---

**160.** See supra notes 146–48 and accompanying text.

should have objected to the prosecutor's reference to petitioner's crimes as "mass murder" because that term was inflammatory.[161] However, said counsel's subsequent statement is not conclusive on the issue of whether his failure to timely object to the prosecutor's argument was objectively unreasonable. The state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the deficient performance prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### d. *No Prejudice*

The prosecution's evidence at the guilt-innocence phase of petitioner's capital trial was overwhelming. Not only did the prosecution present the jury with petitioner's confession, the last paragraph of which appeared in petitioner's own handwriting, the jury was also presented with the unchallenged testimony of eyewitness Belinda Prado. In addition, it was undisputed petitioner made highly inculpatory, spontaneous, oral statements to his arresting officers, including bragging he had "killed them just like cockroaches." Finally, Carolina and Eric Prado's personal property were found at petitioner's grandmother's San Marcos residence within days after petitioner's arrest at the same location. "If the facts adduced at trial point so overwhelmingly to the defendant's guilt that even the most competent attorney would be unlikely to have obtained an acquittal,

then the defendant's ineffective assistance claim must fall." *Green v. Lynaugh,* 868 F.2d 176, 177 (5th Cir.), *cert. denied,* 493 U.S. 831, 110 S.Ct. 102, 107 L.Ed.2d 66 (1989).

Given the overwhelming evidence of petitioner's guilt, even if petitioner's trial counsel had made a timely objection to the prosecutor's opening statement referring to petitioner as a "mass murderer," and the trial court had directed the jury to disregard same, there is no reasonable probability the outcome of the guilt-innocence phase of petitioner's capital trial would have been different. There is no reasonable probability such an objection and instruction would have had any impact whatsoever on the prosecution's overwhelming evidence of petitioner's guilt. The state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the prejudice prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### 2. *Failure to Make an Opening Statement*

#### a. *The Claim*

Petitioner complains his trial counsel should not have waived the right to make an opening statement at the guilt-innocence phase of trial.[162]

#### b. *State Court Disposition*

During petitioner's state habeas hearing, petitioner failed to inquire of petitioner's

---

**161.** S.F. State Habeas Hearing, Volume 1 of 3, testimony of Vincent D. Callahan, at pp. 17–18.

**162.** Petition, at pp. 65–66.

trial counsel why said counsel chose not to make an opening statement. The state habeas court concluded petitioner had failed to overcome the presumption of reasonableness afforded a trial counsel's strategic decisions.[163]

### c. *No Deficient Performance*

██ As respondent correctly notes, the decision whether to make an opening statement is a strategic matter ordinarily left to a defense counsel's discretion. *See Gilliard v. Scroggy*, 847 F.2d 1141, 1147 (5th Cir.1988) (holding the decision not to make an opening statement in a death penalty case was "the essence of a strategic choice"), *cert. denied*, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989). The state habeas court correctly noted the presumption of reasonableness ordinarily afforded a trial counsel's strategic decisions. *See Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066 ("[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.").

Petitioner argues his trial counsel should have used his opening statement to argue petitioner was guilty only of the murder of Eric Prado and Carolina's murder was the work of a third party. However, petitioner fails to identify any evidence then available to petitioner's trial counsel which supported such arguments. During petitioner's state habeas hearing, his former trial counsel testified: (1) he could never get a straight answer from petitioner regarding the events of the night of the murders, (2) petitioner's various accounts to said counsel of the circum-

stances surrounding Carolina and Eric Prado's murders all differed from the account of the murders contained in petitioner's confession, (3) while petitioner did allege, at one point, a third party was involved in the murders, petitioner told his trial counsel he had "blacked out" during the murders, (4) petitioner was unable to furnish him with the names of any witnesses who could corroborate petitioner's belated alibi claim, (5) petitioner was unable to identify any witnesses or other source of evidence supporting petitioner's claim someone else had committed the murders, (6) he was unaware of any evidence supporting any affirmative defense other than possibly insanity (based on the extraordinary violence involved in the murders), (7) petitioner refused to cooperate with the presentation of an insanity defense, and (8) he was forced to abandon his initial trial strategy of asserting an insanity defense after the court-appointed mental health expert found petitioner had not been insane at the time of the crimes.[164] Moreover, petitioner's written confession clearly stated petitioner had struck Carolina Prado in the head with a baseball bat.[165] Petitioner presented the state habeas court with no evidence showing any third-party was responsible for the murders of either Carolina or Eric Prado. During his testimony at his state habeas corpus hearing, petitioner testified: (1) he had no knowledge regarding the circumstances of Carolina Prado's murder, (2) he was not present at the scene at the time of the murders, (3) while he wanted two persons, one unnamed and the other identified only as "Frank" last name unknown, called to testify as alibi witnesses

---

163. State Habeas Transcript, at p. 235.

164. S.F. State Habeas Hearing, Volume 1 of 3, testimony of Vincent D. Callahan, at pp. 8, 26–30, 59–65, 75–84, & 96–97.

165. *See supra* note 45 and accompanying text.

at trial, he did not furnish his trial counsel with any identifying information regarding Frank or the other alibi witness, (4) he did not assist his trial counsel with trial preparations because he did not trust his trial counsel, (5) he did not want his trial counsel to pursue an insanity defense, and (6) he did not give his trial counsel the names of any other suspects.[166] Thus, petitioner's trial counsel possessed objectively reasonable reasons for failing to make an opening statement blaming an unidentified third-party for Carolina Prado's murder.

In view of the failure of petitioner to either explore (during examination of petitioner's former trial counsel at the state habeas hearing) the rationale behind his trial counsel's decision to waive opening argument or offer the state habeas court any other evidence showing his trial counsel's decision to waive opening argument was objectively unreasonable, the state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the deficient performance prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

#### d. *No Prejudice*

Because the state habeas court did not address the prejudice prong of *Strickland* in connection with this aspect of petitioner's ineffective assistance claim, this Court's review of same is necessarily *de novo*. See *Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005) (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. 510, 534, 123 S.Ct. 2527, 2542, 156 L.Ed.2d 471 (2003) (holding the same).

Having conducted a *de novo* review of the prejudice prong of *Strickland* with regard to this aspect of petitioner's ineffective assistance claim, this Court finds no evidence showing petitioner was "prejudiced" by his trial counsel's failure to make an opening statement of the type now urged by petitioner.

Petitioner alleges no specific facts showing how his trial counsel's failure to make an opening statement "prejudiced" petitioner within the meaning of *Strickland*. While petitioner complains his trial counsel should have utilized an opening statement to argue petitioner was guilty only of the murder of Eric Prado, and Carolina's murder was the work of a third party, as explained above, such an argument finds no evidentiary support in the record from either phase of petitioner's trial. Belinda Prado testified without contradiction during the guilt-innocence phase of petitioner's trial: (1) petitioner and a young, skinny friend of petitioner came home on the night of the murders but (2) the petitioner's friend left fifteen to twenty minutes later, before anyone went into her mother's bedroom.[167] Petitioner's written confession states, in pertinent part, he walked his friend home several hours before he returned to Carolina Prado's home and

---

166. S.F. State Habeas Hearing, Volume 2 of 3, testimony of David Martinez, at pp. 32–40, 56–57, & 61–62.

167. S.F. Trial, Volume 17, testimony of Belinda Prado, at pp. 2463–64.

fatally struck her with a baseball bat.[168] During his punishment-phase testimony, petitioner denied he had killed either Carolina or Eric Prado and claimed to have been asleep when Eric was murdered.[169] During his state habeas corpus proceeding, petitioner presented the state habeas court with no evidence showing petitioner was guilty of murdering only Eric Prado or a third party murdered Carolina Prado. In his pleadings in this Court, petitioner alleges no specific facts supporting either of those two contentions.

Likewise, while petitioner complains his trial counsel should have made an opening statement reminding the jury the prosecution bore the burden of proving petitioner's guilt beyond a reasonable doubt, as explained above, the prosecution's evidence at the guilt-innocence phase of petitioner's capital trial was overwhelming.

Under such circumstances, there is no reasonable probability that, but for the failure of petitioner's trial counsel to make an opening statement claiming petitioner murdered only Eric Prado, claiming a third party murdered Carolina Prado, or reminding the jury about the burden of proof beyond a reasonable doubt, the outcome of the guilt-innocence phase of petitioner's trial would have been different.

### 3. No Objection to Lay Testimony on Presence of Blood

#### a. The Claim

Petitioner complains his trial counsel should have objected when lay witnesses testified the baseball bat found wrapped in a towel at Carolina Prado's residence was covered with what appeared to be blood and human blood was found on petitioner's undershorts following petitioner's arrest. More specifically, petitioner complains no scientific testimony was admitted at trial establishing either item had been tested to confirm the substance was blood.[170]

#### b. State Court Disposition

During the guilt-innocence phase of petitioner's trial, a San Antonio police detective testified in pertinent part: (1) he collected several items of physical evidence, including a baseball bat, from the crime scene on July 11, 1994, (2) all but the handle of the baseball bat was initially covered with towels, (3) when he removed the towels, there appeared to be blood and hair on the end of the bat, and (4) the blood appeared to be wet.[171]

At the same phase of trial, a different San Antonio police detective testified in pertinent part: (1) following petitioner's arrest, he took custody of petitioner's clothing, including a pair of black pants, socks, and underwear and (2) petitioner's undershorts had spots on the front that were made by human blood.[172]

During petitioner's state habeas corpus hearing, petitioner made no effort to explore his trial counsel's knowledge regarding any scientific testing which might have been done on either the baseball bat or petitioner's underwear. More specifically, petitioner made no inquiry of his former trial counsel's personal knowledge regarding whether the prosecution's file contained any documentation establishing

---

168. S.F. Trial, Volume 18, at p. 2646; State Exhibit No. 65, found in S.F. Trial, Volume 21.

169. S.F. Trial, Volume 20, testimony of David Martinez, at pp. 3062–64, 3068, 3102, & 3117.

170. Petition, at pp. 66–68.

171. S.F. Trial, Volume 17, testimony of Brian Walsh, at pp. 2530–33.

172. S.F. Trial, Volume 18, testimony of Alvin C. Brown, II, at pp. 2649–50.

scientific testing had been performed on either item to confirm the presence of human blood. Petitioner presented the state habeas court with no evidence establishing the trial testimony identifying both items as containing human blood stains was in any manner inaccurate.

The state habeas court found no evidence had been presented to it establishing any of the trial testimony concerning the presence of human blood on the two items had been inaccurate and concluded petitioner had, therefore, failed to satisfy the prejudice prong of *Strickland.*[173]

### c. *No Deficient Performance*

Because the state habeas court failed to analyze the deficient performance prong of *Strickland* with regard to this aspect of petitioner's ineffective assistance claim, this Court's analysis of same is necessarily *de novo. Rompilla v. Beard,* 125 S.Ct. at 2467.

■ Having independently reviewed the record from petitioner's trial and state habeas corpus proceeding, this Court concludes petitioner has failed to establish the failure of his trial counsel to object to the lay testimony regarding the presence of blood on the baseball bat and petitioner's underwear was objectively unreasonable. Petitioner made no effort during his state habeas corpus proceeding to explore the knowledge of his former trial counsel regarding precisely what scientific testing had been done on either item.[174] Petitioner also fails to present this Court with any fact-specific allegations regarding any alleged inaccuracy in the trial testimony re-garding the blood on the bat and underwear.

A cursory review of the crime scene photographs reveals the presence of extensive quantities of blood on Carolina Prado's bedroom walls, bed, and bedroom furnishings. Likewise, a substantial portion of the living room, where the bat was discovered wrapped in a towel, was covered with Eric Prado's blood. Belinda Prado testified without contradiction at the guilt-innocence phase of trial she had witnessed petitioner, clad only in his underwear, beat her sleeping brother in the head with a baseball bat. Petitioner admitted in his confession he had beaten both Carolina and Eric in the head with a wooden baseball bat. Under such circumstances, there was nothing objectively unreasonable with petitioner's trial counsel's decision not to contest the presence of blood on the likely murder weapon or petitioner's underwear.

The Supreme Court has long recognized a presumption of reasonableness underlies most strategic decisions made by trial counsel. *See Strickland v. Washington,* 466 U.S. at 690, 104 S.Ct. at 2066 ("[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."). Petitioner presents this Court with no fact specific allegations or evidence, establishing the substance identified by San Antonio police detectives as blood on the baseball bat and petitioner's underwear was not human blood.[175] Likewise, petitioner alleges no

---

**173.** State Habeas Transcript, at p. 235.

**174.** Petitioner did not ask his trial counsel about the blood testimony and did not introduce the prosecution's case file into evidence during the petitioner's state habeas corpus proceeding. Likewise, petitioner did not examine the lead prosecuting attorney concern-ing his knowledge of the availability of scientific test results on the bat and underwear.

**175.** Given Belinda Prado's uncontradicted guilt-innocence phase testimony regarding petitioner's assault on Eric, certainly some blood would have remained on the murder weapon. Given the grisly scene in Carolina

specific facts showing, at the time of petitioner's trial, the prosecution was without the means of establishing the presence of human blood on either item scientifically, had petitioner's trial counsel successfully challenged either of the two police detectives' testimony on hearsay grounds.[176] In the absence of a fact-specific allegation showing a timely trial objection (on hearsay or other grounds) to either of the two detectives' trial testimony would have had any potential benefit to petitioner, the failure to make such an objection was not objectively unreasonable.

#### d. No Prejudice

■■■ Petitioner failed to present the state habeas court with any evidence showing the substance on the bat or petitioner's underwear identified at trial as blood by the San Antonio police detectives was not human blood. Petitioner also failed to present the state habeas court with any evidence showing admissible proof of the presence of human blood on either item was not readily available to the prosecution had petitioner successfully challenged the testimony in question on hearsay grounds. Absent fact-specific allegations of same, there is no reasonable probability hearsay objections to the San Antonio police detectives' trial testimony would have had any impact on the outcome of petitioner's trial. Further, the overwhelming evidence of petitioner's guilt included petitioner's confession, the unchallenged eyewitness testimony of Belinda Prado, and the physical evidence which

corroborated both. Regardless of whether petitioner's trial counsel had successfully excluded any and all testimony establishing the presence of blood on petitioner's underwear and the baseball bat, the prosecution's remaining evidence against petitioner established his guilt beyond any doubt, reasonable or otherwise. There is no reasonable probability that, but for the testimony establishing the presence of human blood on the baseball bat and petitioner's underwear, the outcome of the guilt-innocence phase of petitioner's trial would have been different.

Therefore, the state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the prejudice prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

#### 4. Failure to Develop and Present Exculpatory Evidence

#### a. The Claim

Petitioner complains his trial counsel failed to develop and present evidence showing: (1) petitioner was intoxicated on the night of the murders, (2) petitioner was guilty only of Eric Prado's murder but not Carolina's, (3) the lack of a substantial amount of blood on petitioner's boxer

---

Prado's bedroom, it is difficult to imagine how any object which had been present in her bedroom during her murder could have not contained at least some of her blood.

176. If, in fact, there were scientific tests readily available at the time of petitioner's trial which could have confirmed the presence or absence of human blood on the baseball bat and petitioner's underwear, and the

bat and underwear did contain human blood, petitioner's trial counsel would have invited a counter-argument from the prosecution had petitioner's trial counsel successfully challenged the detectives' trial testimony on hearsay grounds. The prosecution could then have offered scientific testimony verifying the presence of human blood on both items.

shorts, (4) the bloody hand-print and foot-print on Carolina Prado's bed sheet did not belong to petitioner, and (5) petitioner owned the clothing petitioner took from the Prado residence after the murders.[177]

### b. *State Court Disposition*

During the punishment-phase of his trial, petitioner testified, in pertinent part: (1) he was asleep when Carolina and Eric were killed, (2) he could not recall what he meant when he wrote "I messed up" on the note he gave to Belinda, (3) the person he brought home with him on the night of the murders was Frank, last name unknown, whom petitioner had met while working at Handy Andy, (4) he directed his trial counsel not to cross-examine Belinda, (5) detectives told him what to write in his confession, and (6) detectives threatened to bring more charges against him unless he signed his confession.[178]

During his state habeas corpus hearing, petitioner testified, in pertinent part: (1) he instructed his trial counsel not to pursue an insanity defense and not to seek a life sentence, (2) in addition to Frank, there was another person, whom he was unable to identify, whom his trial counsel should have located and called to testify at trial as an alibi witness for petitioner, (3) he did not attempt to assist his trial counsel in presenting a defense at trial, (4) he wrote the note he gave to Belinda the morning after the murders, (5) he does not feel responsible for the murders, only sorry they occurred, (6) he did not testify at the guilt-innocence phase of his trial because his lawyer advised against same, (7) if he had testified at the guilt-innocence phase of trial, he would have testified in the same manner as he did at the punish-ment-phase, (8) he did not want his trial counsel to assert an insanity defense, (9) he owned all the clothing items found at his grandmother's residence following his arrest which other trial witnesses had claimed belonged to Eric and Eric's uncle, and (10) he wanted his trial counsel to investigate a bloody footprint and hand-print in Carolina's bedroom.[179]

Petitioner presented the state habeas court with no other evidence either identifying or purporting to identify either "Frank" or the other person whom petitioner complained his trial counsel should have located and called to testify at trial. Petitioner presented the state habeas court with no evidence showing he would have gained any benefit (in terms of discovering exculpatory, impeachment, or mitigating evidence) had his trial counsel conducted further investigation into the bloody hand and footprints in Carolina Prado's bedroom. Petitioner presented the state habeas court with no testimony other than his own, nor any other evidence, establishing he was intoxicated on the night of the murders. Petitioner presented the state habeas court with no evidence showing any person, other than himself, had access to Carolina Prado's bedroom at the time she was murdered. Nor did petitioner offer the state habeas court any evidence, other than his own testimony, contradicting the eyewitness testimony of Belinda Prado which established petitioner had fatally beaten Eric Prado with a baseball bat. Petitioner presented the state habeas court with no evidence, other than his own testimony, suggesting petitioner was the owner of the clothing found at petitioner's grandmother's residence following petitioner's arrest.

---

**177.** Petition, at pp. 68–70 & 76–78.

**178.** S.F. Trial, Volume 20, testimony of David Martinez, at pp. 3068–86.

**179.** S.F. State Habeas Hearing, Volume 2 of 3, testimony of David Martinez, at pp. 11–13, 22, 32–36, 39–40, 42–49, 56–57, & 61–63.

In sum, petitioner offered the state habeas court no new exculpatory evidence other than his own self-serving testimony, substantial portions of which were either in direct conflict with petitioner's written confession or inconsistent with petitioner's testimony during the punishment-phase of his trial in which he admitted he had been present but claimed to be asleep during Carolina and Eric's murders.

During petitioner's state habeas corpus proceeding, petitioner's former trial counsel testified, in pertinent part: (1) petitioner never furnished him with the names of any potential witnesses who could corroborate petitioner's alibi assertions, (2) he was never able to get a firm answer from petitioner regarding where petitioner was at the time of the murders, (3) petitioner refused to give him any information supporting petitioner's assertion someone else had committed the murders, (4) petitioner was less than honest with him, and (5) he was aware of no evidence supporting any factual theory of the offense which would have exculpated petitioner.[180]

The state habeas court found "there has been no evidence brought forth to substantiate what 'defense' the applicant had available to him, nor the identity of witnesses to establish said 'defense.'"[181] However, the state habeas court failed to clearly delineate which prong of *Strickland* it had concluded these aspects of petitioner's ineffective assistance claim failed to satisfy.

#### c. *No Deficient Performance*

Because of the ambiguity in the state habeas court's opinion, and in the exercise of an abundance of caution, this Court will undertake to review these aspects of petitioner's ineffective assistance claim per both prongs of *Strickland* under both the AEDPA's deferential standard, as well as a *de novo* standard.

#### (1) *De Novo Review*

 This Court independently concludes the failure of petitioner's trial counsel to present at trial the purportedly exculpatory evidence in question urged by petitioner did not cause the performance of said counsel to fall outside the broad parameters of objectively reasonable performance.

Based on petitioner's state habeas corpus proceeding, there does not appear to be any other source of allegedly exculpatory evidence other than petitioner's own testimony. There was nothing objectively unreasonable with the decision by petitioner's trial counsel not to call petitioner to testify during the guilt-innocence phase of trial. During their testimony at petitioner's state habeas hearing, petitioner and his trial counsel agreed petitioner had been uncooperative with his trial counsel's efforts to investigate the case against petitioner. More specifically, petitioner did not contradict his trial counsel's state habeas testimony asserting petitioner failed to furnish his trial counsel with: (1) a clear explanation of where petitioner was at the time of the murders, (2) the name of any identified alibi witnesses, (3) any other evidence corroborating petitioner's various theories of the offense, or (4) a consistent explanation of what happened the night of the murders. In view of the inconsistency in what petitioner told his trial counsel prior to trial about the relevant facts and given petitioner's combative and remorseless demeanor throughout his punishment-phase trial testimony, as well as during petitioner's testimony at his state habeas

---

180. S.F. State Habeas Hearing, Volume 1 of 3, testimony of Vincent D. Callahan, at pp. 59–66.

181. State Habeas Transcript, at p. 236.

corpus proceeding, reasonable trial counsel could have concluded putting petitioner on the stand during the guilt-innocence phase of trial would have been counter-productive. In sum, there was nothing objectively unreasonable with petitioner's trial counsel choosing not to put what amounted to "a loose cannon" on the stand during the guilt-innocence phase of trial.[182]

Petitioner's trial counsel was faced with a difficult choice at the guilt-innocence phase of petitioner's trial: put petitioner on the stand to testify without any assurance of precisely which version of the critical events on the night of the murders petitioner might furnish (and risk the same type of devastating cross-examination the prosecution enjoyed during petitioner's punishment-phase trial testimony) or keep petitioner off the stand during the guilt-innocence phase and attempt to employ cross-examination of prosecution witnesses to raise a reasonable doubt as to petitioner's guilt. Petitioner's trial counsel chose the latter course which, under the circumstances, was objectively reasonable.

### (2) *AEDPA Review*

 For similar reasons, insofar as the state habeas court concluded these aspects of petitioner's ineffective assistance claim failed to satisfy the deficient performance prong of *Strickland,* that conclusion was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

Petitioner failed to present the state habeas court with any evidence showing petitioner's trial counsel could have found a source of evidence, other than petitioner's own testimony, establishing: (1) any person other than petitioner committed the dual murders, (2) petitioner murdered only Eric, and not Carolina, or (3) petitioner was intoxicated on the night of the murders. Petitioner failed to present the state habeas court with any evidence showing any exculpatory evidence could have been obtained had petitioner's trial counsel further investigated the bloody hand and footprints in Carolina Prado's bedroom or established petitioner as the owner of all the clothing found at petitioner's grandmother's residence following petitioner's arrest. The state habeas court reasonably concluded petitioner's trial counsel's decision not to put petitioner on the stand at the guilt-innocence phase of trial was an objectively reasonable exercise of counsel's strategic discretion.

### d. *No Prejudice*

### (1) *De Novo Review*

 This Court independently concludes there is no possibility or reasonable probability, that, but for the failure of petitioner's trial counsel to call petitioner to testify during the guilt-innocence phase of petitioner's trial, the outcome of the guilt-innocence phase of petitioner's trial would have been different. The evidence of petitioner's guilt was overwhelming. Petitioner's testimony on direct examination during the punishment-phase of his capital trial was inconsistent with both petitioner's written confession and the otherwise unchallenged eyewitness testimony of

---

**182.** In fact, during petitioner's state habeas hearing, petitioner's trial counsel testified petitioner's inability to furnish a consistent account of the night of the murder tied his trial counsel's hands almost as much as the peti-

tioner's confession foreclosed the ability of said counsel to fashion and present a defense at the guilt-innocence phase of trial. S.F. State Habeas Hearing, Volume 1 of 3, testimony of Vincent D. Callahan, at pp. 59–65.

Belinda Prado. Furthermore, petitioner's direct, punishment-phase testimony was followed a most devastating cross-examination as petitioner refused to admit responsibility for any of his lengthy history of criminal acts, except for a few juvenile burglaries. Petitioner presented his jury with numerous unbelievable assertions during his punishment-phase trial testimony, including contentions: (1) he wrote the note he gave to Belinda Prado because the eleven-year-old directed him to do so, (2) police detectives coerced petitioner into confessing to capital murder by threatening to bring unspecified "other charges" against him, (3) the same detectives told petitioner what to write in his confession, (4) he did not write his confession (despite the presence of his own handwriting in the final paragraph), and (5) he was asleep during the murders. Had petitioner offered this same testimony during the guilt-innocence phase of trial, there is no possibility or reasonable probability the outcome of the guilt-innocence phase of petitioner's trial would have been different.

Given the overwhelming evidence of petitioner's guilt refuting petitioner's uncorroborated, conclusory assertions he played no role in the murder, there is no reasonable probability petitioner's denial of criminal responsibility would have moved his jury to acquit him.

Finally, petitioner has alleged no facts nor furnished this Court with evidence establishing petitioner would have gained any benefit whatsoever at trial had his trial counsel either further investigated the bloody hand and footprints in Carolina Prado's bedroom or established petitioner as the owner of all the clothing found at petitioner's grandmother's residence following petitioner's arrest. With regard to the former subject, petitioner failed to present to Court and the state habeas court any evidence showing any exculpatory evidence could have been obtained from further examination of the bloody hand and foot prints in Carolina Prado's bedroom. Absent evidence showing the person who made the bloody hand and footprints in question could have been identified at the time of petitioner's trial as someone other than petitioner, petitioner's complaint about his trial counsel's failure to further investigate that matter is of no consequence.

Furthermore, the ownership of the black slacks, white dress shirt, and other clothing found inside petitioner's grandmother's residence following petitioner's arrest was not critical to the outcome at the guilt-innocence phase of petitioner's trial. Petitioner was charged with capital murder for having murdered Carolina and Eric Prado in the course of the same criminal transaction, not with having murdered them during the course of also robbing them. Petitioner offered the state habeas court, and offers this Court, no evidence establishing anyone other than he had possession of Carolina Prado's Texas identification card or telephone calling card after her murder. Petitioner was convicted of capital murder primarily based on his own confession and the unchallenged eyewitness trial testimony of Belinda Prado (both of which were corroborated by the physical evidence at the crime scene) and petitioner's highly inculpatory, post-arrest, oral statements. None of this evidence was subject to impeachment through evidence showing ownership of the clothing at petitioner's grandmother's residence.

In conclusion, this Court independently concludes there is no reasonable probability that, but for the failure of petitioner's trial counsel to present any of the allegedly exculpatory evidence identified by petitioner, the outcome of the guilt-innocence phase of petitioner's trial would have been different.

### (2) AEDPA Review

For similar reasons, insofar as the state habeas court concluded these aspects of petitioner's ineffective assistance claim failed to satisfy the prejudice prong of *Strickland,* that conclusion was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

The state habeas court reasonably concluded petitioner failed to establish he would have derived any benefit from testifying at the guilt-innocence phase of trial in the same manner petitioner testified during his punishment-phase of trial and during his state habeas hearing. Petitioner's punishment-phase and state habeas hearing testimony was not only offensive (for petitioner's failure to express any sincere remorse for his criminal conduct) but, at several points, unbelievable. The state habeas court acted reasonably in implicitly rejecting as incredible those portions of petitioner's state habeas hearing testimony in which petitioner asserted his innocence, claimed he was intoxicated when he executed his written confession, and claimed he was not cognizant of the words contained in his written confession when he executed same. Further, the state habeas court acted reasonably when it implicitly determined petitioner had presented it with no credible exculpatory evidence supporting petitioner's defensive theories suggesting someone else had committed one or both of the murders or petitioner was intoxicated at the time of the murders. In sum, the state habeas court reasonably concluded the failure of petitioner's trial

counsel to pursue, develop, and present evidence supporting such theories was not ineffective assistance.

### 5. Failure to Request Lesser–Included Offense Instruction

#### a. The Claim

Petitioner complains his trial counsel failed to request a jury instruction at the guilt-innocence phase of trial instructing the jury on the lesser-included offense of murder, premised on the theory petitioner was responsible for only one of the two murders.[183]

#### b. State Court Disposition

The state habeas court: (1) found petitioner presented no evidence addressing the rationale underlying petitioner's trial counsel's strategic decision not to request such an instruction, (2) found petitioner presented no evidence establishing petitioner was guilty of only murder, and (3) concluded this complaint satisfied neither prong of *Strickland.*[184]

#### c. Clearly Established Federal Law

In a capital murder case, a criminal defendant is constitutionally entitled to an instruction on a lesser-included offense if the evidence would permit a jury rationally to find the defendant guilty of the lesser offense and acquit him of the greater. *Hopper v. Evans,* 456 U.S. 605, 611–12, 102 S.Ct. 2049, 2053, 72 L.Ed.2d 367 (1982); *Beck v. Alabama,* 447 U.S. 625, 637–38, 100 S.Ct. 2382, 2389–90, 65 L.Ed.2d 392 (1980). The Fifth Circuit has consistently applied this standard in its habeas review of Texas capital murder cases. *See, e.g., Aguilar v. Dretke,* 428 F.3d 526, 531 (5th Cir.2005) (*Beck* held "a

---

**183.** Petition, at p. 71.

**184.** State Habeas Transcript, at pp. 236.

lesser-included offense charge is constitutionally required in capital cases 'when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense ...' "; "[a] defendant is entitled to the [lesser-included offense] instruction if the jury could rationally acquit the defendant on the capital crime and convict on the noncapital crime"); *Dowthitt v. Johnson*, 230 F.3d 733, 757 (5th Cir.2000) (holding the same), *cert. denied*, 532 U.S. 915, 121 S.Ct. 1250, 149 L.Ed.2d 156 (2001); *Jones v. Johnson*, 171 F.3d 270, 274 (5th Cir.) (holding the same), *cert. denied*, 527 U.S. 1059, 120 S.Ct. 29, 144 L.Ed.2d 832 (1999); *Nobles v. Johnson*, 127 F.3d 409, 418–19 (5th Cir. 1997) (holding the same), *cert. denied*, 523 U.S. 1139, 118 S.Ct. 1845, 140 L.Ed.2d 1094 (1998); *Ransom v. Johnson*, 126 F.3d 716, 724–25 (5th Cir.) (holding the same), *cert. denied*, 522 U.S. 944, 118 S.Ct. 361, 139 L.Ed.2d 281 (1997); *East v. Scott*, 55 F.3d 996, 1005 (5th Cir.1995) (holding the same); *Mann v. Scott*, 41 F.3d 968, 976 (5th Cir.1994) (holding the same), *cert. denied*, 514 U.S. 1117, 115 S.Ct. 1977, 131 L.Ed.2d 865 (1995); *Allridge v. Scott*, 41 F.3d 213, 218–19 (5th Cir.1994) (holding the same), *cert. denied*, 514 U.S. 1108, 115 S.Ct. 1959, 131 L.Ed.2d 851 (1995); *Kinnamon v. Scott*, 33 F.3d 462, 464–65 (5th Cir.) (holding the same), *cert. denied*, 513 U.S. 1054, 115 S.Ct. 660, 130 L.Ed.2d 595 (1994); *Andrews v. Collins*, 21 F.3d 612, 629 (5th Cir.1994) (holding the same), *cert. denied*, 513 U.S. 1114, 115 S.Ct. 908, 130 L.Ed.2d 790 (1995); *Cantu v. Collins*, 967 F.2d 1006, 1013 (5th Cir.1992) (holding the same), *cert. denied*, 509 U.S. 926, 113 S.Ct. 3045, 125 L.Ed.2d 730 (1993); *Lincecum v. Collins*, 958 F.2d 1271, 1275 (5th Cir.) (holding the same), *cert. denied*, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992); *Montoya v. Collins*, 955 F.2d 279, 285–86

(5th Cir.) (holding the same), *cert. denied*, 506 U.S. 1036, 113 S.Ct. 820, 121 L.Ed.2d 692 (1992); *Cordova v. Lynaugh*, 838 F.2d 764, 767 (5th Cir.) (holding the same), *cert. denied* 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 932 (1988). Therefore, a Texas capital murder defendant is entitled to an instruction on a lesser-included offense under federal law if the evidence would permit a jury rationally to find him guilty of the lesser offense and to acquit him of the greater. *Aguilar v. Dretke*, 428 F.3d at 531.

This necessarily requires a showing the facts of the case and the laws of the state warrant such an instruction. *See id.* (holding defendant was not entitled to an instruction on murder where evidence did not permit a rational conclusion the defendant was responsible for only one of multiple murders committed as part of the same criminal transaction); *Jones v. Johnson*, 171 F.3d at 275 (holding: (1) under Texas law, evidence showing the brutal, drawnout nature of the murder furnished evidence the crime was intentional and negated a defendant's claim his crime was merely knowingly committed and (2) details of defendant's confession negated any rational finding that the victim's robbery had been a mere after-thought to the victim's murder); *Nobles v. Johnson*, 127 F.3d at 419 (holding, under Texas law, when a defendant initiates a criminal episode, a victim's attempts to defend himself will not rise to the level of "adequate cause" from which sudden passion will arise for purposes of the former offense of voluntary manslaughter); *East v. Scott*, 55 F.3d at 1005–06 (holding, under Texas law, evidence of voluntary intoxication does not negate the specific intent to commit murder or necessitate a jury instruction on the lesser-included offense of felony murder); *Mann v. Scott*, 41 F.3d at 976–78 (holding, under Texas law, a murder committed in

the course of an attempted robbery was sufficient to prove capital murder and evidence showing the murder occurred prior to the completion of the robbery did not mandate a jury instruction on non-capital murder); *Cantu v. Collins,* 967 F.2d at 1013–14 (examining state law to determine whether a capital murder defendant was entitled to instructions on the lesser-included offense of voluntary manslaughter); *Lincecum v. Collins,* 958 F.2d at 1275–77 (examining state law to determine whether a capital murder defendant was entitled to jury instructions on the lesser-included offenses of murder and voluntary manslaughter).

### d. *No Deficient Performance*

■ The state habeas court's factual finding of no evidence to support a charge of only murder was a reasonable determination of the facts in light of the evidence presented in the guilt-innocence phase of petitioner's trial. As this Court explained in Sections III.D.2. and III.D.4. above, during the guilt-innocence phase of petitioner's trial, petitioner neither testified nor offered any evidence from which a rational jury could have concluded petitioner was responsible for only Eric Prado's murder. Petitioner argues, without citation to any evidence in the record, that at the guilt-innocence phase of his trial, the jury was free to find an unidentified third party was responsible for Carolina's murder while petitioner was responsible only for Eric's murder. However, the state habeas court found no such evidence in the record from the guilt-innocence phase of petitioner's trial. Having conducted an independent review of the same evidence, this Court reaches the same conclusion. During the guilt-innocence phase of trial, Belinda Prado testified without

contradiction petitioner brought a friend home from work but petitioner's friend left the residence only minutes later, before petitioner or anyone else went into her mother's bedroom that night. Petitioner's written confession stated, in pertinent part, he walked his unidentified friend home before petitioner returned to the Prado residence and fatally assaulted both Carolina and Eric with a baseball bat. There was no evidence admitted during the guilt-innocence phase of petitioner's trial suggesting any person other than petitioner and his three victims were physically present inside the Prado residence when the murders occurred.

Petitioner argues, nonetheless, the physical difference in the extent of the head injuries suffered by Carolina and Eric Prado, respectively, reflected a difference in the amount of force applied to each of their bodies. Citing this perceived difference in the amount of force applied to Carolina's and Eric's heads, petitioner speculates that a different person might have inflicted Eric's and Carolina's injuries, respectively. In support of this contention, petitioner cites not the medical examiner's trial testimony regarding the victims' respective injuries but, rather, his own trial counsel's closing argument at the guilt-innocence phase of trial.[185] In fact, the medical examiner testified he could not tell whether more force had been applied during the murder of Carolina Prado or Eric Prado, only that more damage had been done to Carolina Prado's head.[186] Given the absence of any evidence showing the presence of anyone inside the Prado residence at the time of the murders other than Belinda, Eric, and Carolina Prado and the petitioner, no rational jury could have found petitioner guilty of only Eric's

---

185. Petition, at p. 71.

186. S.F. Trial, Volume 18, testimony of Robert Charles Bux, at p. 2707.

murder but not Carolina's. Petitioner's confession and Belinda Prado's eyewitness testimony during the guilt-innocence phase of trial established beyond reasonable doubt petitioner murdered Eric Prado with a baseball bat. During the guilt-innocence phase of his capital trial, petitioner offered his jury no evidence suggesting either: (1) anyone other than himself, Belinda, Eric, and Carolina Prado were present inside the Prado residence at the time of the murders, (2) Belinda or Eric played any role in Carolina's murder, or (3) Carolina or Belinda played any role in Eric's murder.

Petitioner has presented this Court with no fact specific allegations or clear and convincing evidence establishing the state habeas court's factual finding of no evidence in the guilt-innocence phase record to support a rational finding of petitioner's guilt as to only Eric Prado's murder. As such, under clearly established federal law, petitioner possessed no constitutional right to a guilt-innocence phase jury instruction on the lesser-included offense of murder.[187] *See Aguilar v. Dretke*, 428 F.3d at 531–32 (holding defendant was not entitled to an instruction on murder where evidence did not permit a rational conclusion the defendant was responsible for only one of multiple murders committed as part of the same criminal transaction). The failure of petitioner's trial counsel to request a guilt-innocence phase lesser-included offense jury instruction to which petitioner was not legally entitled did not cause the performance of said counsel to fall below an objective level of reasonableness. *See Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir.2002) (holding no professional deficiency in counsel's failure to object to the admission of psychiatric testimony which was admissible under then-existing precedent), *cert. denied*, 538 U.S. 926, 123 S.Ct. 1573, 155 L.Ed.2d 319 (2003); *Robison v. Johnson*, 151 F.3d 256, 261 (5th Cir.1998) (holding no professional deficiency in trial counsel's failure to seek admission of a document the state court concluded was inadmissible), *cert. denied*, 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999); *Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir.1997) (holding the failure to assert a meritless objection cannot be the grounds for a finding of deficient performance), *cert. denied*, 525 U.S. 969, 119 S.Ct. 418, 142 L.Ed.2d 339 (1998); *Sones v. Hargett*, 61 F.3d 410, 415 n. 5 (5th Cir.1995) ("Counsel cannot be deficient for failing to press a frivolous point").

In sum, because the state habeas court reasonably found no evidence in the guilt-innocence phase trial record to support a finding of petitioner's guilt as to only the

---

187. Petitioner was also not entitled to a lesser-included offense instruction under clearly established Texas law. The well-settled Texas standard for determining whether a capital murder defendant is entitled to a lesser-included offense jury instruction has two prongs: first, the requested lesser-included offense must be included within the proof necessary to establish the capital offense charged; and second, some evidence must exist in the record that, if the defendant is guilty, he is guilty only of the lesser offense. *See Medina v. State*, 7 S.W.3d 633, 638 (Tex.Crim.App.1999) (recognizing the long-standing nature of this test under applicable Texas law), *cert. denied*, 529 U.S. 1102, 120 S.Ct. 1840, 146 L.Ed.2d 782 (2000); *Skinner v. State*, 956 S.W.2d 532, 543 (Tex.Crim.App. 1997) ("It is not enough that the jury may disbelieve crucial evidence pertaining to the capital offense. Rather, there must be some evidence directly germane to a lesser-included offense for the factfinder to consider before an instruction on a lesser-included offense is warranted."). This same standard was equally well-settled at the time of petitioner's trial. *See Rousseau v. State*, 855 S.W.2d 666, 672–75 (Tex.Crim.App.) (discussing the extensive Texas case law recognizing and applying this two-pronged standard), *cert. denied*, 510 U.S. 919, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993).

murder of Eric Prado, the state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the deficient performance prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

#### e. *No Prejudice*

For the foregoing reasons, petitioner was not entitled to a lesser-included offense instruction at the guilt-innocence phase of his capital murder trial under either state or federal law. Thus, the failure of petitioner's trial counsel to request such an instruction did not prejudice petitioner within the meaning of *Strickland.* There is no reasonable probability petitioner's trial court would have granted such a request for a lesser-included offense instruction. Nor is there a reasonable probability petitioner's jurors would have disregarded the evidence or their duty to find petitioner guilty only of murder had such a lesser-included offense instruction erroneously been given at the guilt-innocence phase of petitioner's capital trial. The evidence of petitioner's guilt for the murders of both Carolina and Eric Prado was overwhelming. No rational jury could have ignored that evidence based solely on the suggestion of a second murderer inside the house offered during closing argument by petitioner's trial counsel.

Under such circumstances, the state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the prejudice prong of *Strick-*

*land* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

#### 6. *Failure to Object to Prosecutor's Comment on Petitioner's Failure to Testify*

#### a. *The Claim*

Petitioner complains his trial counsel failed to object during closing argument at the guilt-innocence phase of trial when the prosecutor commented on petitioner's failure to testify.[188]

#### b. *State Court Disposition*

The trial court instructed the jury at the guilt-innocence phase of trial as follows:

Our law provides a defendant may testify in his own behalf if he elects to do so. This, however, is a right accorded a defendant; and, in the event he elects not to testify, that fact cannot be taken as a circumstance against him.

In this case, the defendant has elected not to testify; and you are instructed that you cannot and must not refer or allude to that fact throughout your deliberations or take it into consideration for any purpose as a circumstance against him.[189]

In his closing argument at the guilt-innocence phase of trial, the prosecutor concluded his initial remarks as follows:

I want you to understand that the Defendant's failure to testify is absolutely no evidence. You are not to take that

---

**188.** Petition, at pp. 71–73.

**189.** Trial Transcript, at p. 172.

into consideration for any purpose. Whoever amongst you is chosen to be the presiding juror, the foreman, that's your job, to make sure that any reference to that is quelled; is stopped. It doesn't make any difference. It can't be in his favor; it can't be held against him. Please don't refer to that in any fashion. That is the law. Your job is to follow the law and render a true verdict.

We also, virtually all of you, if not all of you, were described an example during the jury selection process about intoxication. You know it's in the law. The fact that someone gets intoxicated is no defense to any crime. Remember that you are the judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony. You may choose to believe or disbelieve what is contained in the statement concerning intoxication. Remember that the evidence is that the Defendant didn't drink. It came from the grandmother, the mother. She said that her daughter told her he doesn't drink. You can choose to disbelieve that. But remember, even if you do believe it, it's not a defense. That's why it's in the charge.

I want lastly to remind you that when I sit down, the defense has an opportunity to talk to you. I want you to listen very carefully to what they have to say. I want you to keep in mind that you should also pay attention to what they do not say and what they do not refer to. And also, if there are any unanswered questions that referred to your deliberations, they say what about this, what about that, ask yourselves could those questions have been answered during the testimony of any of those witnesses. Thank you.[190]

When petitioner complained about his trial counsel's failure to object to the foregoing jury argument, the state habeas court concluded the prosecutor's comments were not properly construed as a comment on petitioner's failure to testify and petitioner's complaint satisfied neither prong of *Strickland*.[191]

c. *Clearly Established Federal Law*

 The Fifth Amendment prohibits a prosecutor from commenting on a defendant's failure to testify. *Griffin v. California*, 380 U.S. 609, 614–15, 85 S.Ct. 1229, 1232–33, 14 L.Ed.2d 106 (1965); *Cotton v. Cockrell*, 343 F.3d 746, 751 (5th Cir.2003), *cert. denied*, 540 U.S. 1186, 124 S.Ct. 1417, 158 L.Ed.2d 92 (2004). A prosecutor's comments must be evaluated in the context of trial. *See United States v. Robinson*, 485 U.S. 25, 31–34, 108 S.Ct. 864, 868–70, 99 L.Ed.2d 23 (1988) (holding prosecutor was permitted to respond to defense counsel's argument that the prosecution had prevented the defendant from giving his version of the relevant facts by pointing out nothing prevented the defendant from taking the stand at trial and testifying to her version of those facts); *Cotton v. Cockrell*, 343 F.3d at 751 (recognizing a prosecutor's challenged comments must be evaluated in the context of the trial in which they were made).

In this Circuit, for a prosecutor's jury argument to rise to the level of a denial of a criminal defendant's Fifth Amendment right to remain silent, either the prosecutor's manifest intent in making the remark must have been to comment on the defendant's silence or the character of the remark must have been such that the jury would naturally and necessarily have construed it as a comment on the defendant's silence. *Cotton v. Cockrell*, 343 F.3d at

---

190. S.F. Trial, Volume 18, at pp. 2724–26.

191. State Habeas Transcript, at p. 237.

751; *United States v. Virgen–Moreno*, 265 F.3d 276, 291 (5th Cir.2001), *cert. denied*, 534 U.S. 1095, 122 S.Ct. 843, 151 L.Ed.2d 721 (2002); *Barrientes v. Johnson*, 221 F.3d 741, 780 (5th Cir.2000), *cert. denied*, 531 U.S. 1134, 121 S.Ct. 902, 148 L.Ed.2d 948 (2001); *Jackson v. Johnson*, 194 F.3d 641, 652 (5th Cir.1999), *cert. denied*, 529 U.S. 1027, 120 S.Ct. 1437, 146 L.Ed.2d 326 (2000). The prosecutor's remarks are not a manifest comment on the defendant's silence if there is some other, equally plausible, explanation for the remark. *Cotton v. Cockrell*, 343 F.3d at 751; *United States v. Virgen–Moreno*, 265 at 291; *Barrientes v. Johnson*, 221 F.3d at 780; *Jackson v. Johnson*, 194 F.3d at 652. As for whether the jury would naturally and necessarily construe a remark as a comment on the defendant's failure to testify, the question is not whether the jury possibly or even probably would view the challenged remark in this manner but whether the jury necessarily would have done so. *Cotton v. Cockrell*, 343 F.3d at 751; *United States v. Virgen–Moreno*, 265 at 291; *Barrientes v. Johnson*, 221 F.3d at 780; *Jackson v. Johnson*, 194 F.3d at 652.

### d. *No Deficient Performance*

■ The state habeas court reasonably concluded the prosecutor's comments in question did not constitute a comment on petitioner's failure to testify at the guilt-innocence phase of trial. The focus of this Court's deficient performance inquiry, as was the state habeas court's, is on the three paragraphs quoted above from the prosecutor's closing guilt-innocence phase jury argument.

The first of the three paragraphs in question constituted a restatement of the trial court's proper guilt-innocence phase instruction directing the jury to disregard in any manner petitioner's failure to testify. *See Green v. Johnson*, 160 F.3d 1029,

1038 (5th Cir.1998) (holding there was nothing improper with a prosecutor's voir dire explanations to prospective jurors of the defendant's constitutional right to remain silent and the prosecution's corresponding inability to compel the defendant to testify at trial), *cert. denied*, 525 U.S. 1174, 119 S.Ct. 1107, 143 L.Ed.2d 106 (1999). The second paragraph quoted above constituted an appropriate reminder of the unavailability under state law of intoxication as an affirmative defense to the criminal charge against petitioner. There was nothing objectionable contained in either of these portions of the prosecutor's guilt-innocence phase argument.

Viewed objectively, the final paragraph quoted above from the prosecutor's guilt-innocence phase closing argument consisted of the prosecutor's prospective requests that the jurors: (1) carefully scrutinize petitioner's trial counsel's closing argument, both as to what petitioner's trial counsel was about to say and what said counsel might not say, (2) ask themselves whether petitioner's trial counsel's argument raised any questions in their minds, and (3) consider whether any questions raised in their minds by the petitioner's trial counsel's argument might have been answered by the actual testimony given up to that point in the trial. Thus, the final paragraph focused the jury's attention not on the petitioner's failure to testify, but rather on the content of, and any logical omissions from, petitioner's trial counsel's guilt-innocence phase closing argument. The prosecutor also urged the jury to consider the possibility any questions petitioner's trial counsel might attempt to raise in his argument (presumably concerning the sufficiency of the evidence to convict petitioner of capital murder) could be answered from the evidence already before the jury.

Because there were other, equally plausible, explanations for the prosecutor's argument in question, the prosecutor's remarks were not a manifest comment on the petitioner's failure to testify during the guilt-innocence phase of trial. *See Cotton v. Cockrell*, 343 F.3d at 751 (holding a prosecutor's remarks are not a manifest comment on the defendant's silence if there is some other, equally plausible, explanation for the remark); *United States v. Virgen–Moreno*, 265 F.3d at 291 (holding the same); *Barrientes v. Johnson*, 221 F.3d at 780 (holding the same); *Jackson v. Johnson*, 194 F.3d at 652 (holding the same). Thus, the state habeas court reasonably concluded the prosecutor's comments in question did not satisfy the first prong of *Griffin v. California* analysis.

The state habeas court also reasonably concluded the petitioner's jury would not have naturally or necessarily construed the prosecutor's remarks as a comment on the defendant's failure to testify. In making such an inquiry, the question is not whether the jury possibly or even probably would view the challenged remark in this manner but whether the jury necessarily would have done so. *Cotton v. Cockrell*, 343 F.3d at 751; *United States v. Virgen–Moreno*, 265 F.3d at 291; *Barrientes v. Johnson*, 221 F.3d at 780; *Jackson v. Johnson*, 194 F.3d at 652. As explained above, this Court has independently reviewed the prosecutor's comments in question and concludes those remarks focused the jury on the petitioner's trial counsel's forthcoming arguments and urged the jury to consider whether the evidence already before it might answer any effort by petitioner's trial counsel to argue for the existence of reasonable doubt as to petitioner's guilt. In fact, in view of their context and content, this Court concludes no rational jury could have construed the prosecutor's comments in question as a comment on the petitioner's failure to testify.

Because there was no arguable legal basis for a Fifth Amendment objection to the prosecutor's remarks in question, the failure of petitioner's trial counsel to object did not cause the performance of said counsel to fall below an objective level of reasonableness. *See Johnson v. Cockrell*, 306 F.3d at 255 (holding no professional deficiency in counsel's failure to object to the admission of psychiatric testimony which was admissible under then-existing precedent); *Robison v. Johnson*, 151 F.3d at 261 (holding no professional deficiency in trial counsel's failure to seek admission of a document the state court concluded was inadmissible); *Emery v. Johnson*, 139 F.3d at 198 (holding the failure to assert a meritless objection cannot be the grounds for a finding of deficient performance); *Sones v. Hargett*, 61 F.3d at 415 n. 5 ("Counsel cannot be deficient for failing to press a frivolous point.").

The state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the deficient performance prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### e. *No Prejudice*

For the reasons previously discussed, there was no arguable legal basis for a Fifth Amendment objection to the prosecutor's comments in question. Thus, the failure of petitioner's trial counsel to make such an objection did not prejudice petitioner within the meaning of *Strickland.* There is no reasonable probability petitioner's trial court would have sustained such

an objection. Nor is there any reasonable probability that, had the trial court erroneously sustained the objection to the prosecutor's argument in question, the outcome of the guilt-innocence phase of petitioner's trial would have been any different. Assuming the trial court instructed the jury to disregard the prosecutor's comment in question, i.e., the usual course of events following a sustained objection to jury argument, there is no reasonable probability the trial court would have thereafter granted a defense motion for mistrial or the jurors would have disregarded the evidence or their duty to find petitioner not guilty of capital murder. The evidence of petitioner's guilt for the capital murder of both Carolina and Eric Prado was overwhelming.

In short, even if the state trial court had erroneously construed the prosecutor's remark in question as a comment on petitioner's failure to testify, the remark constituted an "isolated comment in a sea of incriminating evidence" implicating petitioner in Carolina and Eric Prado's murders and, as such, was harmless. *See Cotton v. Cockrell,* 343 F.3d at 752 (holding a prosecutor's purported comment on the defense's failure to counter or explain the testimony of prosecution witnesses was harmless error); *Montoya v. Collins,* 955 F.2d 279, 287–88 (5th Cir.1992) (holding harmless a prosecutor's alleged comment on the defendant's failure to testify where the comment was "an isolated remark amid a sea of evidence incriminating the defendant").

Under such circumstances, the state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the prejudice prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### E. Ineffective Assistance at Punishment–Phase

Petitioner complains his trial counsel failed to: (1) object to the admission, or move to exclude, the trial testimony of the state trial court bailiff concerning petitioner's oral threats against his own trial counsel and the prosecutor, (2) develop and present available mitigating evidence showing (a) petitioner had a good institutional record during his prior incarceration, (b) petitioner's criminal record was not heinous, (c) petitioner suffered from intoxication rising to the level of temporary insanity at the time of his offense, and (d) petitioner had a "neglected" upbringing, (3) request a jury instruction regarding the mitigating effect of evidence showing petitioner's voluntary intoxication at the time of his offense rose to the level of temporary insanity, (4) object to the prosecution's punishment-phase jury arguments (a) speculating on why petitioner's mother had abandoned petitioner but not petitioner's sister, (b) contending petitioner's trial counsel's invocation of God and request for mercy on petitioner's behalf were "insulting," (c) referring to petitioner as a "mass murderer," and (d) asserting petitioner's "mitigating" evidence was, in fact, aggravating, (5) adequately prepare Cecelia Flores for cross-examination, (6) ascertain precisely what petitioner would say during his punishment-phase trial testimony and advise petitioner of the negative consequences of asserting innocence following his conviction, (7) object to allegedly improper cross-examination of petitioner regarding (a) petitioner's pornography col-

lection, (b) statements to the prosecutor during the October 12, 1995 pretrial hearing, and (c) the incendiary lyrics of rap music found in petitioner's possession, (8) object to the jury instruction directing the jury to disregard the effect of state parole law in answering the capital sentencing special issues, (9) request a limiting jury instruction regarding evidence of extraneous, unadjudicated misconduct, (10) argue (a) petitioner's voluntary intoxication at the time of his offense was mitigating in nature, (b) petitioner's violent conduct was aberrational, (c) petitioner did not have a violent past, (d) petitioner had a history of compassion toward others and tended to run away when confronted, (e) petitioner had a peaceful record in prison, (f) petitioner's youth was a mitigating factor favoring a life sentence, and (g) petitioner's pathological intoxication explained the horrific nature of petitioner's crime, (11) specifically object to the admission of harmful hearsay evidence contained in petitioner's pen packet, and (12) object to the admission of petitioner's pornographic magazines.[192]

### 1. Failure to Object/Move to Exclude Bailiff's Testimony

#### a. The Claim

Petitioner complains his trial counsel failed to object to the admission, or move to exclude, the punishment-phase trial testimony of the court bailiff who testified petitioner had verbally threatened both his own trial counsel and the prosecutor on separate dates during the pretrial phase of trial.[193]

#### b. State Court Disposition

As explained in Section III.C.5.b. above, the state habeas court concluded the heated exchange between petitioner and the prosecuting attorney during the October 12, 1995 pretrial hearing did not constitute a form of custodial interrogation and, therefore, petitioner's complaints regarding his trial counsel's allegedly deficient performance during the hearing failed to satisfy either prong of Strickland.[194] Moreover, petitioner failed to call the state habeas court's attention to any arguable constitutional basis for excluding evidence of petitioner's verbal threats made against his own trial counsel two days prior to that date from the punishment-phase of petitioner's trial.

#### c. No Deficient Performance

As this Court explained in Section III.C.5.c. above, the fundamental analytical flaw with petitioner's constitutional complaints about the admission of the court bailiff's punishment-phase testimony regarding petitioner's verbal threats is the absence of any existing legal authority, much less any Supreme Court opinion, recognizing verbal threats made by a criminal defendant in open court in the presence of the criminal defendant's counsel as equivalent to the product of an un-counseled custodial interrogation. The Supreme Court authorities cited by petitioner do not support petitioner's contention his verbal threats should have been excluded from evidence during the punishment-phase of his trial.[195] The failure of petitioner's trial counsel to object to the admission of the court bailiff's punishment-phase testimony on the constitutional grounds urged by petitioner herein did not cause the per-

---

192. Petition, at pp. 48–64 & 83–121.

193. Petition, at pp. 48–64.

194. State Habeas Transcript, at pp. 233–34.

195. See supra note 141 and accompanying text.

formance of said counsel to fall below an objective level of reasonableness.

Given the state habeas court's reasonable conclusion that evidence regarding petitioner's verbal threats was admissible during the punishment-phase of petitioner's trial, the state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the deficient performance prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

d. *No Prejudice*

To properly analyze petitioner's complaints regarding his trial counsel's performance during the punishment-phase of trial, it is necessary to remember during the punishment-phase of petitioner's trial for the first time petitioner's jury: (1) heard testimony (unchallenged through cross-examination or contradictory evidence other than petitioner's own testimonial denials) establishing petitioner sexually assaulted Belinda Prado after brutally murdering her mother and older brother, (2) learned petitioner had previously been convicted of numerous burglaries during his youth and had been convicted of attempted sexual assault as an adult, (3) heard uncontradicted expert testimony identifying petitioner as an anti-social personality, possessing little ability to empathize with his victims and a fascination with pornography and the sexual exploitation of children, (4) heard testimony establishing petitioner's long history of violent conduct and petitioner's refusal (while on probation and parole) to attend psychological counseling and group therapy sessions designed to help him address his aggressive tendencies, and (5) heard petitioner's own testimony asserting he (a) had not murdered either Carolina or Eric Prado, (b) had not written his confession, (c) wrote the note he gave to Belinda Prado the morning after the murders solely because she directed him to do so, (d) felt no personal responsibility for the deaths of Carolina or Eric Prado, (e) had not committed any of the criminal offenses for which he had previously been convicted except for his juvenile burglaries, (f) had never held any job for longer than nine months, (g) did not like it when people "disrespected" him and it did not take much for him to feel people were "disrespecting" him, and (h) believed the jury had erroneously convicted him of capital murder.[196] In addition, the horrific nature of petitioner's offense had been firmly etched in the jury's consciousness by grisly crime scene and autopsy photographs. In sum, the prosecution's evidence supporting an affirmative answer to the future dangerousness special issue and a negative answer to the *Penry* or mitigation special issue was overwhelming.

For the reasons set forth in Section III.C.5.d. above,[197] there is no reasonable probability that, but for the admission of the court bailiff's brief punishment-phase testimony regarding petitioner's verbal threats against his own trial counsel and the prosecutor, the outcome of the punishment-phase of petitioner's trial would have been different. Therefore, the state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the prejudice prong of *Strickland* was neither contrary to, nor involved

---

**196.** *See supra* notes 61–79 & 81 and accompanying text.

**197.** *See supra* notes 145–53 and accompanying text.

an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### 2. *Failure to Present Available Mitigating Evidence*

#### a. *The Claim*

Petitioner complains his trial counsel failed to develop and present available mitigating evidence showing: (1) petitioner had a good institutional record during his prior incarceration, (2) petitioner's criminal record was not heinous, (3) petitioner suffered from intoxication rising to the level of temporary insanity at the time of his offense, and (4) petitioner had a "neglected" upbringing.[198] More specifically, petitioner complains his trial counsel should have presented: (1) unspecified evidence (other than petitioner's confession) showing petitioner's intoxication resulted in temporary insanity at the time of his offense, (2) testimony from the mental health professional (Dr. Julia B. Spears) who examined petitioner prior to trial for competency to stand trial and who concluded petitioner suffered from a neglected upbringing, alcohol and poly-substance abuse, and a personality disorder characterized by antisocial traits, and (3) testimony from family friend Rosemary Vargas concerning petitioner's mother's physical, emotional, and mental problems and petitioner's difficult childhood.

#### b. *State Court Disposition*

During his punishment-phase trial testimony, petitioner undercut his trial coun-sel's efforts to paint petitioner in a sympathetic light by: (1) denying he had a drug or alcohol problem when he left prison, (2) denying he had played any role in the murders of Carolina or Eric Prado, (3) claiming he had been coerced into giving his written confession (which included an expression of remorse for the murders), (4) stating "I can't say I'm sorry for killing them because I did not kill them," (5) claiming he had pleaded guilty to a charge of attempted sexual assault simply to obtain a probated sentence, and (6) arguing with the prosecutor concerning the contents of the court reporter's record of their heated exchange during the October 12, 1995 pretrial hearing.[199]

During petitioner's state habeas corpus hearing, petitioner's former trial counsel testified without contradiction in pertinent part: (1) the crime scene was extraordinarily bloody and the crime so excessively violent he initially wanted to pursue an insanity defense, (2) petitioner refused to cooperate with an insanity defense and threatened to kill himself, (3) he was never able to get a firm answer from petitioner regarding the circumstances of the offense because petitioner kept changing his version of the relevant facts, (3) the information petitioner did give him conflicted with petitioner's confession, (4) it was difficult to marshal mitigating evidence because petitioner's family were reticent to testify on petitioner's behalf, (5) petitioner was less than honest with counsel, (6) petitioner chose to testify at the punishment-phase of trial but his failure to express remorse or to accept responsibility for the murders undermined his counsel's efforts to request mercy and secure a life sen-

---

198. Petition, at pp. 96–102.

199. S.F. Trial, Volume 20, testimony of David Martinez, at pp. 3062–64, 3066–70, 3074, 3076, 3085–86, 3102, 3110–15, 3117, 3119, 3120, & 3127.

tence for petitioner, (7) petitioner's protests of innocence ran counter to petitioner's confession, and (8) while the evidence of petitioner's intoxication might have warranted submission of a jury instruction regarding the mitigating impact of intoxication rising to the level of temporary insanity, petitioner's intoxication at the time of the murders, if any, had been voluntary.[200] Petitioner made no effort to inquire as to why counsel chose not to call Dr. Spears, Mark Martinez, Rosemary Vargas (who did, in fact, testify during the punishment-phase of petitioner's trial), or any other potentially helpful witness to testify during the punishment-phase of petitioner's trial.

During his state habeas hearing, petitioner testified in pertinent part: (1) he told his trial counsel not to pursue an insanity defense or to attempt to seek a life sentence but, rather, to seek only an acquittal, (2) he did not believe he could trust his trial counsel, (3) he did not cooperate with his trial counsel, did not furnish the names of any other suspects, and did not try to help his counsel, (4) he did not want his family called to testify at his trial, (5) he requested his trial counsel present testimony from Roy Lopez and his wife, who both testified at the punishment-phase of his trial, (6) he wanted Cecelia Flores to testify certain items of clothing belonged to petitioner, (7) he wanted Mark Martinez to testify at the punishment-phase of trial petitioner was intoxicated at the time of his arrest and both he and petitioner had smoked marijuana shortly before petitioner's arrest, and (8) he did not want insanity raised as defense at the punishment-phase of his trial.[201]

Petitioner did not, however, present the state habeas court with any testimony from either Mark Martinez, Cecelia Flores, Dr. Spears, or any other uncalled, potential punishment-phase witness concerning petitioner's allegedly neglected childhood, intoxication at the time of his arrest, ownership of particular clothing, mental health problems, or any other subject. Nor did petitioner present the state habeas court with any testimony or other evidence specifically addressing the allegedly "peaceful" nature of petitioner's previous incarceration or the "not heinous" nature of petitioner's criminal record.

The state habeas court: (1) found petitioner had dictated the trial strategy his trial counsel was forced to pursue during the punishment-phase of trial, (2) concluded petitioner's trial counsel's resulting failure to develop and present intoxication-induced-insanity mitigating evidence did not satisfy the deficient performance prong of *Strickland,* (3) concluded petitioner had failed to overcome the presumption of reasonableness afforded his trial counsel's strategic decision not to call Dr. Spears to testify at trial, (4) found petitioner had failed to present any evidence showing precisely what potentially mitigating evidence any of petitioner's identified, uncalled, punishment-phase witnesses could have furnished at trial, and (5) concluded petitioner's complaints regarding his trial counsel's failure to call these same punishment-phase witness satisfied neither prong of *Strickland.*[202]

### c. *No Deficient Performance*

Complaints about uncalled witnesses are not favored in federal habeas corpus pro-

---

**200.** S.F. State Habeas Hearing, Volume 1 of 3, testimony of Vincent D. Callahan, at pp. 8–9, 21, 26–27, 30, 59–65, 70, 73–76, & 80.

**201.** S.F. State Habeas Hearing, Volume 2 of 3, testimony of David Martinez, at pp. 11–13, 30–31, 35–39, & 58–62.

**202.** State Habeas Transcript, at pp. 238–40.

ceedings because the presentation of testimonial evidence is a matter of trial strategy and allegations of what a witness would have testified are largely speculative. *Coble v. Dretke,* 417 F.3d 508, 513 (5th Cir. 2005); *United States v. Harris,* 408 F.3d 186, 190 (5th Cir.), *cert. denied,* —— U.S. ——, 126 S.Ct. 297, 163 L.Ed.2d 259 (2005); *Graves v. Cockrell,* 351 F.3d 143, 156 (5th Cir.2003), *cert. denied,* 541 U.S. 1057, 124 S.Ct. 2160, 158 L.Ed.2d 757 (2004); *Evans v. Cockrell,* 285 F.3d 370, 377 (5th Cir.2002); *Sayre v. Anderson,* 238 F.3d 631, 635–36 (5th Cir.2001).

▇ Petitioner offered the state habeas court no testimony or other evidence establishing the failure of his trial counsel to call Dr. Spears, Mark Martinez, Rosemary Vargas, or any other witness to testify at the punishment-phase of petitioner's trial regarding petitioner's allegedly neglected childhood or any other potentially mitigating subject fell outside the realm of reasonable trial strategy. During petitioner's state habeas hearing, petitioner did not explore with his former trial counsel the reasons why said counsel chose not to call any of the witnesses in question to testify during the punishment-phase of petitioner's trial. Likewise, petitioner failed to present the state habeas court with testimony from any of the uncalled witnesses in question. Petitioner thereby deprived the state habeas court of any evidentiary basis for concluding the strategic decision by petitioner's trial counsel not to call these witnesses was objectively unreasonable. Under such circumstances, the state habeas court reasonably relied on the presumption of reasonableness afforded a trial counsel's strategic decisions to conclude petitioner's complaints of uncalled punishment-phase witnesses failed to satisfy the deficient performance prong of *Strickland. See Strickland v. Washington,* 466 U.S.

668, 687–91, 104 S.Ct. 2052, 2064–66, 80 L.Ed.2d 674 (1984) (a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance).

Petitioner made no effort during his state habeas proceeding to demonstrate his trial counsel's failure to call any of these witnesses was objectively unreasonable. Petitioner failed to present the state habeas court with any evidence showing any of the uncalled witnesses could have furnished potentially mitigating punishment-phase evidence without also being subject to potentially devastating cross-examination. Concern for the potentially harmful effect of cross-examination on a punishment-phase witness is particularly acute in a capital trial because, as the Fifth Circuit has noted, "mitigation is in the eye of the beholder." *Nobles v. Johnson,* 127 F.3d 409, 423 (5th Cir.1997), *cert. denied,* 523 U.S. 1139, 118 S.Ct. 1845, 140 L.Ed.2d 1094 (1998). A wide range of potentially mitigating evidence also possesses "double-edged" potential to harm a convicted capital defendant seeking a life sentence. As this Court explained in Section III. C.6.d. above, petitioner's potentially mitigating evidence of his youth, difficult childhood, and intoxication at the time of his offense all possessed potential to harm petitioner's trial counsel's efforts to secure a life sentence for petitioner. The same principle applies to petitioner's proposed, mitigating evidence showing: (1) he had a history of alcohol and poly-substance abuse, (2) he suffered from a neglected childhood, (3) he possessed an anti-social personality, and (4) he was so intoxicated at the time of his offense he was temporarily insane.[203]

---

**203.** In fact, there was at least some evidence before petitioner's jury at the punishment-

phase of trial on these subjects. Dr. Pina testified extensively regarding petitioner's

The Fifth Circuit has repeatedly held a strategic decision not to introduce evidence which possesses both mitigating and aggravating qualities is objectively reasonable. *See Hopkins v. Cockrell*, 325 F.3d 579, 586 (5th Cir.) (holding a tactical decision not to pursue and present potentially mitigating evidence on the ground that it is double-edged in nature is objectively reasonable), *cert. denied*, 540 U.S. 968, 124 S.Ct. 430, 157 L.Ed.2d 314 (2003); *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002) (recognizing that where evidence is double-edged in nature it is uncertain whether reasonable counsel would have used same had it been available); *Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir.2002)(holding that so long as the decision not to introduce double-edged mitigating evidence was based on trial strategy rather than a lack of investigation, such decisions are not susceptible to judicial second-guessing), *cert. denied*, 538 U.S. 926, 123 S.Ct. 1573, 155 L.Ed.2d 319 (2003); *Foster v. Johnson*, 293 F.3d 766, 778–79 (5th Cir.) (holding that a tactical decision not to pursue and present potential mitigating evidence on the grounds that it is double-edged in nature is objectively reasonable and does not amount to deficient performance), *cert. denied*, 537 U.S. 1054, 123 S.Ct. 625, 154 L.Ed.2d 532 (2002); *Kitchens v. Johnson*, 190 F.3d 698, 701–03 (5th Cir.1999) (holding "objectively reasonable" trial counsel's decisions not to

pursue or present double-edged evidence showing petitioner: (1) was physically abused by his father, (2) had abused alcohol from an early age, and (3) had been hospitalized several times for attempted suicide, depression, blackouts, and hallucinations because such evidence would also have revealed instances of extreme violence during petitioner's childhood, petitioner's history of violence even when sober, petitioner's extensive history of drug abuse, and petitioner's voluntary termination of needed treatment); *Lamb v. Johnson*, 179 F.3d 352, 357–59 (5th Cir.) (holding "objectively reasonable" a trial counsel's decision not to present mitigating evidence in the form of testimony regarding the petitioner's non-violent character in the past because such testimony would have come from persons who had little contact with the petitioner for many years and who could have been asked about their personal knowledge of the petitioner's extensive juvenile criminal record), *cert. denied*, 528 U.S. 1013, 120 S.Ct. 522, 145 L.Ed.2d 401 (1999); *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir.1997) (holding "objectively reasonable" a trial counsel's decision not to present potentially mitigating evidence showing the petitioner suffered from child abuse, family instability, a poor educational background, low IQ, gunshot injuries, and that petitioner's mother was severely and chronically mentally ill because trial counsel believed the jury might consider that evidence aggravating, rather than mitigating), *cert.*

anti-social personality. S.F. Trial, Volume 19, testimony of Gregorio Pina, III, at pp. 2953–85. Rosemary Vargas testified on petitioner's behalf: (1) petitioner's mother abandoned him, (2) petitioner was homeless while growing up, and (3) petitioner was nonetheless someone she knew and trusted. S.F. Trial, Volume 20, testimony of Rosemary Vargas, at

pp. 3023–28. Cecelia Flores testified: (1) petitioner's mother had mental problems, (2) petitioner was isolated in his home, (3) petitioner's parents often fought, and (4) petitioner's father was later shot in a bar while petitioner was still young. S.F. Trial, Volume 20, testimony of Cecelia Flores, at pp. 3029–48.

*denied,* 522 U.S. 1120, 118 S.Ct. 1061, 140 L.Ed.2d 122 (1998).

Petitioner alleges no specific facts, and presented the state habeas court with no evidence, showing the failure of his trial counsel to present any of the uncalled witnesses in question was the product of a failure by said counsel to adequately investigate the existence of potential mitigating evidence. Petitioner does not allege any specific facts showing his trial counsel was unaware of the existence of any of the potentially mitigating evidence in question. Nor does petitioner identify any alleged deficiency in his trial counsel's efforts to investigate and develop potentially mitigating evidence for use at the punishment-phase of petitioner's capital trial. Thus, petitioner has failed to allege any facts, much less present any evidence, showing the decision by his trial counsel not to present any of the uncalled witnesses during the punishment-phase of petitioner's capital trial fell outside the scope of objectively reasonable strategic or tactical decision-making.

Furthermore, given petitioner's refusal to cooperate with his trial counsel's efforts to present an insanity defense at either phase of trial, and the apparent absence of any other source of testimony regarding petitioner's intoxication at the time of his offense, the state habeas court's conclusion the performance of petitioner's trial counsel could not be faulted for failing to present punishment-phase evidence of intoxication-induced-insanity was a reasonable application of the first prong of *Strickland* in light of the evidence presented during petitioner's state habeas hearing.

For the foregoing reasons, the state habeas court's conclusion petitioner's complaints about his trial counsel's failure to develop and present additional mitigating evidence failed to satisfy the deficient performance prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

d. *No Prejudice*

In evaluating prejudice, a federal habeas court must re-weigh the aggravating evidence against the totality of available mitigating evidence. *Wiggins v. Smith,* 539 U.S. 510, 534, 123 S.Ct. 2527, 2542, 156 L.Ed.2d 471 (2003). For the reasons set forth in Sections III.C.5.d., III.C.6.d., and III.D.1.d. above, there is no reasonable probability that, but for the failure of petitioner's trial counsel to offer any of the new or additional potentially mitigating evidence which petitioner actually presented during petitioner's state habeas corpus proceeding, the outcome of the punishment-phase of petitioner's capital trial would have been different. Even considering petitioner's new and additional potentially mitigating evidence, the evidence supporting the prosecution on petitioner's two capital sentencing issues was overwhelming.[204] The prosecution's punishment-phase evidence, the horrific details of petitioner's crimes, as well as petitioner's devastating performance during cross-examination at the punishment-phase of his trial combined to ensure any rational jury would answer petitioner's two capital sentencing special issues in a manner favorable to the prosecution. This does not change even when one considers the weak, additional, mitigating evidence petitioner identifies in his pleadings herein.

Where a federal habeas petitioner's proposed mitigating evidence pales in comparison to the prosecution's overwhelming evi-

---

**204.** *See supra* notes 145–50 & 157 and accompanying text.

dence supporting the jury's answers to the Texas capital sentencing special issues, it is extremely difficult for a petitioner to establish *Strickland* prejudice arising from his trial counsel's failure to present the new or additional mitigating evidence at the punishment-phase of trial. *See Miniel v. Cockrell,* 339 F.3d 331, 347–48 (5th Cir. 2003) (where evidence of the defendant's propensity for violence overwhelmed the family's proposed mitigating testimony regarding defendant's history of childhood physical abuse and substance abuse, petitioner was not prejudiced by the failure of his trial counsel to present such mitigating evidence), *cert. denied* 540 U.S. 1179, 124 S.Ct. 1413, 158 L.Ed.2d 81 (2004); *Harris v. Cockrell,* 313 F.3d 238, 244 (5th Cir. 2002) (holding the failure to present double-edged evidence regarding the petitioner's allegedly abusive childhood was not prejudicial when viewed in the context of the petitioner's overall stable family background and the petitioner's history of violent conduct while incarcerated), *cert. denied,* 540 U.S. 1218, 124 S.Ct. 1503, 158 L.Ed.2d 152 (2004); *Ladd v. Cockrell,* 311 F.3d at 359–60 (holding a petitioner was not prejudiced by his trial counsel's failure to present double-edged evidence of the petitioner's low childhood IQ, drug treatment as a child for psycho-motor problems, and good behavior in an institutional setting where this same evidence was undermined by the petitioner's significantly higher IQ scores as an adult and the overwhelming evidence of the petitioner's future dangerousness); *Boyd v. Johnson,* 167 F.3d 907, 911 (5th Cir.) (holding a petitioner was not prejudiced by his trial counsel's failure to introduce evidence showing the petitioner was borderline mentally retarded where the petitioner's offense was cold-blooded and calculated and the petitioner had a track record of violent conduct), *cert. denied,* 527 U.S. 1055, 120 S.Ct. 20, 144 L.Ed.2d 824 (1999).

Most of the potentially mitigating evidence which petitioner now identifies, but which he failed to present to the state habeas court (i.e., evidence showing: (1) petitioner was so intoxicated at the time of his crimes he was temporarily insane, (2) petitioner had a neglected childhood, and (3) petitioner possessed an anti-social personality) was cumulative of testimony and other evidence already before petitioner's capital sentencing jury. For instance, Dr. Pina testified extensively during the punishment-phase of petitioner's trial regarding petitioner's anti-social personality.[205] Family friends, Rosemary Vargas and Cecelia Flores, testified not only about petitioner's endearing personal qualities but also the difficult circumstances of petitioner's childhood, including his mother's mental problems, his parents' quarrelsome marriage, his father's violent, untimely death, and his mother's abandonment of petitioner.[206] However, Mrs. Vargas and Mrs. Flores also testified they made their homes available to petitioner during his childhood and acknowledged petitioner had family members in San Marcos, Houston, and the Rio Grande Valley to whom he could turn during his childhood.[207]

Supporting his current argument he was so severely intoxicated at the time of his crimes he was temporarily insane, petitioner relies primarily on his own confession, which he expressly repudiated during his

**205.** S.F. Trial, Volume 19, testimony of Gregorio Pina, III, at pp. 2953–85.

**206.** S.F. Trial, Volume 20, testimony of Rosemary Vargas, at pp. 3023–28; testimony of Cecelia Flores, at pp. 3029–48.

**207.** *Id.*

punishment-phase trial testimony and again during his state habeas hearing testimony. During his state habeas corpus proceeding, petitioner: (1) testified he had categorically refused to cooperate with his trial counsel's efforts to present an insanity defense at either stage of trial and (2) failed to present any evidence showing there was any potential source of evidence (other than his own confession) then-available which would have supported an intoxication-induced-insanity defense at the punishment-phase of his trial. Petitioner offered his state habeas court no evidence showing he would have been willing to either testify at his trial in a manner other than the manner in which he actually testified during the punishment-phase of his trial. or assist his trial counsel in establishing petitioner was rendered temporarily insane at the time of his crimes due to severe intoxication. On the contrary, petitioner was quite clear during his state habeas hearing that he wanted no part of any such trial strategy at either phase of his trial.[208]

While petitioner complains his trial counsel should have presented evidence showing petitioner's peaceful conduct during petitioner's prior incarceration, petitioner did not present his state habeas court with any new evidence on this subject or call to the state habeas court's attention any evidence already in the record supporting this contention. Furthermore, any evidence showing petitioner had behaved properly during his previous incarceration would have been of only marginal value to petitioner at trial because of

the prosecution's punishment-phase evidence showing petitioner had engaged in numerous instances of threatening behavior during his pretrial detention,[209] as well as the prosecution's evidence showing petitioner's violent outbursts during his stay in the TYC.[210]

In conclusion, the new or additional, potentially mitigating evidence which petitioner now complains his trial counsel should have presented was: (1) extremely weak in nature when contrasted with the prosecution's weighty evidence showing petitioner's long history of violent, predatory conduct and refusal to accept responsibility for his criminal misbehavior, (2) unavailable at trial, in the case of evidence showing petitioner's intoxication rose to the level of temporary insanity, because of petitioner's own unwillingness to assist his trial counsel, and (3) merely cumulative of evidence already before petitioner's capital sentencing jury.

For the foregoing reasons, the state habeas court's conclusion petitioner's complaints about his trial counsel's failure to develop and present additional mitigating evidence failed to satisfy the prejudice prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

---

**208.** S.F. State Habeas Hearing, Volume 2 of 3, testimony of David Martinez, at pp. 11–13, 35–39, & 61–62.

It should be noted petitioner seemingly took great pains during his state habeas testimony to assert he was intoxicated at the time of his arrest and when he wrote his confession (which possessed potential mitigating value because petitioner therein expressed remorse

for his crimes) but not to claim he was similarly intoxicated at the time of his offense. *Id.* at pp. 11–13, 31, 45–46, 48–50, 59–62.

**209.** *See supra* notes 71–75 and accompanying text.

**210.** *See supra* notes 61–63.

### 3. *Failure to Request Temporary Insanity Instruction*

#### a. *The Claim*

Petitioner complains his trial counsel failed to request a jury instruction pursuant to Section 8.04(b) of the Texas Penal Code advising the jury Texas law allows evidence of temporary insanity caused by intoxication to be introduced in mitigation of punishment.[211]

#### b. *State Court Disposition*

During its deliberations at the punishment-phase of petitioner's trial, the jury had before it petitioner's confession in which he asserted he had consumed a twelve pack of beer and a big bottle of rum in the hours before the murders, and "I was freaking and tripping and I hit Carol for no reason."[212] The jury also had before it petitioner's punishment-phase trial testimony in which he: (1) admitted he smoked marihuana on the night of the murders, (2) insisted he had not killed either Carolina or Eric Prado, (3) asserted he was drunk and did not read his confession prior to signing, and (4) asserted police detectives had told him what to include in his confession.[213]

At the punishment-phase of petitioner's trial, the trial court instructed petitioner's jury, in pertinent part, as follows:

In deliberating upon the first issue, you shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the Defendant's background or charac-

ter or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.[214]

The second issue is: State whether, taking into consideration all the evidence, including the circumstances of the offense, the defendant's character or background, and the personal moral culpability of the Defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.[215]

You are instructed that, in answering this second question, you shall consider "mitigating evidence" to be evidence that a juror might regard as reducing the Defendant's moral blameworthiness or death worthiness.[216]

Texas Penal Code Section 8.04 provides as follows:

(a) Voluntary intoxication does not constitute a defense to the commission of crime.

(b) Evidence of temporary insanity caused by intoxication may be introduced by the actor in mitigation of the penalty attached to the offense for which he is being tried.

(c) When temporary insanity is relied upon as a defense and the evidence tends to show that such insanity was caused by intoxication, the court shall charge the jury in accordance with the provisions of this section.

(d) For purposes of this section "intoxication" means disturbance of mental

---

211. Petition, at p. 99.

212. S.F. Trial, Volume 18, at p. 2645–46; State Exhibit No. 65 found in S.F. Trial, Volume 21.

It is unclear from petitioner's confession precisely when petitioner claims to have consumed the beer and rum.

213. S.F. Trial, Volume 20, testimony of David Martinez, at pp. 3062–64, 3066–68, 3074, 3085–86, 3102, 3117, 3119, & 3127.

214. Trial Transcript, at p. 196.

215. Trial Transcript, at pp. 196–97.

216. Trial Transcript, at p. 197.

or physical capacity resulting from the introduction of any substance into the body.

During petitioner's state habeas hearing, his former trial counsel conceded his failure to request a jury instruction pursuant to Section 8.04 had been an "oversight" on his part.[217]

The state habeas court concluded: (1) under applicable state law, petitioner was not entitled to a jury instruction pursuant to Section 8.04 and (2) for that reason, the failure of petitioner's trial counsel to request such an instruction did not satisfy the deficient performance prong of *Strickland*.[218]

### c. *No Deficient Performance*

■ Petitioner's trial counsel's subsequent statement does not, standing alone, establish his failure to request a jury instruction pursuant to Section 8.04(b) was objectively unreasonable.

On the contrary, even disregarding the state habeas court's reliance on substantive state law principles as a basis for rejecting this portion of petitioner's ineffective assistance claim, this complaint fails to satisfy the deficient performance prong of *Strickland*. At the punishment-phase of petitioner's trial, the trial court specifically directed the jury to consider "the circumstances of the offense" in answering each of the capital sentencing special issues. The trial court further instructed petitioner's jury that "mitigating evidence" meant any evidence a juror felt reduced the petitioner's moral blameworthiness or death worthiness. A rational jury could only have construed those directives as permitting it to consider the potentially mitigating value of evidence showing petitioner was intoxicated at the time of the offense.

The clarity of the trial court's directives on this point would have been greatly undermined had a Section 8.04 instruction been given. As actually given, petitioner's punishment-phase jury instructions clearly permitted his jury to consider the potentially mitigating value of those portions of petitioner's confession suggesting petitioner was intoxicated at the time of the murders regardless of whether the jury determined the severity or extent of petitioner's intoxication rose to the level of temporary insanity. In contrast, had petitioner's trial counsel requested and obtained a Section 8.04(b) instruction, petitioner's jury could rationally have believed itself precluded from giving mitigating effect to evidence of petitioner's intoxication at the time of his offense unless that evidence showed the severity of petitioner's intoxication rose to the level of temporary insanity. Thus, a Section 8.04(b) instruction could easily have nullified the potentially mitigating value of petitioner's confession, which implied petitioner had consumed a quantity of alcohol in the hours before the murders and was intoxicated at the time he committed the murders.

Section 8.04 does not require a capital sentencing jury consider evidence of voluntary intoxication to have "mitigating" value. *See Morrow v. State*, 910 S.W.2d 471, 473 n. 5 (Tex.Crim.App.1995) (recognizing Section 8.04 does not provide voluntary intoxication is "mitigating" as a matter of law), *cert. denied*, 517 U.S. 1192, 116 S.Ct. 1683, 134 L.Ed.2d 784 (1996). In fact, the term "voluntary" does not appear in the language of Section 8.04. Therefore, had petitioner's trial counsel obtained a Section 8.04 instruction, petitioner's sentencing

217. S.F. State Habeas Hearing, Volume 1 of 3, testimony of Vincent D. Callahan, at pp. 31–32 & 52.

218. State Habeas Transcript, at p. 239.

jury would not have been required to treat evidence of petitioner's voluntary intoxication as mitigating in nature and, on the other hand, might very well have considered itself precluded from considering evidence of petitioner's voluntary intoxication as "mitigating" unless petitioner also showed his intoxication rose to the level of temporary insanity.

Thus, there were significant, objectively reasonable, tactical or strategic reasons why petitioner's trial counsel could have concluded a Section 8.04 instruction might prove harmful to petitioner at the punishment-phase of trial.

Under such circumstances, the state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the deficient performance prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

#### d. *No Prejudice*

Because the state habeas court failed to analyze the prejudice prong of *Strickland* with regard to this aspect of petitioner's ineffective assistance claim, this Court's analysis of same is necessarily *de novo*. *Rompilla v. Beard*, 545 U.S. 374, ——, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005).

For the same reasons discussed above in connection with the deficient performance prong of *Strickland*, there is no reasonable probability that, but for the failure of petitioner's trial counsel to request a Section 8.04 instruction, the outcome of the punishment-phase of petitioner's trial would have been different. A Section 8.04 instruction presented very little potential benefit to petitioner beyond the language already included in petitioner's punishment-phase jury charge directing the jury to consider "the circumstances of the offense" when answering both special issues. On the other hand, a Section 8.04 instruction had the potential to deprive petitioner of whatever mitigating value the jury was otherwise inclined to give his confession suggesting he was voluntarily intoxicated at the time of his offense. Finally, given the overwhelming evidence presented by the prosecution during the punishment-phase of petitioner's trial, the horrific details of petitioner's offense, and petitioner's refusal to accept responsibility or express sincere remorse for the murders, there is no reasonable probability the jury would have answered either of the two capital sentencing special issues differently had the trial court included a Section 8.04 instruction in petitioner's punishment-phase jury charge.

#### 4. *Failure to Object to Prosecution's Jury Argument*

#### a. *The Claim*

Petitioner complains his trial counsel failed to object to the prosecution's punishment-phase jury arguments: (1) speculating on why petitioner's mother had abandoned petitioner but not petitioner's sister, (2) contending petitioner's trial counsel's invocation of God and request for mercy on petitioner's behalf were "insulting," (3) referring to petitioner as a "mass murderer," and (4) asserting petitioner's "mitigating" evidence was, in fact, aggravating in nature.[219]

#### b. *State Court Disposition*

Other than obtaining his trial counsel's concession that the term "mass murder"

---

**219.** Petition, at pp. 101–02 & 113–17.

was harmful and inflammatory during petitioner's state habeas hearing, petitioner made no effort to explore with petitioner's trial counsel the reasons, if any, why said counsel failed to object to any of these four remarks made by the prosecution during punishment-phase closing argument. The state habeas court concluded, in the absence of any showing of the rationale for petitioner's trial counsel's strategic decisions not to object to any of the prosecutor's comments in question, petitioner failed to overcome the presumption of reasonableness afforded such strategic decisions.[220]

### c. *No Deficient Performance*

The initial problem with this aspect of petitioner's complaints about his trial counsel's performance is petitioner's failure to identify any legal basis for objecting to any of the prosecutor's closing arguments in question.

Under Texas law, proper closing argument by the prosecution in criminal trials fall into four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) pleas for law enforcement. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex.Crim.App.2000), *cert. denied*, 532 U.S. 944, 121 S.Ct. 1407, 149 L.Ed.2d 349 (2001); *Guidry v. State*, 9 S.W.3d 133, 154 (Tex.Crim.App.1999), *cert. denied*, 531 U.S. 837, 121 S.Ct. 98, 148 L.Ed.2d 57 (2000); *Hathorn v. State*, 848 S.W.2d 101, 117 (Tex.Crim.App.1992), *cert. denied*, 509 U.S. 932, 113 S.Ct. 3062, 125 L.Ed.2d 744 (1993); *see also Buxton v. Collins*, 925 F.2d 816, 825 (5th Cir.) (recognizing the four proper areas for prosecuto-

rial jury argument are summation of the evidence, reasonable inference from the evidence, answers to opposing counsel's argument, and pleas for law enforcement), *cert. denied*, 498 U.S. 1128, 111 S.Ct. 1095, 112 L.Ed.2d 1197 (1991),

Petitioner presented the state habeas court with no evidence, available at the time of petitioner's trial, establishing why petitioner's mother had refused to permit petitioner to live with her while permitting petitioner's sister to do so. Petitioner testified during his state habeas hearing he had not wanted his family to testify during his trial.[221] During the same hearing, petitioner's trial counsel testified building a case for mitigation was difficult because petitioner's family did not want to come forward and testify at petitioner's trial.[222] The prosecutor's suggestion petitioner's mother had refused to permit petitioner to live with her based, in part, on petitioner's demonstrated pattern of misbehavior was a reasonable deduction from the evidence at trial showing petitioner had burglarized numerous stores while a juvenile and, after receiving a probated sentence for those burglaries, burglarized another store the following week.

A criminal defendant who, in making an appeal to the jury for mercy, invokes divine authority runs the risk the prosecution will respond by urging the jury to remember the source of divine mercy is also the source of divine justice. Petitioner's trial counsel urged the jury to remember God's forgiveness, turn the other cheek, and to be merciful because "blessed are the merciful."[223] The prosecutor responded by labeling petitioner's appeal "an absolute insult" and urging the jury to

---

**220.** State Habeas Transcript, at p. 247.

**221.** S.F. State Habeas Hearing, Volume 2 of 3, testimony of David Martinez, at pp. 58–59.

**222.** S.F. State Habeas Hearing, Volume 1 of 3, testimony of Vincent D. Callahan, at pp. 9 & 70.

**223.** S.F. Trial, Volume 20, at pp. 3147–51.

impose justice.[224] The prosecution's remark suggesting petitioner's invocation of God was "an insult" was an appropriate response to the petitioner's trial counsel's closing argument.

As explained above, the legislatures of at least two states have defined "mass murder" in their capital sentencing statutes as the murder of two or more persons in a single criminal episode. Given the high degree of barbarity involved in petitioner's multiple murders and petitioner's unrepentant attitude during his punishment-phase trial testimony, referring to petitioner as a "mass murderer" was not inaccurate.

Finally, also as explained above, "mitigating" evidence is often a matter of highly subjective interpretation. See Nobles v. Johnson, 127 F.3d 409, 423 (5th Cir.1997) ("mitigation is in the eye of the beholder"), cert. denied, 523 U.S. 1139, 118 S.Ct. 1845, 140 L.Ed.2d 1094 (1998). There was nothing objectionable with the prosecutor's efforts to point out to the jury petitioner's purportedly mitigating evidence could be viewed in a light favorable to imposing the death penalty.

Thus, petitioner has failed to identify any legitimate basis for objection to any of the prosecution's punishment-phase closing argument, all of which consisted of either responses to petitioner's trial counsel's arguments, reasonable deductions from the evidence then before the jury, or pleas for law enforcement.

Thus, the Texas Court of Criminal Appeals reasonably concluded the failure of petitioner's trial counsel to object thereto did not cause the performance of said counsel to fall below an objective level of reasonableness. See Johnson v. Cockrell, 306 F.3d 249, 255 (5th Cir.2002) (holding there was nothing deficient in counsel's failure to object to the admission of psychi-

atric testimony that was admissible under then-existing precedent), cert. denied, 538 U.S. 926, 123 S.Ct. 1573, 155 L.Ed.2d 319 (2003); Robison v. Johnson, 151 F.3d 256, 261 (5th Cir.1998) (nothing deficient regarding trial counsel's failure to seek admission of a document the state court concluded was inadmissible), cert. denied, 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999); Emery v. Johnson, 139 F.3d 191, 198 (5th Cir.1997) (failure to assert a meritless objection cannot be the grounds for a finding of deficient performance), cert. denied, 525 U.S. 969, 119 S.Ct. 418, 142 L.Ed.2d 339 (1998),; Meanes v. Johnson, 138 F.3d 1007, 1012 (5th Cir.1998) (holding counsel was not constitutionally deficient for failing to raise an objection if, at the time of trial, the objection would have been futile in light of existing state law and the right asserted in the proposed objection was not clearly established), cert. denied, 525 U.S. 968, 119 S.Ct. 417, 142 L.Ed.2d 338 (1998); Sones v. Hargett, 61 F.3d 410, 415 n. 5 (5th Cir.1995) ("Counsel cannot be deficient for failing to press a frivolous point."); United States v. Gibson, 55 F.3d 173, 179 (5th Cir.1995) ("Counsel is not required by the Sixth Amendment to file meritless motions."); Koch v. Puckett, 907 F.2d 524, 527 (5th Cir.1990) ("[C]ounsel is not required to make futile motions or objections."); Murray v. Maggio, 736 F.2d 279, 283 (5th Cir.1984) ("Counsel is not required to engage in the filing of futile motions."). The state habeas court reasonably concluded petitioner's failures to object to the prosecutor's comments in question were little more than failures to make meritless objections.

Analysis of clearly established federal law further supports the reasonableness of the state habeas court's conclusion of no deficient performance. An improper pros-

---

**224.** S.F. Trial, Volume 20, at pp. 3153–60.

ecutorial argument which does not implicate a specific constitutional provision is not cognizable on collateral review unless the defendant shows an abridgment of due process, i.e., the improper argument rendered the proceeding fundamentally unfair. *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) ("it is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant inquiry is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process."); *Harris v. Cockrell,* 313 F.3d 238, 245 (5th Cir.2002) (holding prosecutorial remarks are a sufficient ground for habeas relief only if they are so prejudicial they render the trial fundamentally unfair and such unfairness exists only if the prosecutor's remarks evince either persistent and pronounced misconduct or the evidence was so insubstantial that, in probability, but for the remarks no conviction would have occurred), *cert. denied,* 540 U.S. 1218, 124 S.Ct. 1503, 158 L.Ed.2d 152 (2004); *Dowthitt v. Johnson,* 230 F.3d 733, 755 (5th Cir.2000) (holding: (1) the relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process and (2) the prosecutor is permitted to argue to the jury those inferences and conclusions the prosecutor wishes the jury to draw from the evidence so long as those inferences are grounded upon evidence), *cert. denied,* 532 U.S. 915, 121 S.Ct. 1250, 149 L.Ed.2d 156 (2001); *Barrientes v. Johnson,* 221 F.3d 741, 753 (5th Cir.2000) (holding: (1). federal habeas review of allegedly improper prosecutorial statements made during the punishment-phase of a capital trial focuses on whether the remarks so infected the punishment-phase as to make the resulting sentence a denial of due process, and (2) a trial is fundamentally unfair only

if there is a reasonable probability the verdict might have been different had the trial been properly conducted), *cert. dism'd,* 531 U.S. 1134, 121 S.Ct. 902, 148 L.Ed.2d 948 (2001).

 Improper jury argument by the state does not present a claim of constitutional magnitude in a federal habeas action unless it is so prejudicial that the state court trial was rendered fundamentally unfair within the meaning of the Due Process Clause of the Fourteenth Amendment. *Darden v. Wainwright,* 477 U.S. at 181, 106 S.Ct. at 2471; *Harris v. Cockrell,* 313 F.3d at 245; *Dowthitt v. Johnson,* 230 F.3d at 755; *Barrientes v. Johnson,* 221 F.3d at 753. To establish a prosecutor's remarks are so inflammatory, the petitioner must demonstrate the misconduct is persistent and pronounced or the evidence of guilt was so insubstantial the conviction would not have occurred but for the improper remarks. *Harris v. Cockrell,* 313 F.3d at 245; *Turner v. Johnson,* 106 F.3d 1178, 1188 (5th Cir.1997); *Nichols v. Scott,* 69 F.3d 1255, 1278 (5th Cir.1995) (citing *Milton v. Procunier,* 744 F.2d 1091, 1095 (5th Cir.1984), *cert. denied,* 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985)) (apart from the issue of procedural bar, failure to object to an argument is an indication it was not perceived as having a substantial adverse effect or would not naturally and necessarily be understood as advancing improper considerations), *cert. denied,* 518 U.S. 1022, 116 S.Ct. 2559, 135 L.Ed.2d 1076 (1996); *Buxton v. Collins,* 925 F.2d at 825 (recognizing the four proper areas for prosecutorial jury argument are summation of the evidence, reasonable inference from the evidence, answers to opposing counsel's argument, and pleas for law enforcement).

"A prosecutor's improper argument will, in itself, exceed constitutional limitations in only the most egregious cases." *Harris v.*

*Cockrell*, 313 F.3d at 245 n. 12; *Ortega v. McCotter*, 808 F.2d 406, 410 (5th Cir.1987) (quoting *Menzies v. Procunier*, 743 F.2d 281, 288–89 (5th Cir.1984)). The burden is on the habeas petitioner to show a reasonable probability that, but for the prosecutor's remarks, the result of the trial would have been different. *Nichols v. Scott*, 69 F.3d at 1278.

The prosecutor's allegedly objectionable arguments did not so infect petitioner's trial to render same fundamentally unfair. Nor is there any reasonable probability that, but for the prosecutor's remarks in question, the outcome of the punishment-phase of petitioner's trial would have been different. There was overwhelming evidence favoring the prosecution on both of petitioner's capital sentencing special issues.

Petitioner's conclusory complaints about his trial counsel's failures to object to the prosecution's punishment-phase closing arguments are unaccompanied by any citation to authority (state or federal) identifying any legal impropriety in the prosecution's remarks or any evidence establishing his trial counsel's failures to object thereto were objectively unreasonable. Under such circumstances, the state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the deficient performance prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### d. *No Prejudice*

Because the state habeas court failed to analyze the prejudice prong of *Strickland* with regard to this aspect of petitioner's ineffective assistance claim, this Court's analysis of same is necessarily *de novo*. *Rompilla v. Beard*, 545 U.S. 374, ——, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005).

The four portions of the prosecution's closing jury arguments at the punishment-phase of trial about which petitioner now complains were tangential to the thrust of the prosecution's punishment-phase closing argument, which focused the jury on the overwhelming evidence of petitioner's violent propensity and the lack of any "mitigating evidence." As explained above, petitioner's capital sentencing jury had before it during the punishment-phase of petitioner's trial, overwhelming evidence supporting an affirmative answer to the future dangerousness special issue and a negative answer to the mitigation special issue. Under such circumstances, there is no reasonable probability that, but for the failure of petitioner's trial counsel to object to any of the four allegedly improper comments made by the prosecution, the outcome of the punishment-phase of petitioner's trial would have been any different.

### 5. *Failure to Adequately Prepare Cecelia Flores for Cross*

### a. *The Claim*

Petitioner complains his trial counsel failed to adequately prepare Cecelia Flores for cross-examination yet the specific complaints petitioner voices in this aspect of his ineffective assistance claim focus on his trial counsel's failures to object to allegedly improper questions directed to Mrs. Flores on cross-examination.[225]

---

**225.** Petition, at pp. 102–06.

## b. *State Court Disposition*

■ On direct examination during the punishment-phase of petitioner's trial, Cecelia Flores testified, in pertinent part: (1) petitioner's mother had mental problems, (2) petitioner was isolated in his home, (3) petitioner's parents often fought, (4) petitioner's father was later shot in a bar while petitioner was still young, and (5) she loved petitioner.[226] On cross-examination, without objection from petitioner's trial counsel, the prosecution asked Mrs. Flores, in pertinent part: (1) whether she knew if petitioner's sister had "been in trouble," (2) if she were aware of petitioner's prior criminal convictions, probation revocations, and failures to comply with the conditions of his parole, and (3) whether she "still" thought petitioner deserved mercy after learning the grisly details of his murders of Carolina and Eric Prado by examining the crime scene photographs.[227] Until she was confronted with the crime scene photographs of the victims, Mrs. Flores steadfastly insisted her opinion of petitioner had not changed, and she did not believe petitioner capable of committing such murders; once she viewed the grisly photographs, she told the prosecutor she believed petitioner "still" deserved mercy if he admitted his crimes.[228]

Petitioner failed to make any effort during petitioner's state habeas hearing, to explore with petitioner's former trial counsel the reasons why counsel chose not to object to any of the foregoing cross-examination of Mrs. Flores. The state habeas court concluded: (1) petitioner failed to overcome the presumption of reasonableness afforded his trial counsel's strategic decisions, (2) petitioner failed to identify any specific, potentially meritorious objec-

tions his trial counsel could have made to *any of the questions directed to Mrs. Flores on cross-examination, and (3) this* aspect of petitioner's ineffective assistance claim failed to satisfy either prong of *Strickland.*[229]

## c. *No Deficient Performance*

Petitioner does not cite to any authority (state or federal) identifying any specific legal objection his trial counsel could have made to any aspect of the prosecution's cross-examination of Cecelia Flores. While it might have been possible to object to the form of some of the prosecution's questions during cross-examination of Mrs. Flores, this Court's independent research has revealed no legitimate basis for objection to the substance of those inquiries. Petitioner's trial counsel called Mrs. Flores to testify regarding petitioner's difficult family background and petitioner's good character. Generally, both subjects are appropriate for exploration during the punishment-phase of a capital trial. Petitioner does not identify any legal authority suggesting, implying, or otherwise hinting at any impropriety in the prosecution's ensuing efforts to impeach Mrs. Flores by: (1) contrasting petitioner's criminal background with the non-criminal backgrounds of petitioner's siblings, (2) showing Mrs. Flores lacked personal knowledge of the full scope of petitioner's criminal record, or (3) confronting Mrs. Flores with the gruesome details of petitioner's capital offense. Each of these techniques is an appropriate, long-recognized means of challenging the credibility of a defendant's character witness during the punishment-phase of a capital trial. The state habeas court reasonably concluded there was no legitimate

---

**226.** S.F. Trial, Volume 20, testimony of Cecelia Flores, at pp. 3029–33.

**227.** *Id.* at pp. 3035–43.

**228.** *Id.* at p. 3042.

**229.** State Habeas Transcript, at pp. 240–41.

basis for objection to the substance of the inquiries the prosecution made during cross-examination of Mrs. Flores at petitioner's trial.

Furthermore, petitioner made no effort during his state habeas hearing to explore with his former trial counsel the steps counsel undertook to prepare Mrs. Flores for her cross-examination at petitioner's trial. Petitioner identified no specific defects in his trial counsel's pretrial conferences with Mrs. Flores. Nor did petitioner suggest to the state habeas court any ethical course of pretrial preparation his trial counsel could have undertaken which would have "immunized" or "protected" Mrs. Flores from the logical impact of her admission she knew little about petitioner's criminal history or the grisly details of his capital offense.

During their testimony at petitioner's state habeas hearing, petitioner and his trial counsel made clear: (1) petitioner did not wish his family to testify during his trial and (2) petitioner was not very helpful in terms of furnishing his trial counsel with information which could be used to help secure a life sentence for petitioner.[230] Thus, at the punishment-phase of petitioner's trial, his counsel was faced with the daunting task of finding and presenting live witnesses who could enlighten the jury

regarding the difficult details of petitioner's childhood yet still express a favorable personal view of petitioner's character. On the whole, Mrs. Flores accomplished both these tasks as well as could be hoped. Petitioner presented the state habeas court with no evidence showing his trial counsel failed to advise Mrs. Flores prior to her trial testimony as to either the full extent of petitioner's criminal history or the brutal nature of petitioner's capital offense. Nor does petitioner allege any specific facts in this Court showing his trial counsel's efforts to prepare Mrs. Flores for her cross-examination were deficient in any particular regard. Petitioner cites no authority suggesting his trial counsel owed a duty to "rehearse" Mrs. Flores for every question she might be asked during her cross-examination. In sum, petitioner alleges no specific facts showing his trial counsels' efforts to prepare Mrs. Flores for her cross-examination fell outside the broad range of ethically appropriate, objectively reasonable conduct. The state habeas court reasonably relied on the presumption of reasonableness afforded a trial counsel's strategic decisions. *See Strickland v. Washington,* 466 U.S. 668, 687–91, 104 S.Ct. 2052, 2064–66, 80 L.Ed.2d 674 (1984) (a convicted

---

**230.** During petitioner's state habeas hearing, his former trial counsel testified in pertinent part: (1) petitioner's family members were reluctant to testify at petitioner's trial, (2) petitioner's offense, as demonstrated by the crime scene photographs, was extraordinarily brutal, explosive, and violent, (3) he initially wanted to pursue an insanity defense but petitioner did not want to cooperate with those efforts, (4) petitioner's refusal to accept responsibility for his capital offense greatly hindered his trial counsel's efforts to secure a life sentence for petitioner, (5) petitioner was less than honest with said counsel, (6) petitioner's confession and petitioner's unwillingness to give his trial counsel any evidence regarding alibi witnesses effectively undercut any effort

to present a theory someone else had committed the crime or played any role in the commission of the crime, and (7) petitioner's punishment-phase trial testimony hurt his chances for getting a life sentence. S.F. State Habeas Hearing, Volume 1 of 3, testimony of Vincent D. Callahan, at pp. 8–9, 18, 21, 27, 30–32, 59–65, 70–76, 79, & 82.

During the same hearing, petitioner testified in pertinent part: (1) he directed his trial counsel to pursue an acquittal and not to seek a life sentence, (2) he did not assist his trial counsel in locating alibi witnesses, and (3) he did not want his family to testify at his trial. S.F. State Habeas Hearing, Volume 2 of 3, testimony of David Martinez, at pp. 11–13, 38–39, & 58–59.

defendant must carry the burden of proof and overcome a strong presumption the conduct of his trial counsel falls within a wide range of reasonable professional assistance).

Under these circumstances, the state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the deficient performance prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### d. *No Prejudice*

Furthermore, the state habeas court reasonably concluded there was no reasonable probability that, but for the failure of petitioner's trial counsel to: (1) more fully "prepare" Mrs. Flores for her cross-examination or (2) object to the prosecution's cross-examination of Mrs. Flores, the outcome of petitioner's trial could have been different. For the reasons set forth above, this aspect of petitioner's ineffective assistance claim also lacks merit.

Moreover, even if petitioner had succeeded in making timely hearsay objections or objections to the form of some of the prosecution's cross-examination queries to Mrs. Flores, petitioner identifies no legal impediment to the prosecution continuing its cross-examination through substantially similar, properly-worded questions designed to demonstrate Mrs. Flores' positive personal view of petitioner's character was unreasonable given petitioner's criminal background and the brutal nature of his capital offense. Likewise, even if the state trial court had sustained objections (on unspecified grounds) to the pros-

ecution's attempts to demonstrate Mrs. Flores' high personal opinion of petitioner's character was unreasonable, refused to permit further cross-examination of Mrs. Flores on the factual basis for her positive personal opinion of petitioner's character, and directed the jury to disregard the prosecution's queries into the factual bases for Mrs. Flores' high personal opinion of petitioner's character, there is no reasonable probability such actions would have had any impact on the outcome of the punishment-phase of petitioner's capital trial.

It appears petitioner's jury did not answer the two capital sentencing special issues in the manner they did because the prosecution had impeached Mrs. Flores' testimony regarding petitioner's good character. Rather, as this Court has explained, the jury's answers at the punishment-phase of petitioner's capital trial were compelled by overwhelming evidence. Any potential benefits petitioner could have hoped to gain from presenting his sentencing jury with Mrs. Flores' opinion testimony as to petitioner's good character were more than offset by the overwhelming evidence establishing: (1) the particularly brutal nature of petitioner's capital offense, (2) petitioner's demonstrated history of violent, predatory conduct, and (3) petitioner's refusal to accept responsibility, or express sincere remorse for his crimes.

In such circumstances, the state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the prejudice prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented

in the petitioner's state habeas corpus proceeding.

### 6. *Failures Regarding Petitioner's Trial Testimony*

#### a. *The Claim*

Petitioner complains his trial counsel failed to ascertain precisely what petitioner would say during his punishment-phase trial testimony and advise petitioner of the negative consequences of asserting innocence following his conviction.[231]

#### b. *State Court Disposition*

The state habeas court: (1) found there was no evidence establishing petitioner's trial counsel failed to adequately advise petitioner of the potentially negative consequences of testifying during the punishment-phase of petitioner's trial in the manner in which petitioner did, (2) found petitioner had demonstrated no harm as a result of any alleged deficiency in his trial counsel's pre-testimonial advice, and (3) concluded petitioner's complaints in this regard failed to satisfy either prong of Strickland.[232]

#### c. *No Deficient Performance*

██ During petitioner's state habeas hearing, petitioner's former trial counsel testified: (1) he was unsuccessful in his many attempts to learn from petitioner precisely what happened the night of the murders, (2) petitioner initially refused to discuss the subject, threatening suicide, (3) petitioner later changed his unsubstantiated assertions of alibi to a vague allegation claiming a third party had committed the crime, (4) petitioner did not furnish his trial counsel with a consistent explanation of the relevant events that was also consistent with petitioner's written confession, (5) petitioner made the decision to testify or not testify, and (6) while he could only generally recall many of his conversations with petitioner, he did specifically recall explaining to petitioner prior to petitioner's punishment-phase trial testimony the potential pitfalls of denying culpability for an offense: "I recall putting it in terms if you don't show remorse or say you're sorry, you will alienate the jury." [233]

While petitioner testified extensively during the same state habeas hearing, he never challenged the accuracy of his former trial counsel's account of their conversations on the foregoing subjects. In fact, petitioner admitted during his state habeas hearing testimony: (1) he felt frustrated and angry with his trial counsel, (2) he felt his trial counsel would not listen to him, (3) he was not trying to help his trial counsel, (4) he understood his right to testify during the pretrial hearing on his motion to suppress but chose not to do so based on his counsel's advice, and (5) he did not want to assist his trial counsel in asserting an insanity defense at either phase of trial.[234] More significantly, petitioner did not testify he was unaware of the negative results likely to occur when he denied responsibility for Carolina and Eric Prado's murders from the witness stand during the punishment-phase of his trial, or he would have been willing to alter his punishment-phase trial testimony had he been so advised.

**231.** Petition, at pp. 106–07.

**232.** State Habeas Transcript, at pp. 241–45.

**233.** S.F. State Habeas Hearing, Volume 1 of 3, testimony of Vincent D. Callahan, at pp. 26–27, 30, 59–65, 73–74, & 76.

**234.** S.F. State Habeas Hearing, Volume 2 of 3, testimony of David Martinez, at pp. 11–13, 38–39, 56, & 59–62.

During petitioner's state habeas hearing, petitioner's trial counsel testified without contradiction: (1) petitioner refused to give counsel a consistent account of the events which transpired on the night of the murders, (2) petitioner never gave counsel the same version twice, (3) the information which petitioner did give counsel conflicted with petitioner's written confession, and (4) petitioner was less than honest with counsel. In short, petitioner presented the state habeas court with no evidence establishing it was possible for his trial counsel to have ascertained the precise nature of petitioner's punishment-phase trial testimony before petitioner actually testified.

Nor did petitioner present the state habeas court with any evidence showing petitioner was otherwise unaware of the importance of his expressing remorse, and accepting responsibility, for his capital offense at the punishment stage of his trial. In fact, petitioner remained defiant throughout his testimony at his state habeas hearing insisting he had not murdered either Carolina or Eric Prado, explaining he would have testified before the grand jury and during the guilt-innocence phase of his trial in the same manner as he did during the punishment-phase of his trial had he testified at those stages of his criminal proceedings, and asserting he felt no responsibility for his capital offense only sorrow the two victims had died.[235]

Given the unchallenged testimony of petitioner's former trial counsel before the state habeas court, as well as petitioner's continued remorseless, unrepentant demeanor and petitioner's continued refusal to accept responsibility for his offense, the state habeas court's conclusion petitioner's complaints in question failed to satisfy the deficient performance prong of *Strickland*

was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### d. *No Prejudice*

There was no evidence before the state habeas court establishing either: (1) the decision to have petitioner testify during the punishment-phase of his trial was made by anyone other than petitioner, (2) petitioner was unaware when he made the decision to take the stand during the punishment-phase of trial that his refusal to admit his culpability and responsibility for the murders of Carolina and Eric Prado would likely harm his chances of obtaining a life sentence, or (3) petitioner would have heeded any additional advice from his trial counsel regarding the need for petitioner to express remorse and accept responsibility for the Prado murders during his punishment-phase trial testimony.

In sum, there was no evidence before the state habeas court from which that court could have reasonably determined the alleged failures of petitioner's trial counsel had any impact on petitioner's decisions to testify during the punishment-phase of petitioner's capital trial or on petitioner's decision to continue to protest his innocence and assert no responsibility for the murders of Carolina or Eric Prado after his capital murder conviction. On the contrary, it appears undisputed petitioner chose to testify during the punishment-phase of his trial in the manner in

---

**235.** S.F. State Habeas Hearing, Volume 2 of 3, testimony of David Martinez, at pp. 11–13, 18, 35–37, 47–48, & 56–57.

which he did despite the express, specific warnings and advice of his trial counsel. Throughout his state habeas hearing testimony, petitioner continued to protest his innocence and argue the jury had erroneously convicted him for the murders of Carolina and Eric Prado.[236]

Under such circumstances, the state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the prejudice prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### 7. *Failure to Object to Improper Cross–Examination*

#### a. *The Claim*

Petitioner complains his trial counsel failed to object to allegedly improper cross-examination of petitioner during the punishment-phase of trial. More specifically, his trial counsel failed to object to prosecution questions regarding: (1) petitioner's pornography collection, (2) statements to the prosecutor during the October 12, 1995 pretrial hearing, and (3) the incendiary lyrics of rap music found in petitioner's possession.[237]

#### b. *State Court Disposition*

The state habeas court concluded: (1) petitioner failed to overcome the presumption of reasonableness afforded his trial counsel's strategic decisions, (2) petitioner failed to identify any specific, potentially meritorious objections his trial counsel could have made to any of the questions directed to petitioner on cross-examination, and (3) this aspect of petitioner's ineffective assistance claim failed to satisfy either prong of *Strickland*.[238]

#### c. *No Deficient Performance*

■ During his state habeas hearing, petitioner did not explore the reasoning which supported his trial counsel's strategic decision not to object to the prosecution's cross-examination of petitioner on the subjects in question. Thus, the state habeas court reasonably relied on the presumption of reasonableness afforded a trial counsel's strategic decisions. *See Strickland v. Washington,* 466 U.S. at 687–91, 104 S.Ct. at 2064–66 (a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance).

Nor did petitioner identify any legitimate legal bases for objecting to any of the prosecution's questions regarding those subjects directed to petitioner during his punishment-phase trial testimony. Those portions of petitioner's cross-examination to which petitioner now complains his trial counsel should have objected were all clearly relevant to the issues before the jury at the punishment-phase of petitioner's trial, i.e., the probability of petitioner's future dangerousness and petitioner's character and moral blameworthiness.

For instance, petitioner's complaint about the prosecution's questions regarding petitioner's collection of pornographic magazines focuses on petitioner's assertion the magazines in question were not "obscene"; however, having placed his own

---

**236.** *Id.* at pp. 18, 35–37, & 47.

**237.** Petition, at pp. 106–07.

**238.** State Habeas Transcript, at p. 246.

character at issue through the testimony of a bevy of character witnesses, petitioner identifies no legal principle precluding the prosecution from inquiring into petitioner's fascination with pornography, regardless of whether the objects of petitioner's fascination met the legal definition of obscenity. At the time of his capital offense, petitioner was a convicted sex offender with a history of refusing to participate in mandatory psychological counseling designed to help him address his aggressiveness toward women. During the punishment-phase of petitioner's trial, eleven-year-old Belinda Prado testified petitioner sexually molested her immediately after he murdered her brother. Thus, petitioner's capital sentencing jury could properly consider petitioner's continuing fascination with pornography when evaluating petitioner's character and moral blameworthiness.

Likewise, as explained in Section III. C.5. above,[239] petitioner's verbal threats against his own trial counsel and the prosecution were not only admissible but clearly proper subjects for the jury's consideration during the punishment-phase of petitioner's trial. The fact petitioner made such threats in open court was most certainly relevant to the issue of the probability of his future dangerousness. The same is true for evidence of petitioner's predilection for violent song lyrics.

In sum, petitioner has failed to identify any arguable legal basis to support an objection to the prosecution's cross-examination of petitioner on the foregoing subjects. Thus, petitioner's complaints about his trial counsel's failures to object to those portions of his cross-examination are without merit. There was nothing objectively unreasonable with the failure of petitioner's trial counsel to voice baseless, groundless objections. *See Johnson v. Cockrell,* 306 F.3d 249, 255 (5th Cir.2002)

(holding there was nothing deficient in counsel's failure to object to the admission of psychiatric testimony that was admissible under then-existing precedent), *cert. denied,* 538 U.S. 926, 123 S.Ct. 1573, 155 L.Ed.2d 319 (2003); *Robison v. Johnson,* 151 F.3d 256, 261 (5th Cir.1998) (nothing deficient regarding trial counsel's failure to seek admission of a document the state court concluded was inadmissible), *cert. denied,* 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999).

Under such circumstances, the state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the deficient performance prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### d. *No Prejudice*

The failure of a petitioner's trial counsel to make frivolous, baseless objections can never satisfy the prejudice prong of *Strickland. See United States v. Wilkes,* 20 F.3d 651, 653 (5th Cir.1994) (prejudice cannot result from the failure to make a meritless objection or to urge a meritless argument); *Smith v. Puckett,* 907 F.2d 581, 585 n. 6 (5th Cir.1990) (prejudice does not issue from the failure to raise a legally meritless claim), *cert. denied,* 498 U.S. 1033, 111 S.Ct. 694, 112 L.Ed.2d 685 (1991). There can never be a reasonable probability that, but for the failure of a criminal defendant's trial counsel to make a legally frivolous objection, the outcome

**239.** *See supra* notes 133–54 and accompanying text.

of either phase of a capital trial would have been different.

Furthermore, even assuming that petitioner's trial counsel could have successfully precluded the prosecution from cross-examining petitioner on any or all of the subjects identified in this aspect of petitioner's ineffective assistance claim, there is no reasonable probability of a different outcome at the punishment-phase of petitioner's trial. The evidence supporting an affirmative answer to the future dangerousness special issue and a negative answer to the mitigation special issue was overwhelming. For the reasons explained in Sections III.C.5.d., III.C.6.d., and III.D.1.d. above, as well as in connection with each of petitioner's complaints of ineffective assistance during the punishment-phase of his trial discussed above, there is no reasonable probability that, but for the failure of petitioner's trial counsel to preclude cross-examination of petitioner on any of the subjects in question, the outcome of the punishment-phase of petitioner's trial would have been different.

The state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the prejudice prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### 8. *Failure to Object to Jury Instruction on Parole*

#### a. *The Claim*

Petitioner complains his trial counsel expressly waived the right to complain on appeal about the trial court's submission of a jury instruction directing the jury to disregard the effect of state parole law in answering the capital sentencing special issues.[240]

#### b. *State Court Disposition*

The state habeas court: (1) found petitioner had presented no evidence addressing the objective reasonableness of petitioner's trial counsel's strategic decision not to object to the trial court's punishment-phase jury instruction directing the jury to disregard Texas parole law when answering the capital sentencing special issues and (2) concluded this aspect of petitioner's ineffective assistance claim failed to satisfy the deficient performance prong of *Strickland*.[241]

#### c. *No Deficient Performance*

■ The state habeas court reasonably relied on petitioner's failure to overcome the presumption of reasonableness usually afforded a trial court's strategic decisions. *See Strickland v. Washington,* 466 U.S. at 687–91, 104 S.Ct. at 2064–66 (a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance). In the absence of any evidence showing precisely why his trial counsel made the decision not to challenge the punishment-phase jury instructions in question (or otherwise showing this decision was objectively unreasonable), petitioner failed to overcome this presumption. *See Medellin v. Dretke,* 371 F.3d 270, 276–77 (5th Cir.2004) (recognizing as objectively reasonable a trial counsel's belief, based on his past experience in death penalty

---

**240.** Petition, at pp. 107–09.

**241.** State Habeas Transcript, at p. 246.

trials, jurors would assume a "life" sentence meant life without parole), *cert. dism'd*, 544 U.S. 660, 125 S.Ct. 2088, 161 L.Ed.2d 982 (2005).

Moreover, the premise underlying this aspect of petitioner's ineffective assistance claim is petitioner's erroneous suggestion he was entitled, as a matter of federal constitutional law, to a jury instruction directing, or at least permitting, his capital sentencing jury to consider petitioner's parole eligibility as a "mitigating" factor when answering his capital sentencing special issues. This aspect of petitioner's ineffective assistance claim fails because petitioner possessed no clearly established federal constitutional right to such a jury instruction.

Petitioner's ineffective assistance complaint is premised on an extremely broad interpretation of the Supreme Court's opinions addressing capital sentencing in South Carolina and other jurisdictions which authorize capital sentencing juries to impose sentences of either death or life without the possibility of parole. *See Simmons v. South Carolina*, 512 U.S. 154, 168–69 & n. 8, 114 S.Ct. 2187, 2196 & n. 8, 129 L.Ed.2d 133 (1994) (plurality opinion specifically explaining that, as of that date, Texas courts traditionally kept capital sentencing juries unaware of the availability of parole for those sentenced to serve terms of life imprisonment). Representing the views of three members of the Supreme Court, Justice O'Connor's concurring opinion in *Simmons* is significant because it emphasized South Carolina law provided a capital defendant faced the possibility of life without parole. *See id.* at 176–78, 114 S.Ct. at 2200–01 (concurring opinion).

The Supreme Court's more recent opinion in *Ramdass v. Angelone*, 530 U.S. 156, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000), continues the vitality of this distinction, as

the plurality opinion for the Supreme Court therein specifically limited the holding in *Simmons* to "only those instances where, as a legal matter, there is no possibility of parole if the jury decides the appropriate sentence is life in prison." *Id.* at 169, 120 S.Ct. at 2121. In her separate, pivotal, concurring opinion in *Ramdass*, Justice O'Connor once again emphasized her view of the continued vitality of the rule in *Simmons*, as enunciated by the plurality in *Ramdass*, and also pointed out *Ramdass* came before the Supreme Court in the context of a federal habeas corpus proceeding, in which the Supreme Court's review, like this Court's review in the present cause, is circumscribed by the terms of the AEDPA. *See Id.* at 179, 120 S.Ct. at 2126 (concurring opinion).

Even more recently, the Supreme Court's opinion in *Shafer v. South Carolina*, 532 U.S. 36, 121 S.Ct. 1263, 149 L.Ed.2d 178 (2001), at least implicitly acknowledged the continued vitality of the distinction first noted in *Simmons* by holding South Carolina's new capital sentencing scheme contained the same constitutional defect identified in *Simmons* because, at least under some circumstances, the sentencing jury would be faced with a choice between a sentence of death and a sentence of life without the possibility of parole. *Id.* at 51, 121 S.Ct. at 1273 ("We therefore hold that whenever future dangerousness is at issue in a capital sentencing proceeding under South Carolina's new scheme, due process requires that the jury be informed that a life sentence carries no possibility of parole.").

In *Kelly v. South Carolina*, 534 U.S. 246, 122 S.Ct. 726, 151 L.Ed.2d 670 (2002), the Supreme Court reiterated its holding in *Shafer*, emphasizing once again that South Carolina capital sentencing juries unanimously finding the presence of an aggravating circumstances were left to se-

lect between one of only two possible sentences: death or life imprisonment without the possibility of parole. *Id.* at 252 & n. 2, 122 S.Ct. at 730 & n. 2.

While Texas has recently joined South Carolina and other jurisdictions which provide capital sentencing juries the option of sentencing a convicted capital murderer to a term of life without parole, at the time of petitioner's offense and trial, Texas law did not provide for a sentence of life imprisonment without the possibility of parole. The legal premise underlying this aspect of petitioner's ineffective assistance claim ignores this critical distinction.

Having carefully reviewed Supreme Court case law on the subject, this Court finds the Texas Court of Criminal Appeals' rejection of this aspect of petitioner's ineffective assistance claim was neither contrary to, nor involved an unreasonable application of, "clearly established Federal law, as determined by the Supreme Court of the United States." The United States Supreme Court has never held that either the Fourteenth Amendment's Equal Protection Clause, the Eighth Amendment, or the Fourteenth Amendment's Due Process Clause require a jurisdiction such as Texas, which at the time of petitioner's offense and trial did not offer a capital sentencing jury the option of sentencing a convicted capital murderer to a term of life imprisonment without the possibility of parole, to instruct capital sentencing juries regarding the intricacies of then-current parole law applicable to terms of life imprisonment. In fact, the Supreme Court's Fourteenth Amendment jurisprudence, including *Simmons, Ramdass, Shafer,* and *Kelly,* makes an express distinction between the rule applied in *Simmons* and *Shafer* and the due process requirements in jurisdictions such as Texas, where sentences of either death or life without parole are not the only choices facing a capital sentencing

jury. While the petitioner cites to United States Supreme Court opinions analyzing the Eighth Amendment, none of those opinions address the issue underlying this aspect of petitioner's ineffective assistance claim herein, i.e., whether a Texas capital sentencing jury must be informed of the details concerning a convicted capital murder defendant's eligibility for release on parole and given an opportunity to consider same when answering the Texas capital sentencing special issues. Thus, there is simply no "clearly established" federal law, as enunciated by the United States Supreme Court, holding the Eighth Amendment or Fourteenth Amendment's Due Process or Equal Protection Clauses require an instruction at the punishment-phase of a Texas capital murder trial as urged by the petitioner.

On the contrary, the Supreme Court: (1) took great pains in *Simmons* to distinguish jurisdictions such as Texas (at the time of petitioner's offense and trial) from those to which its holding in *Simmons* applied, and (2) has consistently continued to adhere to the same distinction in its subsequent opinions addressing the Fourteenth Amendment's Due Process Clause. *See Simmons v. South Carolina,* 512 U.S. at 168–69 & n. 8, 114 S.Ct. at 2196 & n. 8, (plurality opinion specifically explaining that, as of that date, Texas courts traditionally kept capital sentencing juries unaware of the availability of parole for those sentenced to serve terms of life imprisonment). Moreover, unlike the defendant in *Simmons,* petitioner's jury was given accurate information regarding parole eligibility for those sentenced to death and those convicted capital murderers who are sentenced to serve a life sentence.

This aspect of petitioner's ineffective assistance claim is also premised on petitioner's argument suggesting the Eighth Amendment requires capital murder de-

fendants be permitted to invite their sentencing juries to speculate on parole when deliberating over capital sentencing special issues. The Supreme Court has held the Eighth Amendment requires capital sentencing juries be permitted to consider and give effect to "constitutionally relevant mitigating evidence." *See Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S.Ct. 757, 761, 139 L.Ed.2d 702 (1998) ("the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence"); *Johnson v. Texas*, 509 U.S. 350, 367, 113 S.Ct. 2658, 2669, 125 L.Ed.2d 290 (1993) (holding the appropriate standard of review is whether there is a reasonable likelihood the challenged jury instructions were applied by the jury in a way that prevented the consideration of constitutionally relevant mitigating evidence); *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990) (holding the same). However, the Supreme Court has never declared information regarding state parole eligibility laws constitutes "mitigating evidence." The defendant in *Simmons* argued his ineligibility for release on parole was a relevant consideration with regard to the propriety of his sentence because the evidence showed all of his victims had been elderly women and he was unlikely to encounter such persons if he were sentenced to serve a term of life imprisonment. Petitioner's situation is significantly different.

A review of pertinent Supreme Court case law reveals the Supreme Court has consistently employed the term "constitutionally relevant mitigating evidence" to describe evidence which tends to diminish a convicted capital murderer's moral blameworthiness or lessen the reprehensible nature of the offense, i.e., evidence which relates to the defendant's background or character or to the circumstances of the offense. *See, e.g., Tennard*

*v. Dretke*, 542 U.S. 274, 285–87, 124 S.Ct. 2562, 2571–72, 159 L.Ed.2d 384 (2004) (holding impaired intellectual functioning is inherently mitigating); *Penry v. Johnson*, 532 U.S. 782, 796–97, 121 S.Ct. 1910, 1920, 150 L.Ed.2d 9 (2001) (holding jury instructions in a Texas capital sentencing proceeding did not adequately afford the jury a means of giving effect to mitigating evidence of the defendant's mental retardation and history of childhood abuse); *Buchanan v. Angelone*, 522 U.S. at 278–79, 118 S.Ct. at 762–63 (holding jury instructions in a Virginia capital sentencing proceeding adequately permitted consideration of mitigating evidence of the defendant's difficult family background and mental and emotional problems); *Johnson v. Texas*, 509 U.S. at 369–71, 113 S.Ct. at 2669–71 (holding the Texas capital sentencing special issues given at the defendant's trial permitted adequate jury consideration of the defendant's youth at the time of his offense); *Penry v. Lynaugh*, 492 U.S. 302, 309, 109 S.Ct. 2934, 2941, 106 L.Ed.2d 256 (1989)(holding an earlier Texas capital sentencing scheme did not permit the sentencing jury to give effect to the defendant's history of childhood abuse and mental retardation).

The foregoing Supreme Court opinions relied upon principles enunciated initially in a series of plurality opinions which echoed the same underlying Eighth Amendment concern, i.e., a capital sentencing authority must be free to give independent mitigating weight to aspects of the defendant's character or record and to the circumstances of the offense when proffered in mitigation. *See Eddings v. Oklahoma*, 455 U.S. 104, 107–12, 102 S.Ct. 869, 872–75, 71 L.Ed.2d 1 (1982) (overturning the death sentence of a defendant because the sentencing judge had expressly refused to consider mitigating evidence showing the defendant: (1) had been raised without

proper guidance following his parents' divorce when he was only five, (2) had lived with virtually no supervision from his alcoholic and promiscuous mother until he reached fourteen, when he was sent to live with his physically abusive father, (3) was emotionally disturbed and exhibited a mental and emotional development several years below his age, (4) was categorized by a psychologist as a sociopath and antisocial but given a thirty percent chance of growing out of that condition, (5) was identified as being a potential prospect for rehabilitation with proper therapy for fifteen-to-twenty years, and (6) probably did not know what he was doing when he fired the fatal shot and, with proper therapy, would not be a threat to society); *Lockett v. Ohio,* 438 U.S. 586, 604–05, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978) ("we conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death"); *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) ("we believe in capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.").

In *Cordova v. Johnson,* 993 F.Supp. 473, 499–500 (W.D.Tex.1998), *appeal denied,* 157 F.3d 380 (5th Cir.1998), *cert. denied,* 525 U.S. 1131, 119 S.Ct. 922, 142 L.Ed.2d 971 (1999), this Court defined "constitutionally relevant mitigating evidence" as "evidence which relates to the defendant's character or background or to the circumstances of the offense and is sufficient to lead a reasonable juror to impose a penalty less than death." This construction is consistent with the Fifth Circuit's definition of the same term. *Smith v. Cockrell,* 311 F.3d 661, 680 (5th Cir.2002) ("In determining whether a defendant's mitigating evidence is constitutionally relevant, the question is whether 'the evidence implicates the basic concern of *Penry* that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.' "), *cert. dism'd,* 541 U.S. 913, 124 S.Ct. 1652, 158 L.Ed.2d 263 (2004); *Muniz v. Johnson,* 132 F.3d 214, 222 (5th Cir.1998) ("Mitigating evidence is 'any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' "), *cert. denied,* 523 U.S. 1113, 118 S.Ct. 1793, 140 L.Ed.2d 933 (1998); *Madden v. Collins,* 18 F.3d 304, 307 (5th Cir. 1994) (holding Texas capital sentencing special issues adequately permitted consideration of relevant mitigating evidence showing defendant suffered from a learning disability, a personality disorder, and a troubled childhood), *cert. denied,* 513 U.S. 1156, 115 S.Ct. 1114, 130 L.Ed.2d 1078 (1995). The status of Texas parole eligibility statutes or regulations at the time of petitioner's offense and trial did not satisfy this definition of constitutionally relevant mitigating evidence.

The Supreme Court has never declared that state statutes and administrative regulations addressing parole eligibility for those defendants convicted of capital murder and sentenced to life imprisonment lessen a defendant's moral blameworthiness. There simply is no "clearly established" Supreme Court precedent holding the Eighth Amendment mandates jury consideration of a defendant's potential pa-

role eligibility at the punishment-phase of a Texas capital trial.

■ The Supreme Court's opinion in *Ramdass* reaffirmed that the principle in *Simmons* applies only to jurisdictions, unlike Texas at the time of petitioner's offense and trial, where convicted capital murderers face the prospect of a term of life imprisonment without the possibility of parole. The Fifth Circuit has likewise consistently adhered to an understanding that neither voir dire of potential jurors nor punishment-phase jury instructions regarding parole eligibility for a life sentence are constitutionally necessary in a Texas capital murder trial. *See Hughes v. Dretke,* 412 F.3d 582, 592 (5th Cir.2005) (holding the rule in *Simmons* applies only where state law provides for life imprisonment without possibility of parole), *cert. denied,* —— U.S. ——, 126 S.Ct. 1347, 164 L.Ed.2d 60 (2006) (No. 05–7107); *Cardenas v. Dretke,* 405 F.3d 244, 250 (5th Cir. 2005) (recognizing the Supreme Court's *Ramdass* opinion clarified the rule limiting the applicability of the *Simmons* rule to only those jurisdictions where a convicted capital murderer is ineligible for parole), *petition for cert. filed,* (U.S. July 12, 2005) (No. 05–5304); *Thacker v. Dretke,* 396 F.3d 607, 617 (5th Cir.2005) (recognizing neither the Fourteenth Amendment's Due Process Clause nor the Eighth Amendment requires Texas to allow presentation of parole eligibility issues because Texas does not offer life imprisonment without possibility of parole as an alternative to the death penalty), *cert. denied,* —— U.S. ——, 126 S.Ct. 80, 163 L.Ed.2d 100 (2005); *Jones v. Dretke,* 375 F.3d 352, 357 (5th Cir.2004) (rejecting a due process argument seeking to extend the rule in *Simmons* to Texas capital murder trials), *cert. denied,* 543 U.S. 1060, 125 S.Ct. 878, 160 L.Ed.2d 788 (2005); *Elizalde v. Dretke,* 362 F.3d 323, 332–33 (5th Cir.) (emphasiz-

ing that the Supreme Court's holding in *Ramdass* forecloses any extension of the holding in *Simmons* to Texas), *cert. denied,* 543 U.S. 849, 125 S.Ct. 293, 160 L.Ed.2d 80 (2004); *Smith v. Cockrell,* 311 F.3d 661, 684 (5th Cir.2002) (rejecting argument that Eighth Amendment required jury instruction on parole eligibility at punishment-phase of Texas capital murder trial), *cert. dism'd,* 539 U.S. 986, 124 S.Ct. 46, 156 L.Ed.2d 703 (2003); *Woods v. Cockrell,* 307 F.3d 353, 361 (5th Cir.2002) (rejecting due process argument seeking extension of *Simmons* holding to Texas); *Johnson v. Cockrell,* 306 F.3d 249, 257 (5th Cir.2002) (rejecting due process argument seeking to extend holding in *Simmons* to Texas), *cert. denied,* 538 U.S. 926, 123 S.Ct. 1573, 155 L.Ed.2d 319 (2003); *Collier v. Cockrell,* 300 F.3d 577, 583–86 (5th Cir.) (rejecting due process, equal protection, and Eighth Amendment claims seeking to extend holding in *Simmons* to Texas), *cert. denied,* 537 U.S. 1084, 123 S.Ct. 690, 154 L.Ed.2d 586 (2002); *Tigner v. Cockrell,* 264 F.3d 521, 525–26 (5th Cir.2001) (rejecting due process and equal protection arguments seeking to extend holding in *Simmons* to Texas), *cert. denied,* 534 U.S. 1164, 122 S.Ct. 1177, 152 L.Ed.2d 120 (2002); *Rudd v. Johnson,* 256 F.3d 317, 320 (5th Cir.) (rejecting due process arguments seeking to extend holding in *Simmons* to Texas), *cert. denied,* 534 U.S. 1001, 122 S.Ct. 477, 151 L.Ed.2d 391 (2001); *Wheat v. Johnson,* 238 F.3d 357, 362 (5th Cir.) (rejecting claims Fourteenth and Eighth Amendments required Texas to permit voir dire on parole issues in capital cases), *cert. denied,* 532 U.S. 1070, 121 S.Ct. 2226, 150 L.Ed.2d 218 (2001); *Clark v. Johnson,* 227 F.3d 273, 282 (5th Cir.2000) (holding *Teague* foreclosed extension of *Simmons* holding to permit introduction of evidence regarding parole eligibility in capital trials), *cert. denied,* 531

U.S. 1167, 121 S.Ct. 1129, 148 L.Ed.2d 995 (2001); *Soria v. Johnson*, 207 F.3d 232, 243 (5th Cir.) (holding that the Constitution does not require Texas to permit voir dire regarding parole issues and rejecting due process arguments for extending *Simmons* holding to Texas), *cert. denied*, 530 U.S. 1286, 121 S.Ct. 2, 147 L.Ed.2d 1027 (2000); *Miller v. Johnson*, 200 F.3d 274, 290–91 (5th Cir.) (rejecting due process and Eighth Amendment arguments for extending *Simmons* holding to Texas), *cert. denied*, 531 U.S. 849, 121 S.Ct. 122, 148 L.Ed.2d 77 (2000). In sum, there is no "clearly established" federal law holding a jury not faced with the option of imposing a sentence of life imprisonment without possibility of parole must be instructed or permitted to speculate on the defendant's potential parole eligibility when deliberating on capital sentencing special issues.

Additionally, the *Teague* non-retroactivity doctrine forecloses extension of the rule in *Simmons* to a Texas capital murder trial conducted at the time Texas law did not provide for life without parole, i.e., at the time of petitioner's offense and trial. *Hughes v. Dretke*, 412 F.3d at 592; *Cardenas v. Dretke*, 405 F.3d at 251; *Thacker v. Dretke*, 396 F.3d at 617 n. 15; *Woods v. Cockrell*, 307 F.3d 353, 361–62 (5th Cir. 2002); *Johnson v. Cockrell*, 306 F.3d at 257; *Collier v. Cockrell*, 300 F.3d at 583; *Tigner v. Cockrell*, 264 F.3d at 525; *Wheat v. Johnson*, 238 F.3d at 361–62; *Clark v. Johnson*, 227 F.3d at 282; *Green v. Johnson*, 160 F.3d 1029, 1045 n. 16 (5th Cir. 1998), *cert. denied*, 525 U.S. 1174, 119 S.Ct. 1107, 143 L.Ed.2d 106 (1999); *Muniz v. Johnson*, 132 F.3d at 224–25; *Johnson v. Scott*, 68 F.3d 106, 112 n. 12 (5th Cir.1995), *cert. denied*, 517 U.S. 1122, 116 S.Ct. 1358, 134 L.Ed.2d 525 (1996). While petitioner's conviction became final for *Teague* purposes after the date of the Supreme Court's opinion in *Simmons*, as explained above, the opinion in *Simmons* specifically excepted jurisdictions such as Texas from the rule announced in that case. Extending *Simmons* to Texas would, therefore, constitute adoption of a "new rule" for *Teague* purposes.

In conclusion, there was no arguable legal basis for an objection to the trial court's punishment-phase jury instruction directing petitioner's jury to disregard the potential impact of Texas parole law when answering the capital sentencing special issues. Thus, the failure of petitioner's trial counsel to make such an objection was not objectively unreasonable.

The state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the deficient performance prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### d. *No Prejudice*

Because the state habeas court failed to analyze the prejudice prong of *Strickland* with regard to this aspect of petitioner's ineffective assistance claim, this Court's analysis of same is necessarily *de novo*. *Rompilla v. Beard*, 545 U.S. 374, ——, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005). Petitioner's trial counsel's failure to make a meritless, legally frivolous, objection to the trial court's punishment-phase jury instruction directing the jury to disregard Texas parole law when answering petitioner's capital sentencing special issues did not "prejudice" petitioner within the meaning of *Strickland*. *See United States v. Wilkes*, 20 F.3d 651, 653 (5th Cir.1994)

(prejudice cannot result from the failure to make a meritless objection or to urge a meritless argument); *Smith v. Puckett,* 907 F.2d 581, 585 n. 6 (5th Cir.1990) (prejudice does not issue from the failure to raise a legally meritless claim), *cert. denied,* 498 U.S. 1033, 111 S.Ct. 694, 112 L.Ed.2d 685 (1991).

There is no reasonable possibility that but for the failure of petitioner's trial counsel to make such a meritless objection, the jury's answers to either of petitioner's capital sentencing special issues would have been different. Even if the trial court had granted such an objection and deleted the directive to disregard Texas parole law from its punishment-phase jury instructions, there is no reasonable probability this deletion would have had any impact on the jury's punishment-phase verdict. The evidence supporting an affirmative answer to the future dangerousness special issue and a negative answer to the mitigation special issues was overwhelming. The peculiarities of Texas parole law and their possible impact on a defendant statutorily ineligible for parole for thirty-five or forty years, yet nonetheless eligible for release on parole at some point in the future, do not constitute "mitigating evidence" in the broadest sense of that term; the details of state parole laws bear no relationship whatsoever to either the circumstances of a capital defendant's offense, his moral blameworthiness, or the legitimate purposes of capital sentencing, i.e., deterrence and retribution. *Green v. Johnson,* 160 F.3d at 1044. There is no reasonable probability injection of parole considerations into the jury's punishment-phase deliberations would have resulted in a different answer to either capital sentencing special issues.

### 9. *Failure to Request a Limiting Jury Instruction on Evidence of Unadjudicated Misconduct*

#### a. *The Claim*

Petitioner complains his trial counsel failed to request a punishment-phase jury instruction directing the jury to disregard evidence petitioner had engaged in extraneous, unadjudicated misconduct unless the jury found beyond a reasonable doubt petitioner had, in fact, engaged in such misconduct.[242]

#### b. *State Court Disposition*

The state habeas court concluded this aspect of petitioner's ineffective assistance claim failed to satisfy the deficient performance prong of *Strickland* because there was no legal basis for such an instruction.[243]

#### c. *No Deficient Performance*

■■■■ Once again, the legal premise underlying petitioner's ineffective assistance complaint is faulty. There is no federal constitutional prohibition on the introduction at a capital trial's punishment-phase of evidence showing the defendant has engaged in extraneous, unadjudicated criminal conduct. *Brown v. Dretke,* 419 F.3d 365, 376 (5th Cir.2005), *cert. denied,* —— U.S. ——, 126 S.Ct. 1434, 164 L.Ed.2d 137 (2006) (No. 05–8258); *Hughes v. Dretke,* 412 F.3d at 593 ("the Supreme Court has never held that the federal constitution requires a state to prove an extraneous offense beyond a reasonable doubt"). Neither does the Constitution require unadjudicated extraneous offenses be proved beyond a reasonable doubt for evidence of those offenses to be admitted at trial. *See Brown v. Dretke,* 419 F.3d at 376–77 (the Constitution does not require

---

**242.** Petition, at pp. 109–10.

**243.** State Habeas Transcript, at p. 246.

the defendant's commission of unadjudicated extraneous offenses be proven beyond a reasonable doubt before evidence of same may be admitted at a capital trial's punishment-phase); *Harris v. Cockrell*, 313 F.3d 238, 246 (5th Cir.2002) (the introduction of evidence of extraneous offenses, even those of which the defendant has been acquitted, does not violate due process and there is no constitutional requirement that extraneous offenses offered at the punishment-phase of a capital trial be proven beyond a reasonable doubt), *cert. denied*, 540 U.S. 1218, 124 S.Ct. 1503, 158 L.Ed.2d 152 (2004); *Vega v. Johnson*, 149 F.3d 354, 359 (5th Cir.1998) (extraneous offenses offered at the punishment-phase of a capital trial need not be proven beyond a reasonable doubt and may be admitted even after the defendant has been acquitted of those charges), *cert. denied*, 525 U.S. 1119, 119 S.Ct. 899, 142 L.Ed.2d 899 (1999). Both before and after petitioner's trial, the Fifth Circuit has consistently held admission of evidence of unadjudicated extraneous misconduct at the punishment-phase of a capital murder trial does not violate the Constitution. *See Gutierrez v. Dretke*, 392 F.Supp.2d 802, 870 (W.D.Tex.2005) (discussing the long line of additional Fifth Circuit opinions holding evidence of unadjudicated extraneous misconduct admissible during the punishment-phase of a Texas capital trial).

Clearly established Supreme Court precedent likewise fails to support the premise underlying this aspect of petitioner's ineffective assistance claim. Several years before it rendered its decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the Supreme Court had held the prosecution was required to prove factual matters by only a preponderance of the evidence in federal sentencing hearings. *See United States v. Watts*, 519 U.S. 148, 157, 117 S.Ct. 633, 638, 136 L.Ed.2d 554 (1997) (a jury's verdict of acquittal does not prevent a federal sentencing court from considering the conduct underlying the acquitted charge so long as that conduct has been proved by a preponderance of the evidence). Likewise, in *McMillan v. Pennsylvania*, 477 U.S. 79, 87–92, 106 S.Ct. 2411, 2416–19, 91 L.Ed.2d 67 (1986), the Supreme Court upheld, against a due process challenge, a Pennsylvania statute which imposed a mandatory minimum sentence on certain felony offenders whenever the trial judge found by a preponderance of the evidence that the convicted defendant "visibly possessed a firearm" during commission of the offense.

Finally, at the time of petitioner's trial, Texas law did not require proof beyond a reasonable doubt of a defendant's commission of extraneous, unadjudicated, criminal conduct before evidence of same could be admitted during the punishment-phase of a capital trial. *See Gutierrez v. Dretke*, 392 F.Supp.2d at 866–70 (discussing Texas Court of Criminal Appeals opinions construing the relevant Texas statute, i.e., Article 37.071 of the Texas Code of Criminal Procedure, addressing the admissibility of evidence of unadjudicated extraneous misconduct at the punishment-phase of a capital trial).

At the time of petitioner's capital murder trial in October, 1995, neither Texas law nor federal law required the prosecution to establish beyond a reasonable doubt the petitioner had engaged in unadjudicated, extraneous misconduct before evidence concerning such misconduct could be admitted at the punishment-phase of petitioner's trial. Thus, this aspect of petitioner's ineffective assistance claim is another complaint about petitioner's trial counsel's failure to raise a meritless, legally frivolous argument. The failure of petitioner's trial counsel to request a jury instruction clearly inconsistent with both

state and federal law, and premised on a facially frivolous argument, did not cause the performance of said counsel to fall below an objective level of reasonableness. *See Johnson v. Cockrell,* 306 F.3d 249, 255 (5th Cir.2002) (nothing deficient in counsel's failure to object to the admission of psychiatric testimony which was admissible under then-existing precedent), *cert. denied,* 538 U.S. 926, 123 S.Ct. 1573, 155 L.Ed.2d 319 (2003); *Robison v. Johnson,* 151 F.3d 256, 261 (5th Cir.1998) (nothing deficient regarding trial counsel's failure to seek admission of a document the state court concluded was inadmissible), *cert. denied,* 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999); *Emery v. Johnson,* 139 F.3d 191, 198 (5th Cir.1997) (failure to assert a meritless objection cannot be the grounds for a finding of deficient performance), *cert. denied,* 525 U.S. 969, 119 S.Ct. 418, 142 L.Ed.2d 339 (1998); *Meanes v. Johnson,* 138 F.3d 1007, 1012 (5th Cir.) (counsel not constitutionally deficient for failing to raise an objection if, at the time of trial, the objection would have been futile in light of existing state law and the right asserted in the proposed objection was not clearly established), *cert. denied,* 525 U.S. 968, 119 S.Ct. 417, 142 L.Ed.2d 338 (1998).

The state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the prejudice prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

#### d. *No Prejudice*

Because the state habeas court failed to analyze the prejudice prong of *Strickland*

with regard to this aspect of petitioner's ineffective assistance claim, this Court's analysis of same is necessarily *de novo. Rompilla v. Beard,* 125 S.Ct. at 2467.

Petitioner's trial counsel's failure to make a meritless, legally frivolous request for a punishment-phase jury instruction limiting the jury's consideration of the prosecution's evidence showing petitioner had engaged in myriad instances of unadjudicated, extraneous, criminal misconduct did not "prejudice" petitioner within the meaning of *Strickland. See United States v. Wilkes,* 20 F.3d at 653 (prejudice cannot result from the failure to make a meritless objection or to urge a meritless argument); *Smith v. Puckett,* 907 F.2d at 585 n. 6 (prejudice does not issue from the failure to raise a legally meritless claim).

There is no reasonable possibility or probability that but for the failure of petitioner's trial counsel to make such a meritless request, the jury's answers to either of petitioner's capital sentencing special issues would have been different. Even if the trial court had granted such an objection and given such an erroneous instruction, there is no reasonable probability this directive would have had any impact on the jury's punishment-phase verdict. Ignoring the evidence of petitioner's unadjudicated, extraneous acts of misconduct, both in open court and while in custody awaiting trial, there was overwhelming evidence supporting an affirmative answer to the future dangerousness special issue and a negative answer to the mitigation special issues. The uncontested facts of petitioner's prior convictions for attempted sexual assault and multiple burglaries, as well as the gruesome facts of petitioner's capital offense and petitioner's remorseless, argumentative, unrepentant demeanor throughout his punishment-phase trial testimony, all but ensured an affirmative answer to

the future dangerousness special issue and a negative answer to the mitigation special issue. As petitioner's former trial counsel noted during his testimony at petitioner's state habeas hearing: (1) the extremely violent, explosive nature of petitioner's offense, (2) petitioner's refusal to furnish a coherent account of the offense or to otherwise be honest with his trial counsel, (3) the highly inculpatory content of petitioner's written confession, and (4) petitioner's openly defiant, remorseless, punishment-phase trial testimony to make it extremely difficult for anyone to convince a capital sentencing jury petitioner warranted a life sentence.[244]

Having independently reviewed the record from petitioner's trial, this Court concludes there is no reasonable probability a punishment-phase jury instruction of the type urged by petitioner, i.e., limiting the jury's consideration of petitioner's unadjudicated extraneous criminal misconduct to only those discreet acts which the jury concluded had been proved beyond a reasonable doubt, would have induced petitioner's capital sentencing jury to ignore the overwhelming evidence of petitioner's violent propensities and lack of remorse for his offense which remained before it, or would have otherwise had any impact on the jury's answers to the capital sentencing special issues.

### 10. *Inadequate Punishment–Phase Closing Argument*

#### a. *The Claim*

 Petitioner complains his trial counsel failed to argue: (1) petitioner's voluntary intoxication at the time of his offense was mitigating in nature, (2) petitioner's violent conduct was aberrational,

(3) petitioner did not have a violent past, (4) petitioner had a history of compassion toward others and tended to run away when confronted, (5) petitioner had a peaceful record in prison, (6) petitioner's youth was a mitigating factor favoring a life sentence, and (7) petitioner's pathological intoxication explained the horrific nature of petitioner's capital crime.[245]

#### b. *State Court Disposition*

The state habeas court concluded this aspect of petitioner's ineffective assistance claim failed to satisfy the deficient performance prong of *Strickland* because petitioner had failed to overcome the presumption of reasonableness afforded a trial counsel's strategic decisions.[246]

#### c. *No Deficient Performance*

The state habeas court reasonably relied on petitioner's failure to overcome the presumption of reasonableness usually afforded a trial court's strategic decisions. *See Strickland v. Washington*, 466 U.S. 668, 687–91, 104 S.Ct. 2052, 2064–66, 80 L.Ed.2d 674 (1984) (a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance). In the absence of any evidence showing precisely why his trial counsel made the decision not to present the punishment-phase jury arguments which petitioner now urges (or otherwise showing this decision was objectively unreasonable), petitioner failed to overcome this presumption.

Furthermore, having independently reviewed the entire record from petitioner's

---

**244.** S.F. State Habeas Hearing, Volume 1 of 3, testimony of Vincent D. Callahan, at pp. 9, 30, 59–65, & 70–76.

**245.** Petition, at pp. 110–13.

**246.** State Habeas Transcript, at pp. 247.

trial, this Court concludes most of the arguments now urged by petitioner were either: (1) actually made by petitioner's trial counsel during their punishment-phase jury argument, (2) without support in the evidence (or supported by only weak evidence) before petitioner's jury at the punishment-phase of trial, (3) refuted by petitioner's own trial testimony, or (4) so unsupported they would have obliterated petitioner's trial counsel's credibility and alienated the jury had petitioner's trial counsel attempted to make those arguments.

For instance, petitioner argues his trial counsel should have focused the jury's attention on those portions of petitioner's written confession suggesting petitioner was intoxicated at the time of his offense. In point of fact, this is precisely what petitioner's trial counsel did during punishment-phase closing argument.[247] The problem with this argument, however, was the fact petitioner expressly recanted the entirety of his written confession during his punishment-phase trial testimony.[248] Therefore, further urging the jury to find petitioner was intoxicated at the time of his offense would have necessarily required petitioner's trial counsel to undermine the credibility of his own client.

Likewise, there was evidence before the jury at the punishment-phase showing petitioner had shown compassion to family friends Rosemary Vargas and Cecelia Flores and possessed good character traits. However, this evidence paled in comparison to the evidence establishing petitioner's long history of violent conduct,

ranging from repeated burglaries as a juvenile, violent outbursts during his stay in the custody of the TYC, a violent sexual assault on a pregnant woman weeks after his release from custody, and his molestation of Belinda Prado after he murdered her mother and brother.

In fact, in their punishment-phase jury argument, petitioner's trial counsel did urge the jury to consider petitioner's youth as a mitigating factor.[249] As explained in Sections III.C.6.d. and III.E.2.c. above, further defense arguments urging the jury to consider petitioner's youth as a mitigating factor could easily have been met by the prosecution with arguments pointing out petitioner's remorseless demeanor during petitioner's punishment-phase trial testimony and urging the jury to consider the likelihood it would be many years, if not decades, before petitioner matured sufficiently to no longer pose the threat of violence as demonstrated by his brutal capital offense. As with most of petitioner's mitigating evidence, petitioner's youth possessed potential double-edged qualities.

Any attempt to emphasize petitioner's peaceful prison record would likely have been met with argument from the prosecution pointing out: (1) petitioner's less than stellar behavior while in custody awaiting trial, (2) petitioner's record of misconduct while on probation and parole, and (3) petitioner's record of criminal misconduct only days or weeks after petitioner received a probated sentence as a juvenile and, later, gained released from custody following his stay in the TYC.

---

247. S.F. Trial, Volume 20, at pp. 3138–39.

248. More specifically, petitioner testified during the punishment-phase of his trial: (1) he never read his confession before he signed it, (2) he wrote a portion of his confession and signed it because he was directed to do so by police detectives, (3) he did not murder Carolina or Eric Prado, (4) he was asleep at the

time of their murders, and (5) he felt no remorse for the murders. S.F. Trial, Volume 20, testimony of David Martinez, at pp. 3062–64, 3066–70, 3074, 3085–86, 3102, 3117, 3119, & 3127.

249. S.F. Trial, Volume 20, at pp. 3137.

In their closing argument during the punishment-phase of petitioner's trial, petitioner's trial counsel urged the jury to consider the following factors as mitigating: petitioner's youth, petitioner's dysfunctional family history, petitioner's resulting personality disorder, petitioner's ingestion of a large quantity of alcohol on the night of the murders, and the remorse petitioner showed in his confession.[250] Petitioner's trial testimony, however, amply demonstrated he possessed no remorse for his crimes and was unwilling to display any repentance for his long history of criminal misbehavior.

In short, there were obvious potential down-sides to each of the jury arguments petitioner now contends his trial counsel should have made at the punishment-phase of trial. Given the weakness of the evidence supporting the punishment-phase jury arguments petitioner now urges, as well as the potential double-edged nature of some of those same arguments, there was nothing objectively unreasonable with petitioner's trial counsels' strategic decision to choose an alternative focus for their punishment-phase jury argument. In view of petitioner's trial testimony, the punishment-phase jury argument actually made by petitioner's trial counsel fell well within the broad range of objectively reasonable, professionally competent performance. Petitioner failed to present the state habeas court with any evidence showing the failure of his trial counsel to make the additional arguments in question was objectively unreasonable.

Under such circumstances, the state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the prejudice prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the

Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

### d. *No Prejudice*

Because the state habeas court failed to analyze the prejudice prong of *Strickland* with regard to this aspect of petitioner's ineffective assistance claim, this Court's analysis of same is necessarily *de novo*. *Rompilla v. Beard*, 545 U.S. 374, ——, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005).

Having independently reviewed the record from petitioner's trial and state habeas corpus proceedings, this Court concludes there is no reasonable probability that, but for the failure of petitioner's trial counsel to make any of the new arguments urged by petitioner, the jury's answers to either of the capital sentencing special issues would have been different. In fact, petitioner's trial counsel urged most of these same arguments during punishment-phase closing argument. Petitioner's own trial testimony undermined most of these arguments, however. Moreover, the evidence supporting the jury's affirmative answer to the future dangerousness special issue and negative answer to the mitigation special issue was overwhelming. There is no reasonable probability any or all of the new arguments urged by petitioner herein would have resulted in different answers to either of those capital sentencing special issues. Petitioner's unrepentant, remorseless, punishment-phase testimony, taken together with the horrific nature of his offense and long history of violent misconduct supported the jury's answers to the capital sentencing special issues at the punishment-phase of petitioner's trial.

11. *Failure to Object to Hearsay in Petitioner's Pen Packet*

a. *The Claim*

Petitioner complains his trial counsel failed to specifically object to the admission of harmful, hearsay evidence contained in petitioner's pen packet.[251]

b. *State Court Disposition*

During petitioner's state habeas hearing, petitioner's former lead trial counsel testified: (1) he routinely reviews every page of a defendant's pen packet before deciding whether to object to same, and (2) he ordinarily does not object to hearsay contained therein if it is helpful or innocuous.[252] The only specific portion of petitioner's pen packet which petitioner called to his former trial counsel's attention during the state habeas hearing was a set of entries regarding a prison disciplinary incident in which petitioner had been charged with threatening an officer—an incident for which the same pen packet showed petitioner was subsequently exonerated.[253]

The state habeas court concluded petitioner's failure to object to the admission of hearsay within his pen packet, and thereby preserve a hearsay objection for appellate review, failed to satisfy the prejudice prong of *Strickland*.[254]

c. *No Deficient Performance*

Because the state habeas court failed to analyze the deficient performance prong of *Strickland* with regard to this aspect of petitioner's ineffective assistance claim, this Court's analysis of same is necessarily

*de novo*. *Rompilla v. Beard*, 125 S.Ct. at 2467.

▓▓▓ During the punishment-phase of trial, petitioner's trial counsel did make a timely objection, on hearsay and other grounds, to the admission of petitioner's pen packet.[255] The trial court overruled the objections and admitted a certified copy of petitioner's prison pen packet.[256] Petitioner's trial counsel testified during petitioner's state habeas hearing it was his practice not to object to hearsay within a pen packet which was either helpful or "innocuous." Petitioner presented the state habeas court with no evidence showing any of the hearsay contained in his pen packet was "harmful." The only specific hearsay entries petitioner called to his former trial counsel's attention during the state habeas hearing related to a prison disciplinary charge of misconduct for which petitioner was later found "not guilty." Likewise, petitioner identifies no specific hearsay within his pen packet which he contends was harmful to him at the punishment-phase of his trial.

This Court has independently reviewed petitioner's pen packet, State Exhibit No. 89, which contains: (1) state court records reflecting petitioner's prior criminal convictions, (2) state court records reflecting petitioner's probation and parole revocations, and (3) a prison disciplinary report on the incident in which petitioner was found not guilty of threatening a prison guard. The only hearsay contained therein which might be deemed "harmful" to petitioner consists of statements attributed to petitioner in which he denied ever abus-

---

251. Petition, at p. 118.

252. S.F. State Habeas Hearing, Volume 1 of 3, testimony of Vincent D. Callahan, at pp. 44–46.

253. *Id.*

254. State Habeas Transcript, at pp. 247–48.

255. S.F. Trial, Volume 19, testimony of Vernon Ginn, at p. 2894.

256. *Id.*

ing alcohol or drugs. This information dovetailed petitioner's punishment-phase trial testimony.

The Supreme Court recognizes a presumption of reasonableness must be afforded a trial court's strategic decisions. *See Strickland v. Washington,* 466 U.S. at 687–91, 104 S.Ct. at 2064–66 (a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance). This Court concludes petitioner's trial counsel could have made an objectively reasonable assessment of the hearsay contained in petitioner's pen packet as "innocuous." While petitioner's trial counsel did raise multiple objections to the admission of petitioner's pen packet, petitioner has not identified for this Court any specific portion of petitioner's pen packet which petitioner contends contains harmful, otherwise inadmissible hearsay. In the absence of any fact-specific allegations or evidence showing his trial counsel's decision not to present a more detailed hearsay objection to admission of petitioner's pen packet was objectively unreasonable, petitioner has failed to overcome this presumption. There was nothing objectively unreasonable with petitioner's trial counsel's failure to specifically object to "innocuous" hearsay contained within petitioner's pen packet.

This Court concludes this aspect of petitioner's ineffective assistance claim fails to satisfy the deficient performance prong of Strickland.

### d. *No Prejudice*

By the time the trial court admitted petitioner's pen packet at the punishment-phase of petitioner's trial, the jury had already heard extensive testimony from witnesses describing the horrific details of petitioner's capital offense, the details of petitioner's other previous offenses, and petitioner's violent behavior while in custody of the TYC. Subsequent to the admission of petitioner's pen packet, petitioner's jury heard testimony from a plethora of jail guards concerning petitioner's misconduct while in custody awaiting trial. Later still, the jury heard Belinda Prado's chilling testimony recounting petitioner's molestation of her after she awoke to witness petitioner beating her brother to death with a baseball bat. Finally, petitioner took the stand and gave the most self-defeating type of testimony imaginable: insisting the jury had convicted "an innocent man" and denying not only responsibility for the murders of Carolina and Eric Prado but every other allegation of criminal conduct ever made against petitioner, except for his teenage burglaries. In short, the evidence supporting the jury's affirmative answer to the future dangerousness special issue and negative answer to the mitigation special issue was overwhelming. Petitioner's pen packet was largely cumulative of far more damning prosecution evidence.

■ There is no reasonable probability that, but for the failure of petitioner's trial counsel to specifically object to any identified hearsay contained within petitioner's pen packet, the outcome of the punishment-phase of petitioner's trial would have been different. *See Miniel v. Cockrell,* 339 F.3d 331, 347–48 (5th Cir. 2003) (where evidence of the defendant's propensity for violence overwhelmed the family's proposed mitigating testimony regarding defendant's history of childhood physical abuse and substance abuse, petitioner was not prejudiced by the failure of his trial counsel to present such mitigating evidence), *cert. denied,* 540 U.S. 1179, 124 S.Ct. 1413, 158 L.Ed.2d 81 (2004); *Harris v. Cockrell,* 313 F.3d 238, 244 (5th Cir.2002) (holding the failure to

present double-edged evidence regarding the petitioner's allegedly abusive childhood was not prejudicial when viewed in the context of the petitioner's overall stable family background and the petitioner's history of violent conduct while incarcerated), *cert. denied*, 540 U.S. 1218, 124 S.Ct. 1503, 158 L.Ed.2d 152 (2004); *Ladd v. Cockrell*, 311 F.3d 349, 359–60 (5th Cir. 2002) (holding a petitioner was not prejudiced by his trial counsel's failure to present double-edged evidence of the petitioner's low childhood IQ, drug treatment as a child for psycho-motor problems, and good behavior in an institutional setting where this same evidence was undermined by the petitioner's significantly higher IQ scores as an adult and the overwhelming evidence of the petitioner's future dangerousness); *Boyd v. Johnson*, 167 F.3d 907, 911 (5th Cir.) (holding a petitioner was not prejudiced by his trial counsel's failure to introduce evidence showing the petitioner was borderline mentally retarded where the petitioner's offense was cold-blooded and calculated and the petitioner had a track record of violent conduct), *cert. denied*, 527 U.S. 1055, 120 S.Ct. 20, 144 L.Ed.2d 824 (1999). Even if petitioner's trial counsel had succeeded in excluding petitioner's pen packet from evidence at petitioner's trial, there is no reasonable probability the outcome of the punishment-phase of petitioner's trial would have been different.

Therefore, the state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the prejudice prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

12. *Failure to Object to "Admission" of Pornographic Magazines*

a. *The Claim*

Petitioner complains his trial counsel failed to object to the admission of petitioner's pornographic magazines.[257]

b. *State Court Disposition*

Petitioner filed a pretrial motion seeking, in part, to suppress the pornographic magazines relatives of the victims found inside petitioner's backpack in a storage shed at the Prado residence.[258] At the conclusion of the pretrial hearing on petitioner's motion to suppress, the trial court denied same, concluding petitioner lacked standing to contest the victims' relatives' search of the storage shed.[259] Undaunted by the fact the magazines in question were never admitted into evidence during petitioner's trial,[260] petitioner's state appellate counsel raised not less than four points of error on direct appeal challenging the trial court's denial of petitioner's

257. Petition, at p. 118.

258. Trial Transcript, at pp. 90–93.

259. S.F. Trial, Volume 16, at p. 2354.

260. In fairness to petitioner's state appellate counsel, the prosecution did have the petitioner's backpack and his pornographic magazines contained therein marked at trial as State Exhibit No. 7 and the prosecution did

cross-examine petitioner during the punishment-phase of trial concerning same; petitioner admitted both the backpack and the magazines contained therein belonged to him. S.F. Trial, Volume 20, testimony of David Martinez, at pp. 3094–96. However, neither the backpack nor any of the magazines were offered or admitted into evidence during petitioner's trial.

pretrial motion to suppress the magazines. Without addressing the issue of whether the magazines had actually been admitted into evidence, the Texas Court of Criminal Appeals upheld the trial court's pretrial ruling denying petitioner's motion to suppress.[261]

The state habeas court concluded petitioner's failure to object to the admission of petitioner's pornographic magazines on relevance and constitutional grounds, and thereby preserve error for appellate review regarding their admission, failed to satisfy the prejudice prong of *Strickland*.[262]

### c. *No Deficient Performance*

Because the state habeas court failed to analyze the deficient performance prong of *Strickland* with regard to this aspect of petitioner's ineffective assistance claim, this Court's analysis of same is necessarily *de novo*. *Rompilla v. Beard*, 125 S.Ct. at 2467.

The short answer to this aspect of petitioner's ineffective assistance claim is petitioner's trial counsel cannot be faulted for rendering deficient performance for allegedly failing to object to the admission of evidence which was never actually offered or admitted into evidence at trial. Petitioner's trial counsel never had the opportunity to object to admission of the magazines in question because the prosecution never offered them for admission at trial

and the trial court never ruled on their admission during trial. There was nothing objectively unreasonable with the failure of petitioner's trial counsel to do the impossible. Thus, this Court independently concludes the failure of petitioner's trial counsel to object to the admission of the magazines in question at trial did not cause the performance of said counsel to fall below an objective level of reasonableness.[263]

### d. *No Prejudice*

Because the magazines in question were never offered for admission or actually admitted into evidence during petitioner's trial, petitioner's alleged failure to object to their admission could not possibly have "prejudiced" petitioner within the meaning of *Strickland*. Moreover, the evidence supporting the jury's affirmative answer to the future dangerousness special issue and its negative answer to the mitigation special issue was overwhelming. Even if petitioner's trial counsel had somehow succeeded in precluding the prosecution's cross-examination of petitioner regarding his ownership of the magazines in question, there is no reasonable probability the outcome of the punishment-phase of petitioner's trial would have been different.

Under such circumstances, the state habeas court's conclusion this aspect of petitioner's ineffective assistance claim failed to satisfy the prejudice prong of *Strick-*

---

**261.** *Martinez v. State*, No. 72,288 (Tex.Crim. App. Nov. 4, 1998), slip op. at pp. 17–18.

**262.** State Habeas Transcript, at pp. 247–48.

**263.** Moreover, insofar as this aspect of petitioner's ineffective assistance claim can be construed as faulting his trial counsel's performance for failing to object to the prosecution's cross-examination of petitioner with regard to petitioner's ownership of the magazines in question, for the reasons discussed in Section III.E.7.c. above, there was no ba-

sis for objection to the prosecution's questions to petitioner about the magazines. As a convicted sex offender who had repeatedly refused to participate in group counseling sessions intended to help petitioner deal with his aggressive sexual tendencies, especially those toward young women and children, petitioner's possession of the magazines in question was relevant to the issues before the jury at the punishment-phase of petitioner's trial.

*land* was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Nor was the state habeas court's conclusion based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

## IV. *Constructive Denial of Counsel*

### A. *The Claim*

In his second claim for federal habeas relief herein, petitioner argues he was constructively denied counsel because his trial counsel's numerous deficiencies, discussed above, collectively amounted to a failure to subject the state's case to meaningful adversarial testing.[264] Because he was constructively denied the effective assistance of counsel, petitioner argues, he is entitled to a presumption of prejudice which eliminates the necessity for his ineffective assistance claims discussed above to independently satisfy the prejudice prong of *Strickland.*

### B. *State Court Disposition*

The state habeas court rejected this claim on the merits, concluding petitioner's reliance on the presumption of prejudice recognized by the Supreme Court in *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), and *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), was misplaced.[265]

### C. *AEDPA Review*

The state habeas court's rejection on the merits of petitioner's "presumed prejudice" argument was a reasonable application of clearly established federal law.

Petitioner's constructive denial of counsel claim is premised upon a broad construction of the Supreme Court's opinion in *United States v. Cronic,* holding a presumption of "prejudice" sufficient to satisfy the second prong of *Strickland* exists when a criminal defense counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing." *Cronic,* 466 U.S. at 659, 104 S.Ct. at 2047. As the Supreme Court explained in its opinion in *Bell v. Cone,* however, in order to satisfy the presumed prejudice standard recognized in *Cronic,* a defendant must show his trial counsel's failure to test the prosecution's case was complete; and this type of failure goes significantly beyond a mere alleged failure to challenge particular portions of the prosecution's case. *Bell,* 535 U.S. at 697, 122 S.Ct. at 1851. Thus, a criminal defendant is entitled to a presumption of prejudice in only extraordinary situations, none of which approach the types of complaints petitioner has raised concerning his trial counsel's performance. *See id.* at 695–97, 122 S.Ct. at 1851 (holding a presumption of prejudice applies only when there has been a complete denial of counsel, when counsel entirely failed to subject the prosecution's case to meaningful adversarial testing, or circumstances rendered even competent counsel unlikely to be able to perform effectively); *Smith v. Robbins,* 528 U.S. 259, 287, 120 S.Ct. 746, 765, 145 L.Ed.2d 756 (2000) (holding a presumption of prejudice applies only when there has been a complete denial of counsel, there has been state interference with counsel's assistance, or counsel is burdened by an actual conflict of interest).

The state habeas court reasonably concluded all of petitioner's complaints about the performance of his trial counsel fell

---

**264.** Petition, at pp. 122–23.

**265.** State Habeas Transcript, at pp. 248–49.

within the garden variety ineffective assistance claims properly analyzed under the dual prongs of *Strickland*. Under clearly established federal law, petitioner was not entitled to a presumption of prejudice. Petitioner's trial counsel vigorously cross-examined prosecution witnesses at both phases of trial, argued at the guilt-innocence phase of trial there was little physical evidence tying petitioner to the murders, and presented both testimony and argument at the punishment-phase of trial in support of their contentions there were mitigating factors which warranted a life sentence for petitioner. Under such circumstances, the state habeas court reasonably concluded petitioner was entitled to no presumption of prejudice under *Cronic*.

The state habeas court's rejection on the merits of petitioner's constructive denial of counsel claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial and habeas corpus proceedings.

## V. Parole Jury Instruction

### A. The Claim

In his third claim herein, petitioner argues the trial court erred when it instructed the jury to disregard Texas parole law when answering the capital sentencing special issues at the punishment-phase of petitioner's capital trial.[266]

### B. State Court Disposition

The state habeas court concluded: (1) petitioner procedurally defaulted on this complaint by failing to object to this aspect of his punishment-phase jury charge, and (2) petitioner's complaint also failed on the

merits because the Eighth Amendment does not mandate a capital sentencing jury's consideration of state parole law.[267]

### C. Procedural Default

#### 1. Texas Contemporaneous Objection Rule

▪ Petitioner's failure to contemporaneous object to the state trial court's proposed jury instruction directing the jury to disregard state parole law when answering petitioner's capital sentencing special issues constitutes a form of procedural default, which serves as a barrier to federal habeas review of this claim. *See Johnson v. Cain*, 215 F.3d 489, 495 (5th Cir.2000) (holding a federal district court may raise the issue of procedural default *sua sponte*); *Magouirk v. Phillips*, 144 F.3d 348, 358 (5th Cir.1998) (holding the same).

▪ Procedural default occurs where: (1) a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, or (2) the petitioner fails to exhaust all available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred. *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 2557 n. 1, 115 L.Ed.2d 640 (1991). In either instance, the petitioner is deemed to have forfeited his federal habeas claim. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848, 119 S.Ct. 1728, 1734, 144 L.Ed.2d 1 (1999). Procedural defaults only bar federal habeas review when the state procedural rule which forms the basis for the procedural default was "firmly established and regularly followed" by the time it was applied to preclude state judicial review of

---

**266.** Petition, at pp. 123–24.

**267.** State Habeas Transcript, at pp. 250–53.

the merits of a federal constitutional claim. *Ford v. Georgia,* 498 U.S. 411, 424, 111 S.Ct. 850, 857–58, 112 L.Ed.2d 935 (1991).

 Petitioner alleges no facts and cites this Court to no Texas case law showing the Texas courts have inconsistently applied the contemporaneous objection rule in similar contexts, i.e., with regard to alleged constitutional errors in a jury charge. More specifically, petitioner identifies no instances in which the Texas Court of Criminal Appeals has entertained the merits of a claim challenging the constitutionality of a punishment-phase jury charge when raised for the first time in a state habeas corpus application. On the contrary, the Fifth Circuit has long recognized a federal habeas petitioner's failure to comply with the Texas contemporaneous objection rule as an adequate and independent state procedural barrier to federal habeas review. *See Rowell v. Dretke,* 398 F.3d 370, 375–75 (5th Cir.) (holding a defendant's failure to timely object to alleged errors in a jury charge determined by a Texas appellate court to be a violation of the Texas contemporaneous objection rule barred federal habeas relief of the alleged erroneous jury charge under the procedural default doctrine), *cert. denied,* —— U.S. ——, 126 S.Ct. 103, 163 L.Ed.2d 117 (2005); *Graves v. Cockrell,* 351 F.3d 143, 152 (5th Cir.) (Texas contemporaneous objection rule is an adequate and independent state ground and failure to comply with this rule procedurally bars federal habeas review), *cert. denied,* 541 U.S. 1057, 124 S.Ct. 2160, 158 L.Ed.2d 757 (2004); *Cotton v. Cockrell,* 343 F.3d 746, 754 (5th Cir.2003) (holding violation of the Texas contemporaneous objection rule is an adequate and independent barrier to federal habeas review), *cert. denied,* 540 U.S. 1186, 124 S.Ct. 1417, 158 L.Ed.2d 92 (2004); *Dowthitt v. Johnson,* 230 F.3d 733, 752 (5th Cir.2000) (holding the Texas contem-

poraneous objection rule is strictly or regularly and evenhandedly applied in the vast majority of cases and, therefore, an adequate state bar), *cert. denied,* 532 U.S. 915, 121 S.Ct. 1250, 149 L.Ed.2d 156 (2001); *Barrientes v. Johnson,* 221 F.3d 741, 779 (5th Cir.2000) (failure to timely object waives error in jury instructions unless the error is so prejudicial no instruction could cure the error), *cert. denied,* 531 U.S. 1134, 121 S.Ct. 902, 148 L.Ed.2d 948 (2001); *Muniz v. Johnson,* 132 F.3d 214, 221 (5th Cir.) (Texas courts strictly and regularly apply the Texas contemporaneous objection rule which is an adequate state procedural rule), *cert. denied,* 523 U.S. 1113, 118 S.Ct. 1793, 140 L.Ed.2d 933 (1998); *Sharp v. Johnson,* 107 F.3d 282, 285–86 (5th Cir.1997) (holding the Texas contemporaneous objection rule is an independent and adequate state ground upon which to base a procedural bar to federal review); *Rogers v. Scott,* 70 F.3d 340, 342 (5th Cir.1995) (holding a federal habeas petitioner's failure to comply with the Texas contemporaneous objection rule also bars federal habeas review of a claim absent cause and prejudice or a fundamental miscarriage of justice), *cert. denied,* 517 U.S. 1235, 116 S.Ct. 1881, 135 L.Ed.2d 176 (1996); *Nichols v. Scott,* 69 F.3d 1255, 1278 n. 44 (5th Cir.1995) (holding the same), *cert. denied,* 518 U.S. 1022, 116 S.Ct. 2559, 135 L.Ed.2d 1076 (1996); *Amos v. Scott,* 61 F.3d 333, 338–45 (5th Cir.) (holding the same), *cert. denied,* 516 U.S. 1005, 116 S.Ct. 557, 133 L.Ed.2d 458 (1995).

More importantly, the Fifth Circuit has recognized the efficacy of the Texas contemporaneous objection rule as a barrier to federal habeas review was "firmly established" for federal procedural default purposes long before the date petitioner filed his brief on direct appeal. *See Hogue v. Johnson,* 131 F.3d 466, 487 (5th Cir.

1997) (holding the Texas contemporaneous objection rule was already well established 35 years ago and recognized as an adequate state procedural barrier to federal habeas review at least twenty years ago), *cert. denied,* 523 U.S. 1014, 118 S.Ct. 1297, 140 L.Ed.2d 334 (1998); *Rogers v. Scott,* 70 F.3d at 342 (recognizing the Texas contemporaneous objection rule foreclosed federal habeas review); *Amos v. Scott,* 61 F.3d at 343–44 (holding Texas appellate courts consistently apply the contemporaneous objection rule in the vast majority of cases and, thereby, strictly and regularly apply same).

Petitioner's failure to make a timely objection to the state trial court's punishment-phase jury instruction directing the jury to disregard the influence of Texas parole law when answering petitioner's capital sentencing special issues bars federal habeas review of petitioner's constitutional challenge to this instruction unless petitioner can satisfy one of the two exceptions to the procedural default doctrine.

### 2. *Exceptions Inapplicable*

 The Supreme Court has recognized exceptions to the doctrine of procedural default where a federal habeas corpus petitioner can show "cause and actual prejudice" for his default or that failure to address the merits of his procedurally defaulted claim will work a "fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. at 750, 111 S.Ct. at 2565; *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989). To establish "cause," a petitioner must show either that some objective external factor impeded the defense counsel's ability to comply with the state's procedural rules or that petitioner's trial or appellate counsel rendered ineffective assistance. *Coleman v. Thompson,* 501 U.S. at 753, 111 S.Ct. at 2566; *Murray v. Carrier,*

477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986) (holding that proof of ineffective assistance by counsel satisfies the "cause" prong of the exception to the procedural default doctrine). While a showing of ineffective assistance can satisfy the "cause" prong of the "cause and actual prejudice" exception to the procedural default doctrine, as explained in Section III. E.8. above, petitioner's complaint regarding his trial counsel's failure to assert a constitutional challenge to this aspect of petitioner's punishment-phase jury charge does not satisfy either prong of the *Strickland v. Washington* test for ineffective assistance.

In order to satisfy the "miscarriage of justice" test, the petitioner must supplement his constitutional claim with a colorable showing of factual innocence. *Sawyer v. Whitley,* 505 U.S. 333, 335–36, 112 S.Ct. 2514, 2519, 120 L.Ed.2d 269 (1992). In the context of the punishment-phase of a capital trial, the Supreme Court has held that a showing of "actual innocence" is made when a petitioner shows by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found petitioner eligible for the death penalty under applicable state law. *Sawyer v. Whitley,* 505 U.S. at 346–48, 112 S.Ct. at 2523. The Supreme Court explained in *Sawyer v. Whitley* this "actual innocence" requirement focuses on those elements which render a defendant eligible for the death penalty and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error. *Sawyer v. Whitley,* 505 U.S. at 347, 112 S.Ct. at 2523. Petitioner has alleged no specific facts satisfying this "factual innocence" standard. Because petitioner has failed to satisfy the "actual innocence" test, he is not entitled to relief from his procedural defaults under the fundamental miscarriage of justice

exception to the procedural default doctrine.

### D. *AEDPA Review: No Merits*

Alternatively, for the reasons discussed in Section III.E.8. above, petitioner's constitutional challenges to his punishment-phase jury instructions lack merit. The Supreme Court has never held a capital defendant is entitled to have his sentencing jury either: (1) instructed on the details of state parole law where the defendant may not be sentenced to a term of life imprisonment without possibility of parole, or (2) consider the speculative impact of state parole law on a potential life sentence as "mitigating evidence." The Fifth Circuit has consistently held both rules are precluded under clearly established federal law. Finally, this Court has consistently rejected arguments suggesting a convicted Texas capital defendant is entitled to have his sentencing jury consider the details of Texas parole law as "mitigating" evidence or to receive a *Simmons* instruction. *Brown v. Dretke*, No. Civ.A.SA01CA0241–XR, 2004 WL 2793266, at *16–18 (W.D.Tex. Dec.3, 2004), *cert. of appealability denied*, 419 F.3d 365 (5th Cir.2005), *cert. denied*, —— U.S. ——, 126 S.Ct. 1434, 164 L.Ed.2d 137 (2006) (No. 05–8258); *Bagwell v. Cockrell*, No. Civ. A.SA99CA1133–OG, 2003 WL 22723006, at *9–13 (W.D.Tex. Aug.19, 2003), *cert. of appealability denied*, 372 F.3d 748 (5th Cir.), *cert. denied*, 543 U.S. 989, 125 S.Ct. 498, 160 L.Ed.2d 374 (2004).

The state habeas court's alternative rejection on the merits of petitioner's constitutional challenges the portion of his punishment-phase jury charge directing his jury to disregard state parole law was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial and habeas corpus proceedings.

## VI. *Narrow "Aggravating" Factors*

### A. *The Claim*

Petitioner argues the Texas capital sentencing special issues include several undefined terms which render those issues unconstitutionally narrow, in violation of the Eighth and Fourteenth Amendments.[268]

### B. *State Court Disposition*

The state habeas court concluded: (1) petitioner procedurally defaulted on this claim by failing to request definitions of the allegedly "vague" terms in question or make a contemporaneous objection to the trial court's punishment-phase jury charge, and (2) these complaints had no merit.[269]

### C. *Procedural Default*

Petitioner's failure to request definitions of the allegedly "vague" terms about which he now complains or to timely object to the lack of definitions of those terms in his punishment-phase jury charge constitutes a state procedural barrier to federal habeas review of this claim. While petitioner did present this Court with a multi-faceted ineffective assistance claim, he did not identify any alleged deficiency in his trial counsel's performance arising from said counsel's failure to make such a request or objection. Likewise, petitioner alleges no specific facts or evidence sufficient to satisfy the "actual innocence" standard under the fundamental miscarriage of justice exception to the procedural default doctrine.

---

**268.** Petition, at pp. 124–28.

**269.** State Habeas Transcript, at pp. 253–54.

Thus, petitioner cannot overcome his procedural default on this claim.

### D. *AEDPA Review: No Merit*

Alternatively, petitioner's complaints about the allegedly "vague" terms included in the Texas capital sentencing special issues are premised on a faulty interpretation of the Supreme Court's Eighth Amendment jurisprudence. Nothing in the Eighth Amendment precludes a State from granting unfettered discretion to a capital sentencing jury once the jury has constitutionally determined the defendant is "eligible" to receive the death penalty. *See Salazar v. Dretke*, 393 F.Supp.2d 451, 488–92 (W.D.Tex.2005) (holding: (1) Texas is not a weighing jurisdiction, (2) the "eligibility" determination mandated by Supreme Court's Eighth Amendment jurisprudence occurs during the guilt-innocence phase of a Texas capital trial, (3) therefore, the Texas capital sentencing special issues need not be accompanied by definitions of every term contained therein because those terms are susceptible of a logical, common sense interpretation by rational jurors, and (4) nothing in the Texas capital sentencing scheme's allegedly vague special issues precluded the jury's consideration of any identified mitigating evidence); *Kimmel v. Dretke*, No. Civ. SA–03–CA–1084–XR, 2005 WL 1959074, at *16–18 (W.D.Tex. Aug.16, 2005) (holding the same); *Prieto v. Dretke*, 386 F.Supp.2d 767, 815–16 (W.D.Tex.2005) (recognizing the constitutionally mandated narrowing function is performed at the guilt-innocence phase of a Texas capital trial); *Leal v. Dretke*, No. Civ.SA–99–CA–1301–RF, 2004 WL 2603736, at *30–31 (W.D.Tex. Oct.20, 2004) (holding the same as in *Salazar*), *cert. of appealability denied*, 428

F.3d 543 (5th Cir.2005), *petition for cert. filed*, (U.S. Jan. 11, 2006) (No. 05–8680).

The state habeas court's alternative rejection on the merits of this claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial and habeas corpus proceedings.

## VII. *Failure to Provide "Meaningful" State Appellate Review*

### A. *The Claim*

Petitioner argues the State of Texas' failure to provide "meaningful" state appellate review of the jury's answer to the Texas capital sentencing special issues violates the Eighth Amendment.[270] More specifically, petitioner complains the Texas capital sentencing special issues are open-ended and do not readily permit proportionality review.

### B. *State Court Disposition*

The state habeas court summarily rejected this complaint on the merits.[271]

### C. *AEDPA Analysis*

■ Contrary to the premise underlying this claim, there is no clearly established federal law mandating state appellate review of the sufficiency of the evidence supporting a sentencing jury's refusal to exercise its discretion to grant mercy to a convicted capital murderer otherwise eligible to receive the death penalty. A capital sentencing jury "may be given 'unbridled discretion in determining whether the death penalty should be imposed after it has found that the

---

**270.** Petition, at pp. 128–32.

**271.** State Habeas Transcript, at p. 254.

defendant is a member of the class made eligible for that penalty.'" *Tuilaepa v. California,* 512 U.S. 967, 979–80, 114 S.Ct. 2630, 2639, 129 L.Ed.2d 750 (1994). The Supreme Court's opinion in *Tuilaepa* holds such judicial second-guessing of jury dispensations of mercy has no place in current Eighth Amendment jurisprudence. *Id.*

As the Supreme Court explained in *Tuilaepa,* the Eighth Amendment addresses two different but related aspects of capital sentencing: the eligibility decision and the selection decision. *Tuilaepa,* 512 U.S. at 971, 114 S.Ct. at 2634. The Supreme Court's analysis of those two aspects of capital sentencing provides a comprehensive system for analyzing Eighth Amendment claims:

> To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment. To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase. The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or both). As we have explained, the aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague.
>
> We have imposed a separate requirement for the selection decision, where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence. "What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." That requirement is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime.

*Id.* at 971–72, 114 S.Ct. at 2634–35 (citations omitted, emphasis in original).

The Supreme Court made it clear in *Tuilaepa* that states may adopt capital sentencing procedures which rely upon the jury, in its sound judgment, to exercise wide discretion. *Tuilaepa,* 512 U.S. at 974, 114 S.Ct. at 2636. The Supreme Court held further, at the selection stage, states are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment." *Id.* at 978, 114 S.Ct. at 2638. Thus, the Supreme Court's holding in *Tuilaepa* forecloses petitioner's complaint about what he perceives to be the lack of "meaningful" state appellate review of a Texas capital sentencing jury's answer to the open-ended *Penry* mitigation issue.

It is not within the province of this Court to either overrule or disregard the Supreme Court's clear holding in *Tuilaepa.* Moreover, the Fifth Circuit has rejected claims similar to petitioner's complaint about the purported lack of "meaningful" state appellate review of a jury's answers to the Texas capital sentencing special issues. *See Rowell v. Dretke,* 398 F.3d 370, 377 (5th Cir.) (recognizing no Supreme Court or Fifth Circuit authority exists mandating state appellate review of the sufficiency of evidence supporting the jury's finding on

the mitigation special issue), *cert. denied,* —— U.S. ——, 126 S.Ct. 103, 163 L.Ed.2d 117 (2005); *Woods v. Cockrell,* 307 F.3d 353, 359–60 (5th Cir.2002) (holding the Texas Court of Criminal Appeals' refusal to review the sufficiency of the evidence supporting negative answers to the Texas capital sentencing scheme's "mitigation" special issue, i.e., the *Penry* issue, did not violate due process principles); *Moore v. Johnson,* 225 F.3d 495, 505–07 (5th Cir.2000) (holding the same), *cert. denied,* 532 U.S. 949, 121 S.Ct. 1420, 149 L.Ed.2d 360 (2001). Finally, this Court has repeatedly rejected the Eighth Amendment component of this same claim as foreclosed by the Supreme Court's holding in *Tuilaepa. Brown v. Dretke,* No. Civ.A.SA01CA0241–XR, 2004 WL 2793266, at *9–10 (W.D.Tex. Dec.3, 2004), *cert. of appealability denied,* 419 F.3d 365 (5th Cir.2005), *cert. denied,* —— U.S. ——, 126 S.Ct. 1434, 164 L.Ed.2d 137 (2006) (No. 05–8258); *Bagwell v. Cockrell,* No. Civ.A.SA99CA1133–OG, 2003 WL 22723006, at *27–30 (W.D.Tex. Aug.19, 2003), *cert. of appealability denied,* 372 F.3d 748 (5th Cir.), *cert. denied,* 543 U.S. 989, 125 S.Ct. 498, 160 L.Ed.2d 374 (2004); *Cordova v. Johnson,* 993 F.Supp. 473, 508–10 (W.D.Tex.1998), *cert. of probable cause denied,* 157 F.3d 380 (5th Cir.1998), *cert. denied,* 525 U.S. 1131, 119 S.Ct. 922, 142 L.Ed.2d 971 (1999).

Thus, clearly established federal law, at the time petitioner's conviction became final: (1) did not require proportionality review of a jury's answers to capital sentencing special issues and (2) was not offended by the open-ended nature of the mitigation special issue. *See Rowell v. Dretke,* 398 F.3d at 378 (recognizing Fifth Circuit precedent repeatedly rejecting the

argument the Constitution requires state appellate review of mitigating evidence); *Cordova v. Johnson,* 993 F.Supp. at 508–10 (recognizing neither Supreme Court nor Fifth Circuit case law mandates proportionality review for capital sentences).

Furthermore, adoption of the new rule advocated by petitioner in this claim would contravene the non-retroactivity doctrine the Supreme Court announced in *Teague.*

For the foregoing reasons, the state habeas court's rejection on the merits of this claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial and habeas corpus proceedings.

## VIII. No Burden of Proof on Mitigation Special Issue

### A. The Claim

Petitioner argues the failure of the Texas capital sentencing scheme to allocate the burden of proof on the *Penry* or mitigation special issue on the prosecution violates the Eighth Amendment.[272]

### B. State Court Disposition

The state habeas court summarily rejected this claim on the merits.[273]

### C. AEDPA Analysis

The Fifth Circuit has expressly rejected this same claim on two grounds, both of which are applicable to petitioner's situation: first, no clearly established federal law supports petitioner's contention the Constitution requires Texas' mitigation special issue be assigned a burden of proof; second, *Teague* forecloses adoption

---

**272.** Petition, at pp. 132–34.

**273.** State Habeas Transcript, at p. 255.

of such a new rule in a federal habeas context. *See Rowell v. Dretke*, 398 F.3d at 376–79 (holding: (1) no Supreme Court or Fifth Circuit precedent supports a constitutional requirement imposing a burden of proof requirement on a mitigation, as opposed to an aggravating factor, special issue, and (2) *Teague* forecloses adoption of such a rule).

Because petitioner's conviction became final in October, 1999, when the Supreme Court denied his certiorari application, *Teague* forecloses any effort by petitioner to rely on the Supreme Court's opinions in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), or *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). *See Schriro v. Summerlin*, 542 U.S. 348, 358, 124 S.Ct. 2519, 2526, 159 L.Ed.2d 442 (2004) (holding *Ring* announced a new procedural rule which does not apply retroactively to cases already final on direct appeal).

Moreover, the Fifth Circuit has recognized no current Supreme Court authority mandates imposition of a burden of proof requirement on either of the Texas capital sentencing special issues submitted at the punishment-phase of petitioner's trial. *See Rowell v. Dretke*, 398 F.3d at 379 (holding the Supreme Court's opinion in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), does not mandate a burden of proof requirement: (1) beyond ordinary reasonable doubt for the Texas future dangerousness special issue, or (2) of "beyond reasonable doubt" for Texas' mitigation or *Penry* special issue).

Because there is no clearly established federal law mandating the imposition of a burden of proof on a mitigation capital sentencing special issue, the state habeas court's rejection on the merits of this claim

was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial and habeas corpus proceedings.

## IX. Texas Ten–Twelve Rule

### A. The Claim

Petitioner argues the portion of his punishment-phase jury instruction requiring unanimity on any special issue answer favorable to the prosecution but only ten votes for an answer favorable to the defense violates the principles set forth in the Supreme Court's opinions in *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990).[274]

### B. State Court Disposition

The state habeas court summarily rejected this claim on the merits.[275]

### C. AEDPA Analysis

█ Because the Texas capital sentencing scheme is vastly different from those employed on Maryland and North Carolina, petitioner's reliance on the Supreme Court's opinions in *McKoy* and *Mills* is misplaced. *See Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir.2000) (specifically rejecting both Fourteenth and Eighth Amendment challenges to the Texas 10–12 ten rule in the course of affirming this Court's rejection of claims identical to those raised by petitioner herein); *Miller v. Johnson*, 200 F.3d 274, 288–89 (5th Cir. 2000) (holding *Mills* inapplicable to a Texas capital sentencing proceeding), *cert. denied*, 531 U.S. 849, 121 S.Ct. 122, 148 L.Ed.2d 77 (2000); *Woods v. Johnson*, 75

---

**274.** Petition, at pp. 134–38.

**275.** State Habeas Transcript, at pp. 255–56.

F.3d 1017, 1036 (5th Cir.) (holding the same), *cert. denied,* 519 U.S. 854, 117 S.Ct. 150, 136 L.Ed.2d 96 (1996); *Jacobs v. Scott,* 31 F.3d 1319, 1328–29 (5th Cir.1994) (holding the same), *cert. denied,* 513 U.S. 1067, 115 S.Ct. 711, 130 L.Ed.2d 618 (1995). Furthermore, this Court has specifically rejected each of the arguments offered by petitioner in support of this claim. *See Prieto v. Dretke,* 386 F.Supp.2d 767, 807–09 (W.D.Tex.2005) (holding because Texas capital sentencing juries are not required to weigh aggravating factors against mitigation factors, neither *Mills* nor *McKoy* furnishes a basis for challenging the Texas 10–12 rule).

Finally, extension of the rules in *Mills* or *McKoy* to Texas capital trials is foreclosed by the rule in *Teague. See Beard v. Banks,* 542 U.S. 406, 416, 124 S.Ct. 2504, 2513, 159 L.Ed.2d 494 (2004) (holding *Mills* announced a new rule for *Teague* purposes); *Hughes v. Dretke,* 412 F.3d 582, 594 (5th Cir.2005) (holding extension of the rule in *Mills* to Texas foreclosed by *Teague* ), *cert. denied,* —— U.S. ——, 126 S.Ct. 1347, 164 L.Ed.2d 60 (2006) (No. 05–7107); *Prieto v. Dretke,* 386 F.Supp.2d at 810–11 (holding *Teague* forecloses extension of the rules in *Mills* and *McKoy* to Texas).

The state habeas court's rejection of this claim on the merits was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial and habeas corpus proceedings.

### X. *No "Hung Jury" Instruction*

#### A. *The Claim*

Petitioner argues the failure of the trial court to instruct his jury at the punishment-phase of trial regarding the impact of a single hold-out juror on any of the capital sentencing special issues violated the Eighth Amendment.[276]

#### B. *State Court Disposition*

The state habeas court summarily rejected this claim on the merits.[277]

#### C. *AEDPA Analysis*

The Supreme Court rejected the arguments underlying this claim when it explained in *Jones v. United States,* 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d . 370 (1999), the Eighth Amendment does not require a capital sentencing jury be instructed as to the effect of a "breakdown in the deliberative process," because: (1) the refusal to give such an instruction does not affirmatively mislead the jury regarding the effect of its verdict and (2) such an instruction might well undermine the strong governmental interest in having the jury express the conscience of the community on the ultimate question of life or death. *Jones v. United States,* 527 U.S. at 382, 119 S.Ct. at 2099. The Supreme Court has never held the Constitution mandates a jury instruction of the type requested by petitioner in this claim.

Furthermore, the Fifth Circuit has repeatedly rejected efforts identical to petitioner's to shoehorn the Supreme Court's holding in *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), into the dissimilar context of a Texas capital trial. In *Caldwell,* the Supreme Court addressed an instance in which a prosecutor's jury argument, in a capital case, suggested, in an erroneous and misleading manner, the jury was not the final

---

**276.** Petition, at pp. 138–39.

**277.** State Habeas Transcript, at p. 256.

arbiter of the defendant's fate.[278] To establish a *Caldwell* violation, "a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams,* 489 U.S. 401, 407, 109 S.Ct. 1211, 1215, 103 L.Ed.2d 435 (1989); *Miniel v. Cockrell,* 339 F.3d 331, 342 (5th Cir. 2003), *cert. denied,* 540 U.S. 1179, 124 S.Ct. 1413, 158 L.Ed.2d 81 (2004); *Hughes v. Johnson,* 191 F.3d 607, 618 (5th Cir.1999), *cert. denied,* 528 U.S. 1145, 120 S.Ct. 1003, 145 L.Ed.2d 945 (2000); *Montoya v. Scott,* 65 F.3d 405, 420 (5th Cir.1995), *cert. denied,* 517 U.S. 1133, 116 S.Ct. 1417, 134 L.Ed.2d 542 (1996); *Sawyer v. Butler,* 881 F.2d 1273, 1285 (5th Cir.1989), *affirmed sub nom. Sawyer v. Smith,* 497 U.S. 227, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990).

In reviewing a *Caldwell* claim, the proper inquiry is whether under all the facts and circumstances, including the entire trial record, the state has misled the jury regarding its role under state law to believe the responsibility for determining the appropriateness of the imposition of the death penalty rests elsewhere. *See Miniel v. Cockrell,* 339 F.3d at 342–44 (holding state court reasonably concluded no *Caldwell* violation resulted from prosecutor's accurate explanation during individual voir dire of the state and federal appellate opportunities available to a Texas capital defendant sentenced to death); *Barrientes v. Johnson,* 221 F.3d 741, 776–78 (5th Cir. 2000), *cert. dismissed,* 531 U.S. 1134, 121 S.Ct. 902, 148 L.Ed.2d 948 (2001) (holding trial court's voir dire instructions informing jury the court would impose sentence, not the jury, but specifically explaining how the jury's answers to the capital sentencing special issues would require the court to impose either a sentence of life or death did not result in a *Caldwell* violation); *Hughes v. Johnson,* 191 F.3d at 618 (holding voir dire explanations to potential jurors of the impact of affirmative answers to the Texas capital sentencing special issues were sufficient to avoid any possibility the jurors misunderstood their role or the effect of their punishment-phase verdict); *Montoya v. Scott,* 65 F.3d 405, 420 (5th Cir.1995) (holding a Texas trial court's instructions during voir dire which were remarkably similar to the prosecution's statements accurately explaining the Texas special sentencing issues in a capital murder trial and the effect of the jury's answers to those issues did not violate the holding in *Caldwell* ), *cert. denied,* 517 U.S. 1133, 116 S.Ct. 1417, 134 L.Ed.2d 542 (1996); *Mann v. Scott,* 41 F.3d 968, 984 (5th Cir.1994) (holding a prosecutor's statements during closing argument to the effect the jury knew the defendant would not be executed the same night the jury returned its verdict at the punishment-phase of trial did not violate the holding in *Caldwell* ), *cert. denied,* 514 U.S. 1117, 115 S.Ct. 1977, 131 L.Ed.2d 865 (1995); *Sawyer v. Butler,* 881 F.2d at 1285–86 (holding a *Caldwell* violation requires a showing that, under all the facts and circumstances, the State misled the jury regarding its role under state law to believe responsibility for determining the appropriateness of the death penalty rested elsewhere).

This Court has rejected complaints similar to petitioner's premised on conclusory assertions of *Caldwell* violations because the failure to instruct a Texas capital sen-

---

**278.** In *Caldwell,* the Supreme Court held the following statement by the prosecution during its closing argument undermined reliable exercise of jury discretion:

> Now, [the defense] would have you believe that you're going to kill this man and they know—they know that your decision is not the final decision. My God, how unfair can they be? Your job is reviewable. They know it.

*Caldwell v. Mississippi,* 472 U.S. at 325 & 329, 105 S.Ct. at 2637 & 2639.

tencing jury regarding the impact of a single hold-out juror neither: (1) precludes the jury from considering any potential mitigating evidence, nor (2) implicitly suggests an authority other than the jury will be the ultimate arbiter of the defendant's fate. *Prieto v. Dretke,* 386 F.Supp.2d at 809–10; *Brown v. Dretke,* No. Civ. A.SA01CA0241–XR, 2004 WL 2793266, at *13–14 (W.D.Tex. Dec.3, 2004), *cert. of appealability denied,* 419 F.3d 365 (5th Cir. 2005), *cert. denied,* —— U.S. ——, 126 S.Ct. 1434, 164 L.Ed.2d 137 (2006) (No. 05–8258); *Cockrell v. Cockrell,* No. Civ. SA–99–CA–1119–FB, 2003 WL 1906163, at *25 (W.D.Tex. March 31, 2003), *cert. of appealability denied,* 88 Fed.Appx. 34 (5th Cir.), *cert. denied,* 543 U.S. 942, 125 S.Ct. 367, 160 L.Ed.2d 253 (2004).

Petitioner identifies no remarks or comments made by the prosecution during closing argument at the punishment-phase of petitioner's trial, or at any other stage of petitioner's trial court proceedings, which suggested any authority other than the jury would ultimately decide petitioner's fate. Nothing in the trial court's jury instructions at the punishment-phase of petitioner's trial could be construed as suggesting any authority other than the jury would be the ultimate arbiter of petitioner's sentence. On the contrary, the state trial court correctly advised the jury of the exact impact of its findings on each of the two capital sentencing special issues.[279] Therefore, nothing said by the prosecution in its closing argument or included or excluded from the petitioner's punishment-

phase jury instructions violated the principle recognized in *Caldwell.* As the Supreme Court held in *Jones,* the Eighth Amendment does not require a capital sentencing jury be advised regarding the effect of a hung jury.

Finally, respondent correctly points out adoption of the new rule advocated by petitioner in this claim is foreclosed by the non-retroactivity principle of *Teague. Prieto v. Dretke,* 386 F.Supp.2d at 810–11.

The state habeas court's rejection on the merits of this claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial and habeas corpus proceedings.

## XI. *Admission of Evidence of Unadjudicated, Extraneous, Misconduct*

### A. *The Claim*

Petitioner argues the trial court erred in admitting evidence of unadjudicated, extraneous offenses during the punishment-phase of petitioner's capital trial in violation of the Eighth Amendment.[280]

### B. *State Court Disposition*

The state habeas court summarily rejected this claim on the merits.[281]

---

**279.** The trial court instructed petitioner's jury at the punishment-phase of trial, in pertinent part, as follows:

You are instructed that if the jury returns an affirmative finding on the first issue submitted, and a negative finding on the second issue, this Court shall sentence the defendant to death. If the jury returns a negative finding on the first issue or an affirmative finding as to the second issue,

the court shall sentence the defendant to confinement in the Institutional Division of the Texas Department of Criminal Justice for life.
Trial Transcript, at p. 197.

**280.** Petition, at pp. 139–41.

**281.** State Habeas Transcript, at pp. 256–57.

## C. *AEDPA Analysis*

■ As explained in Section III.E.9.c. above, the Constitution neither prohibits the admission of evidence at the punishment-phase of a capital trial showing the defendant engaged in extraneous, unadjudicated, criminal conduct nor requires unadjudicated, extraneous offenses be proven beyond a reasonable doubt before evidence of same may be admitted during the punishment-phase of a capital trial. *Brown v. Dretke,* 419 F.3d 365, 376 (5th Cir.2005), *cert. denied,* —— U.S. ——, 126 S.Ct. 1434, 164 L.Ed.2d 137 (2006) (No. 05–8258); *Hughes v. Dretke,* 412 F.3d at 592–93; *Gutierrez v. Dretke,* 392 F.Supp.2d 802, 870–72 (W.D.Tex.2005).

The state habeas court's rejection on the merits of this claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial and habeas corpus proceedings.

## XII. *Open–Ended Discretion for Sentencing Jury*

### A. *The Claim*

■ Petitioner argues the Texas capital sentencing scheme violates the Eighth Amendment because it grants to the capital sentencing jury open-ended discretion to impose or withhold the death penalty.[282]

### B. *State Court Disposition*

The state habeas court summarily rejected this claim on the merits.[283]

### C. *AEDPA Analysis*

For the reasons discussed above in Sections VI and VII, the Supreme Court's opinion in Tuilaepa expressly authorizes Texas capital sentencing juries to exercise open-ended discretion when answering the Texas capital sentencing special issues. *Tuilaepa v. California,* 512 U.S. at 979–80, 114 S.Ct. at 2639 (holding a capital sentencing jury "may be given 'unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty' "). Because the "eligibility" decision is made at the guilt-innocence phase of a Texas capital trial, petitioner's complaint about the exercise of "open-ended discretion" by a Texas capital sentencing jury does not furnish an arguable basis for a federal constitutional claim. *See Salazar v. Dretke,* 393 F.Supp.2d 451, 488–91 (W.D.Tex. 2005) (holding: (1) Texas is not a weighing jurisdiction, (2) the "eligibility" determination mandated by Supreme Court's Eighth Amendment jurisprudence occurs during the guilt-innocence phase of a Texas capital trial, (3) therefore, the Texas capital sentencing special issues need not be accompanied by definitions of every term contained therein because those terms are susceptible of a logical, common sense interpretation by rational jurors, and (4) nothing in the Texas capital sentencing scheme's allegedly vague special issues precluded the jury's consideration of any identified mitigating evidence).

The state habeas court's rejection on the merits of this claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial and habeas corpus proceedings.

---

**282.** Petition, at pp. 142–44.

**283.** State Habeas Transcript, at p. 257.

## XIII. Narrow Statutory Definition of "Mitigating Evidence"

### A. The Claim

Petitioner argues Texas' statutory definition of "mitigating evidence" is unconstitutionally narrow on its face because it is limited to evidence which reduces a defendant's moral blameworthiness or death worthiness.[284]

### B. State Court Disposition

The state habeas court concluded: (1) petitioner procedurally defaulted on this complaint by failing to timely object to the definition used in his punishment-phase jury charge; (2) the argument had no merit; and (3) petitioner's punishment-phase jury instructions did not unconstitutionally limit the jury's ability to consider any mitigating evidence properly before it during the punishment-phase of petitioner's trial.[285]

### C. Procedural Default

 Petitioner does not allege any specific facts establishing his trial counsel's failure to timely object to the statutory definition of "mitigating evidence" contained in petitioner's punishment-phase jury charge constituted ineffective assistance. Likewise, petitioner has alleged no specific facts sufficient to satisfy the fundamental miscarriage of justice exception to the procedural default doctrine. Therefore, petitioner cannot overcome his state procedural default on this claim and federal habeas review of same is precluded.

### D. AEDPA Analysis

 The Supreme Court has established the constitutional standard for evaluating the propriety of a jury instruction at the punishment-phase of a capital murder trial as "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990). The Supreme Court has consistently applied this standard to evaluate challenges to punishment-phase jury instructions. See Weeks v. Angelone, 528 U.S. 225, 226, 120 S.Ct. 727, 729, 145 L.Ed.2d 727 (2000) (emphasizing the Boyde test requires a showing of a reasonable likelihood, as opposed to a mere possibility, the jury construed the jury instructions to preclude its consideration of relevant mitigating evidence); Jones v. United States, 527 U.S. 373, 390 & n. 9, 119 S.Ct. 2090, 2102–03 & n. 9, 144 L.Ed.2d 370 (1999) (holding the same); Calderon v. Coleman, 525 U.S. 141, 146, 119 S.Ct. 500, 503, 142 L.Ed.2d 521 (1998) (holding the same); Buchanan v. Angelone, 522 U.S. 269, 276, 118 S.Ct. 757, 761, 139 L.Ed.2d 702 (1998) (holding the same); Johnson v. Texas, 509 U.S. 350, 367, 113 S.Ct. 2658, 2669, 125 L.Ed.2d 290 (1993) (holding Boyde requires a showing of a reasonable likelihood the jury interpreted the jury instructions so as to preclude it from considering relevant mitigating evidence).

This "reasonable likelihood" standard does not require the petitioner to prove the jury "more likely than not" interpreted the challenged instruction in an impermissible way; however, the petitioner must demonstrate more than "only a possibility" of an impermissible interpretation. Johnson v. Texas, 509 U.S. at 367, 113 S.Ct. at 2669; Boyde v. California, 494 U.S. at 380, 110 S.Ct. at 1198. This Court must analyze the challenged language included in

---

284. Petition, at pp. 144–46.

285. State Habeas transcript, at pp. 257–59.

the jury charge within the context of the overall jury charge. *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). "In evaluating the instructions, we do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would—with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.'" *Johnson v. Texas,* 509 U.S. at 368, 113 S.Ct. at 2669 (quoting *Boyde v. California,* 494 U.S. at 381, 110 S.Ct. at 1198).

At the time of petitioner's trial, Section 2(f)(4) of Article 37.071 of the Texas Code of Criminal Procedure directed the trial court to instruct a capital sentencing jury in connection with the final capital sentencing special issue, i.e., the "mitigation" special issue, it "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." In conformity with this statutory directive, petitioner's trial court instructed petitioner's jury as follows:

> You are instructed that, in answering this second question, you shall consider "mitigating evidence" to be evidence that a juror might regard as reducing the Defendant's moral blameworthiness or deathworthiness.[286]

Petitioner's arguments in support of his penultimate claim herein misconstrue the appropriate constitutional standard for evaluating the propriety of jury instructions at the punishment-phase of a capital trial. As explained above, in *Boyde v. California,* the Supreme Court identified the proper inquiry in reviewing capital sentencing jury instructions as whether there is a reasonable likelihood the jury applied the challenged instructions in a way that prevented the consideration of

constitutionally relevant evidence. *Boyde,* 494 U.S. at 380, 110 S.Ct. at 1198. Thus, the federal constitutional issue properly before the state habeas court in connection with petitioner's challenge to the statutory definition of "mitigating evidence" contained in Article 37.071, § 2(f)(4) was not whether the statutory language in question satisfied some abstract definition of the term "mitigating evidence" but, rather, whether the jury instructions actually given during the punishment-phase of petitioner's trial could reasonably be construed as precluding the jury from giving mitigating effect to any of the evidence properly before the jury at the punishment-phase of petitioner's capital trial.

Petitioner does not identify any mitigating evidence he presented during his trial which he claims his jury was precluded from considering because of the allegedly narrow definition of "mitigating evidence" included in the Texas capital sentencing statute and incorporated in petitioner's punishment-phase jury instructions. Having independently reviewed the entire record from petitioner's capital trial, this Court has been unable to identify any potentially mitigating evidence which a rational jury could have construed as outside its consideration at the punishment-phase of petitioner's trial because of the definition of "mitigating evidence" included in petitioner's punishment-phase jury instructions. In connection with the future dangerousness special issues, the trial court's punishment-phase jury instructions specifically directed petitioner's jury to consider "all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the Defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death

---

**286.** Trial Transcript, at p. 197.

penalty." [287] Furthermore, the mitigation or *Penry* special issue itself directed petitioner's jury to take into consideration "all the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant" when answering that special issue.[288] Finally, the mitigation or *Penry* special issue inquired whether "there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." [289] Nothing in petitioner's punishment-phase jury instructions, including the statutory definition of "mitigating evidence," purported to limit the jury's ability to consider any evidence relating to the petitioner's background or character or the circumstances of the offense as a mitigating circumstance. Thus, the petitioner's punishment-phase jury instructions, including the definition of "mitigating evidence" included therein, did not violate the standard set forth in *Boyde*.

Insofar as petitioner's penultimate claim herein constitutes a facial attack on the constitutionality of the Texas capital sentencing statute's definition of "mitigating evidence," this claim lacks merit. There is no clearly established federal law in the form of Supreme Court precedent mandating a definition of "mitigating evidence" broader than the one set forth in the Texas statute. The Texas statutory definition is fully consistent with the evolving notion of "mitigating evidence" contained in Supreme Court and Fifth Circuit precedent. *See Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir.2001) (holding the same Texas statutory definition of "mitigating evidence" challenged by petitioner herein did not unconstitutionally preclude jury con-

sideration of the mitigating aspects of any evidence of the defendant's character or background or the circumstances of the offense which the defendant presented at trial), *cert. denied*, 534 U.S. 945, 122 S.Ct. 329, 151 L.Ed.2d 243 (2001); *Cordova v. Johnson*, 993 F.Supp. 473, 489–98 (W.D.Tex.) (discussing the Supreme Court's analysis of mitigating evidence), *appeal denied*, 157 F.3d 380 (5th Cir.1998), *cert. denied*, 525 U.S. 1131, 119 S.Ct. 922, 142 L.Ed.2d 971 (1999). The Supreme Court's recent opinion in *Tennard v. Dretke*, 542 U.S. 274, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004), is not to the contrary. *See Tennard*, 542 U.S. at 285–88, 124 S.Ct. at 2571–72 (holding evidence of significantly impaired intellectual functioning is inherently mitigating in nature because it might serve as a basis for a sentence of less than death, even in the absence of evidence showing a nexus between the defendant's impaired intellectual functioning and his offense).

■ The Supreme Court has expressly held that states are not limited to submitting narrow special issues to the jury when the sentencing jury reaches the selection phase of a capital sentencing proceeding. More specifically, the Supreme Court held in *Tuilaepa* that at the selection stage, the states are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment." *Tuilaepa*, 512 U.S. at 978, 114 S.Ct. at 2638. Finally, the Supreme Court has made it clear that states are permitted to guide the discretion exercised

---

**287.** Trial Transcript, at p. 196.

**288.** Trial Transcript, at pp. 196–97.

**289.** Trial Transcript, at p. 197.

by capital sentencing juries as long as the jury is not precluded from giving mitigating effect to evidence that does lessen the defendant's moral culpability or blameworthiness for his crime. *See Johnson v. Texas,* 509 U.S. 350, 362, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993) (holding: (1) there is no constitutional requirement of unfettered sentencing discretion in the jury, and (2) states are free to "structure and shape consideration of mitigating evidence in an effort to achieve a more rational and equitable administration of the death penalty."); *Boyde v. California,* 494 U.S. at 377, 110 S.Ct. at 1196 (holding the same). The Texas statutory definition of "mitigating evidence" is a proper method of guiding the discretion exercised by a capital sentencing jury.

The state habeas court's rejection on the merits of this claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial and habeas corpus proceedings.

## XIV. *Texas Death Penalty "Cruel and Unusual" As Applied*

### A. *The Claim*

Petitioner argues in conclusory fashion the Texas capital sentencing scheme "as presently administered" violates the Eighth Amendment.[290] However, petitioner offers this Court no analysis of why the current method of administering capital punishment in Texas violates the Constitution. The issue remains pending, however, in other courts

### B. *State Court Disposition*

The state habeas court summarily rejected this claim on the merits.[291]

### C. *AEDPA Analysis*

Petitioner made no effort during his state habeas corpus proceeding to present any evidence suggesting any constitutional deficiency currently exists in the manner in which Texas implements the death penalty. Petitioner also failed to allege any specific facts in his state habeas pleadings suggesting any constitutional deficiency existed with the manner in which Texas executed capital offenders sentenced to death.

Conclusory assertions on an ultimate issue do not furnish a basis for federal habeas relief. *See Kinnamon v. Scott,* 40 F.3d 731, 735 (5th Cir.) (holding a petitioner's speculative complaints of ineffective assistance by appellate counsel did not warrant federal habeas relief), *cert. denied,* 513 U.S. 1054, 115 S.Ct. 660, 130 L.Ed.2d 595 (1994); *Anderson v. Collins,* 18 F.3d 1208, 1221 (5th Cir.1994) (holding without a specific, affirmative showing of precisely what evidence or testimony was rendered unavailable due to a trial counsel's failure to investigate, develop, and present same, i.e., a showing of exactly what the missing evidence or testimony would have been, a court cannot begin to apply the *Strickland* analysis because it is very difficult to determine whether the defendant was prejudiced by any such deficiencies in counsel's performance).

The Supreme Court has emphasized legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those

---

**290.** Petition, at pp. 146–47.

**291.** State Habeas Transcript, at p. 259.

principles. *Yarborough v. Alvarado,* 541 U.S. 652, 661, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'" (quoting *Lockyer v. Andrade,* 538 U.S. 63, 71–72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003))). The only legal support petitioner identifies in support of his final claim herein consists of a dissenting opinion written by a single Supreme Court Justice. The dissenting opinion in question does not furnish a basis for determining the precise contours of "clearly established" federal law for purposes of the AEDPA. Thus, petitioner has failed to allege any facts showing the state habeas court's rejection on the merits of petitioner's final claim herein was inconsistent with clearly established federal law.

■ This Court is aware constitutional challenges have been raised recently to the method currently employed by the State of Texas to execute capital offenders sentenced to death. *See Hughes v. Johnson,* No. 06–70010, 2006 WL 637906, at * 1 (5th Cir. Mar.14, 2006) (affirming the dismissal as untimely of a section 1983 challenge to the Texas method of execution by lethal injection); *Smith v. Johnson,* No. 06–70007, 440 F.3d 262, 263, 2006 WL 330114, at *1 (5th Cir. Feb.14, 2006) (affirming the dismissal as untimely of section 1983 challenge to Texas' method of lethal injection); *Neville v. Johnson,* 440 F.3d 221, 222 (5th Cir.2006) (holding the same); *White v. Johnson,* 429 F.3d 572, 573–74 (5th Cir. 2005) (holding the same); *Harris v. Johnson,* 376 F.3d 414, 416–17 (5th Cir.2004) (reversing a district court's grant of a temporary restraining order in a section 1983 challenge to the Texas method of execution by lethal injection on the ground the plaintiff was dilatory in seeking equitable re-

lief). Unlike those actions, petitioner furnished the state habeas court with no fact specific allegations and no evidence establishing the method of lethal injection currently employed by the State of Texas to execute convicted capital offenders causes excessive or excruciating pain or otherwise violates evolving standards of decency. Likewise, petitioner has presented this Court with no evidence addressing the propriety of the current method of execution by lethal injection in Texas. Petitioner's pleadings in this Court identify no alleged defect in the method of lethal injection employed by the State of Texas. On the contrary, petitioner's pleadings in both this Court and the state courts addressed the propriety of all forms of capital punishment, regardless of the specific method of execution employed. Insofar as petitioner's pleadings in this Court could be construed as asserting a constitutional defect in the current method of execution by lethal injection in Texas, any such claim is unexhausted and, therefore, procedurally defaulted. Thus, nothing in this opinion should be construed as addressing the constitutional propriety of the current method of execution by lethal injection employed by the State of Texas.

The state habeas court's rejection on the merits of this conclusory claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial and habeas corpus proceedings.

### XV. *Pro Se Motion to Dismiss*

On October 11, 2005 (Docket entry no. 16) and December 27, 2005 (Docket entry no. 17), petitioner filed a pair of *pro se* motions seeking to dismiss this cause. However, petitioner did not include therein a certificate of service in either of his motions indicating he had sent a copy of

his motion to any counsel of record herein, including his own. Nor did petitioner indicate he had consulted with counsel for any party before filing his *pro se* motions. Petitioner also did not sign his latter motion. Petitioner is not entitled to hybrid representations in this cause. There is no constitutional right to hybrid representation. *United States v. Ogbonna,* 184 F.3d 447, 449 n. 1 (5th Cir.), *cert. denied,* 528 U.S. 1055, 120 S.Ct. 600, 145 L.Ed.2d 498 (1999); *Myers v. Johnson,* 76 F.3d 1330, 1335 (5th Cir.1996); *Neal v. State,* 870 F.2d 312, 315–16 (5th Cir.1989); *United States v. Norris,* 780 F.2d 1207, 1211 (5th Cir.1986); *United States v. Daniels,* 572 F.2d 535, 540 (5th Cir.1978). There is likewise no right to hybrid representation on appeal. *Dyer v. Johnson,* 108 F.3d 607, 609 (5th Cir.1997). Therefore, this Court will strike petitioner's *pro se* motions.

## XVI. *Certificate of Appealability*

The AEDPA converted the "certificate of probable cause" that was required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a Certificate of Appealability ("CoA"). *See Hill v. Johnson,* 114 F.3d 78, 80 (5th Cir.1997) (recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson,* 114 F.3d 43, 45 (5th Cir.1997) (holding the standard for obtaining a CoA is the same as for a CPC). The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA. *Robison v. Johnson,* 151 F.3d 256, 259 n. 2 (5th Cir.1998), *cert. denied,* 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999); *Hallmark v. Johnson,* 118 F.3d 1073, 1076 (5th Cir.1997), *cert. denied sub nom. Monroe v. Johnson,* 523

U.S. 1041, 118 S.Ct. 1342, 140 L.Ed.2d 502 (1998).

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller–El v. Cockrell,* 537 U.S. 322, 335–36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); 28 U.S.C. § 2253(c)(2). Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell,* 301 F.3d 656, 658 n. 10 (5th Cir.2002) (holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain,* 227 F.3d 228, 230 n. 2 (5th Cir.2000) (holding the same); *Lackey v. Johnson,* 116 F.3d 149, 151 (5th Cir.1997) (holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted. *Crutcher v. Cockrell,* 301 F.3d at 658 n. 10; *Lackey v. Johnson,* 116 F.3d at 151; *Hill v. Johnson,* 114 F.3d at 80; *Muniz v. Johnson,* 114 F.3d at 45; *Murphy v. Johnson,* 110 F.3d 10, 11 n. 1 (5th Cir.1997); 28 U.S.C. § 2253(c)(3).

A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke,* 542 U.S. 274, 282, 124 S.Ct. 2562, 2569, 159 L.Ed.2d 384 (2004); *Miller–El v. Cockrell,* 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel,* 529 U.S. 473, 483, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000); *Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983). To make such a showing, the petitioner need not show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree that) the

petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke*, 542 U.S. at 282, 124 S.Ct. at 2569; *Miller–El v. Cockrell*, 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604; *Barefoot v. Estelle*, 463 U.S. at 893 n. 4, 103 S.Ct. at 3394 n. 4. This Court is authorized to address the propriety of granting a CoA *sua sponte*. *Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir.2000).

■ The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the district court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller–El v. Cockrell*, 537 U.S. at 338, 123 S.Ct. at 1040 (quoting *Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604); *accord Tennard v. Dretke*, 542 U.S. at 282, 124 S.Ct. at 2569. In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists ·of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and whether this Court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604 (holding when a district court denies a habeas claim on procedural

grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether: (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

■ In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Cardenas v. Dretke*, 405 F.3d 244, 248 (5th Cir. 2005), *petition for cert. filed*, (U.S. July 12, 2005) (No. 05–5304); *Miller v. Dretke*, 404 F.3d 908, 913 (5th Cir.2005); *Martinez v. Dretke*, 404 F.3d 878, 884 (5th Cir.), *cert. denied*, —— U.S. ——, 126 S.Ct. 550, 163 L.Ed.2d 466 (2005); *Bigby v. Dretke*, 402 F.3d 551, 557 (5th Cir.), *cert. denied*, —— U.S. ——, 126 S.Ct. 239, 163 L.Ed.2d 221 (2005); *Matchett v. Dretke*, 380 F.3d 844, 848 (5th Cir.2004), *cert. denied*, 543 U.S. 1124, 125 S.Ct. 1067, 160 L.Ed.2d 1074 (2005).

A criminal trial is not a proceeding in which everything not prohibited is required of defense counsel. *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir.1992), *cert. denied*, 510 U.S. 829, 114 S.Ct. 97, 126 L.Ed.2d 64 (1993). Petitioner ignores the overwhelming evidence at his capital trial establishing his guilt and compelling any rational juror to answer the capital sentencing special issues in a manner favorable to the prosecution. The evidence of petitioner's confession and the eyewitness trial testimony of Belinda Prado, which petitioner directed his trial counsel not to challenge through cross-examination, supports petitioner's conviction for capital murder. The horrific details of petitioner's offense and petitioner's own remorseless, unrepentant demeanor during his punishment-phase testimony also support a rational jury finding that: (1) there was a substantial likelihood petitioner would

commit more violent acts, and (2) there was were no mitigating circumstances warranting a life sentence for petitioner. Petitioner has alleged no specific facts or furnished any evidence showing there was anything within the bounds of ethical conduct petitioner's trial counsel could have done to change either of those inevitabilities.

All of petitioner's ineffective assistance claims are either without factual support in the record (e.g., his complaint about his trial counsel's failure to object to the admission of petitioner's adult magazines) or foreclosed by any rational construction of the dual prongs of *Strickland*. This Court independently concludes none of petitioner's ineffective assistance claims satisfy either prong of *Strickland*. Admittedly, it is possible for reasonable jurists to disagree over whether petitioner's trial counsel rendered deficient performance by failing to: object or interject himself more vigorously during the pretrial hearing when the prosecutor verbally sparred with petitioner, object to the prosecutor's references during jury argument to petitioner as a "mass murderer," and object to innocuous hearsay contained in petitioner's pen packet. However, no reasonable jurist could disagree with the state habeas court's conclusion that none of these alleged deficiencies in petitioner's trial counsel's performance "prejudiced" petitioner within the meaning of *Strickland*. In fact, this Court's independent review of the record from petitioner's trial and state habeas corpus proceeding compels the conclusion that none of petitioner's complaints about his trial counsel's performance satisfy the prejudice prong of *Strickland*.

Scrutiny of the record from petitioner's trial and state habeas corpus proceedings leads to the conclusion petitioner himself undermined his trial counsel's ability to obtain a favorable result for petitioner at either phase of trial. Petitioner chose not to testify until the punishment-phase of his trial. Because petitioner's testimonial repudiation of his confession was not before the jury, his trial counsel lacked the means to effectively raise a reasonable doubt during the guilt-innocence phase of trial as to the accuracy of petitioner's highly inculpatory confession. Instead, petitioner chose to wait until the punishment-phase of his trial to repudiate his confession. By repudiating his confession after the jury had already convicted him, petitioner undermined his trial counsel's ability to argue the expressions of remorse petitioner included in his confession justified granting petitioner a life sentence.

During his trial testimony, petitioner candidly admitted he had requested his trial counsel not to cross-examine Belinda Prado. By not cross-examining Belinda Prado during the guilt-innocence phase of trial, and not repudiating his confession until the punishment-phase of trial, petitioner deprived his trial counsel of the only available means of effectively challenging the prosecution's case at the guilt-innocence phase of trial. Together with petitioner's confession, Belinda's unchallenged guilt-innocence-phase testimony supports a guilty verdict. By instructing his trial counsel not to cross-examine Belinda Prado during the punishment-phase of trial and testifying in the manner in which he did at the punishment-phase of his trial, petitioner effectively painted himself and his trial counsel into a corner from which it was impossible to extricate petitioner. The overwhelming evidence at the punishment-phase of petitioner's capital trial precludes any conclusion there was anything petitioner's trial counsel could have done which might have prevented petitioner's jury from answering the capital sentencing special issues in the manner in which it did.

All of petitioner's constitutional challenges to the Texas capital sentencing scheme, both on its face and as applied to his case, are foreclosed by well-settled Supreme Court and Fifth Circuit precedent and have been repeatedly rejected by this Court in similar cases. In fact, a number of petitioner's purported constitutional challenges ignore the Supreme Court's holding in *Tuilaepa*. Petitioner makes no effort to distinguish the Supreme Court's holding in *Tuilaepa*, nor any of the many opinions of the Fifth Circuit and this Court rejecting claims identical to petitioner's constitutional challenges herein to the Texas capital sentencing scheme.

Therefore, petitioner is not entitled to a Certificate of Appealability with regard to any of his claims herein.

Accordingly, it is hereby **ORDERED** that:

1. All relief requested in petitioner's federal habeas corpus petition, filed June 24, 2004, docket entry no. 8, is **DENIED.**

3. Petitioner's *pro se* motions to dismiss, filed October 11, 2005, docket entry no. 16, and December 27, 2005, docket entry no. 17, are **STRICKEN.**

4. All other pending motions are **DISMISSED AS MOOT.**

5. Petitioner is **DENIED** a Certificate of Appealability.

6. The Clerk shall prepare and enter a Judgment in conformity with this Memorandum Opinion and Order.

It is so **ORDERED.**